IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA
EASTERN DIVISION

Turtle Mountain Band of Chippewa
Indians, Spirit Lake Tribe, Wesley Davis,
Zachery S. King, and Collette Brown.

Case No. _____

v.

ALVIN JAEGER, in his official capacity as
Secretary of State of North Dakota.

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

Pursuant to 52 U.S.C. § 10310 and 42 U.S.C. § 1983, Plaintiffs file this action challenging North Dakota's legislative redistricting as a violation of Section 2 of the Voting Rights Act. The new redistricting law dilutes the voting strength of Native American voters from the reservations of the Turtle Mountain Band of Chippewa Indians and the Spirit Lake Tribe by packing and cracking those voters, reducing from two to one the number of state house seats in which Native American voters in this region of the state have an opportunity to elect their candidate of choice.

**INTRODUCTION**

1.      On November 11, 2021, Governor Doug Burgum signed into law House Bill No. 1504 ("HB 1504"), redrawing North Dakota's state legislative districts to account for

population shifts captured by the 2020 Census. H.B. 1504, 67th Leg., Spec. Sess. (N.D. 2021).

2.      HB 1504 establishes an effective Native American voting majority for two state house seats; however, the Voting Rights Act ("Voting Rights Act" or "VRA") requires the establishment of an effective Native American voting majority for three state house seats that will allow Native American voters to elect the candidate of their choice.

3.      North Dakota has 47 state legislative districts, and traditionally one senator and two state representatives are elected at large from each district. However, North Dakota law permits state house representatives to be elected either at-large *or* from subdistricts within a given senatorial district. N.D.C.C. 54-03-01.5(2).

4.      HB 1504 contains two house subdistricts in which Native Americans have a meaningful opportunity to elect candidates of their choice to the North Dakota State House.  Those are House District 9A and House District 4A. Residents of each subdistrict elect only a single representative to the state house.

5.      House District 4A covers the Fort Berthold Indian Reservation of the Mandan, Hidatsa, and Arikara (MHA) Nation.

6.      HB 1504's redistricting plan places the Turtle Mountain Reservation into District 9 (divided into subdistricts 9A and 9B) and the Spirit Lake Reservation into District 15 (with no subdistricts).

7.      By subdividing District 9 and keeping Spirit Lake out of District 9, the plan simultaneously packs Turtle Mountain Band of Chippewa Indians members into one

house district, and cracks Spirit Lake Tribe members out of any majority Native house district.

8.      The packing of Native American voters into a single state house subdistrict, and the cracking of nearby Native American voters into two other districts dominated by white voters who bloc vote against Native American's preferred candidates, unlawfully dilutes the voting rights of Turtle Mountain and Spirit Lake Native Americans in violation of Section 2 of the VRA.

9.      In order to comply with the VRA, North Dakota must implement a redistricting plan in which Native American voters on the Turtle Mountain and Spirit Lake Reservations comprise an effective, geographically compact majority in a single legislative district.  Such a plan can be drawn, is legally required, and would provide those Native American voters the opportunity to elect their preferred candidates to both at-large state house seats and the state senate.

## JURISDICTION AND VENUE

10.      This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331, 1343(a)(3) and (4), and 1357, 42 U.S.C. § 1983, and 52 U.S.C. § 10301, *et seq*. Plaintiffs' action for declaratory and injunctive relief is authorized by 28 U.S.C. §§ 2201 and 2202, as well as Rules 57 and 65 of the Rules of Civil Procedure. Jurisdiction for Plaintiffs' claim for costs and attorneys' fees is based upon Rule 54, 42 U.S.C. § 1988, and 52 U.S.C. § 10310(e).

11.      This court also has jurisdiction pursuant to 28 U.S.C. § 1362, which provides that "district courts shall have original jurisdiction of all civil actions, brought by any Indian tribe or band with a governing body duly recognized by the Secretary of the

3

Interior, wherein the matter in controversy arises under the Constitution, laws, or treaties of the United States."

12.     The Court has personal jurisdiction over Defendant, who resides in this district.

13.     Venue is proper in this Court under 28 U.S.C. §§ 1391(b) and (e). Defendant resides in the State of North Dakota, and Defendant is a state official performing official duties in Bismarck, North Dakota. Plaintiff Tribes and Individual Plaintiffs are located within the State of North Dakota.

## PARTIES

### *Plaintiff - Spirit Lake Tribe (Mni Wakan Oyate)*

14.     Plaintiff Spirit Lake Tribe - Mni Wakan Oyate is a federally recognized Tribe with an enrollment of 7,559 members. 86 Fed. Reg. 7557.

15.     The Spirit Lake Tribe is located on the Spirit Lake Reservation.  The Tribal Headquarters are located at 816 3rd Ave. North, Fort Totten, ND 58335.

16.     The Spirit Lake Reservation is in east central North Dakota, and covers approximately 405 square miles, primarily in Benson County and Eddy County, with parts extending into Nelson, Wells, and Ramsey Counties. The Spirit Lake Reservation was established in 1867 through a treaty between the Sisseton Wahpeton Sioux Bands and the United States. The Treaty forced the relocation of the Sisseton Wahpeton Sioux Bands from a more expansive territory in present-day Minnesota and the Northern Plains onto the Reservation with the Sisseton, Wahpeton and the Cuthead Bands of the

Yanktonais, who had already been forced onto the Reservation. These Bands make up the present-day Spirit Lake Tribe.

17.    Approximately 3,459 Spirit Lake members live on the Spirit Lake Reservation, with more living in surrounding areas. This includes a sizeable population of eligible voters.

18.    HB 1504 places the Spirit Lake Reservation into Legislative District 15, which is comprised of one single-member state senate district and a two-member at-large state house districts.

### Plaintiff - Turtle Mountain Band of Chippewa Indians

19.    Plaintiff Turtle Mountain Band of Chippewa Indians is a federally recognized Tribe with an enrollment of more than 30,000 members. 86 Fed. Reg. 7557.

20.    Today, the Turtle Mountain Band of Chippewa Indians is located on the Turtle Mountain Indian Reservation. Many Turtle Mountain citizens live on the Reservation and in the surrounding areas, including on lands held in trust for the Tribe by the federal government outside the boundaries of the reservation. The Tribal Headquarters are located at 4180 Highway 281, Belcourt, ND 58316.

21.    The Turtle Mountain Reservation covers 72 square-miles in north central North Dakota, located entirely within Rolette County. It is one of the most densely populated reservations in the United States, with a population of 5,113 according in 2020 according to the United States Census Bureau. This includes a sizeable population of eligible voters. Substantial populations of tribal citizens also live in the areas surrounding the Reservation, including Rolla, St. John, Dunseith, and Rolette.

22.     HB 1504 places the Turtle Mountain Indian Reservation into Senate District 9 and House District 9A. Lands held in trust for the Turtle Mountain Band of Chippewa Indians are located in House District 9B.

23.     A substantial population of Turtle Mountain citizens live in House Districts 9A and 9B.

### Individual Voter Plaintiffs

24.     Plaintiffs also include individual Native American voters ("Individual Plaintiffs") who reside in the districts that violate Section 2 of the Voting Rights Act.

25.     Individual Plaintiffs' votes are diluted in violation of Section 2 of the Voting Rights Act because they are either: (a) cracked into districts where Native Americans make up less than a majority of the voting age population and their voting power is overwhelmed by a white bloc voting in opposition to their candidates of choice, as in District 15; or (b) packed into a subdistrict with an excessively high number of Native voters—well above what is necessary to afford them an equal opportunity to elect their preferred candidate—as in House District 9A.

26.     Plaintiff Wesley Davis is Native American and a citizen of the Turtle Mountain Band of Chippewa Indians. Mr. Davis resides on the Turtle Mountain Reservation and within State Senate District 9 and House District 9A. Mr. Davis has lived at his residence for 10 years, has lived on the Turtle Mountain Reservation for 30 years, and is a regular voter in North Dakota elections. Mr. Davis intends to vote in 2022 and future elections.

27.     Plaintiff Zachary S. King is Native American and a citizen of the Turtle Mountain Band of Chippewa Indians. Mr. King resides on the Turtle Mountain Reservation and within State Senate District 9 and House District 9A. Mr. King has lived at this residence for 35 years and is a regular voter in North Dakota elections. Mr. King intends to vote in 2022 and future elections.

28.     Plaintiff Collette Brown is Native American and a citizen of the Spirit Lake Tribe. Ms. Brown resides on the Spirit Lake Reservation and within Legislative District 15. Ms. Brown has lived at this residence for 19 years, has resided on the Spirit Lake Reservation for 43 years and is a regular voter in North Dakota elections. Ms. Brown intends to vote in 2022 and future elections.

*Defendant*

29.     Defendant Alvin Jaeger is sued in his official capacity as Secretary of State of North Dakota. The North Dakota Secretary of State is the State's supervisor of elections and is responsible for "supervis[ing] the conduct of elections," and "publish[ing] . . . a map of all legislative districts." N.D.C.C. §§ 16.1-01-01(1) & (2)(a). He is tasked with "maintain[ing] the central voter file," which "must contain . . . the legislative district . . . in which the [voter] resides." N.D.C.C. §§ 16.1-02-01 & -12(6).

**LEGAL BACKGROUND**

30.     Section 2 of the Voting Rights Act, 52 U.S.C. § 10301(a), prohibits any "standard, practice, or procedure" that "results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color . . . ." 52 U.S.C. § 10301(a). A violation of Section 2 is established if it is shown that "the political processes

7

leading to [a] nomination or election" in the jurisdiction "are not equally open to participation by [minority voters] in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." *Id*. § 10301(b).

31.     The dilution of a racial or ethnic minority group's voting strength "may be caused by the dispersal of [the minority population] into districts in which they constitute an ineffective minority of voters or from the concentration of [the minority population] into districts where they constitute an excessive majority." *Thornburg v. Gingles*, 478 U.S. 30, 46 n.11 (1986).

32.     In *Gingles*, the Supreme Court identified three necessary preconditions ("the *Gingles* preconditions") for a claim of vote dilution under Section 2 of the Voting Rights Act: (1) the minority group must be "sufficiently large and geographically compact to constitute a majority in a single-member district"; (2) the minority group must be "politically cohesive"; and (3) the majority must vote "sufficiently as a bloc to enable it . . . usually to defeat the minority's preferred candidate." 478 U.S. at 50-51.

33.     After the preconditions are established, the statute directs courts to assess whether, under the totality of the circumstances, members of the racial minority group have less opportunity than other members of the electoral to participate in the political process and to elect representatives of their choice. 52 U.S.C. § 10301(b). The Court has directed that the Senate Report on the 1982 amendments to the Voting Rights Act be consulted for its non-exhaustive factors that the court should consider in determining if,

in the totality of the circumstances in the jurisdiction, the operation of the electoral device being challenged results in a violation of Section 2.

34. The Senate Factors include: (1) the history of official voting-related discrimination in the state or political subdivision; (2) the extent of which voting in the elections of the state or political subdivision is racially polarized; (3) the extent to which the state or political subdivision has used voting practices or procedures that tend to enhance the opportunity for discrimination against the minority group; (4) the exclusion of members of the minority group from candidate slating processes; (5) the extent to which the minority group bears the effects of discrimination in areas such as education, employment, and health, which hinder their ability to participate effectively in the political process; (6) the use of overt or subtle racial appeals in political campaigns; and (7) the extent to which members of the minority group have been elected to public office in the jurisdiction.

35. Nevertheless, "there is no requirement that any particular number of factors be proved, or that a majority of them point one way or the other." S. Rep. No. 97-417, 97th Cong. 2d Sess. (1982) at 29.

36. Courts have found violations of Section 2 where district maps "pack" minority voters into a district where they constitute a significant supermajority, diluting their ability to elect a candidate of their choice in surrounding districts. *See Boneshirt v. Hazeltine*, 461 F.3d 1011, 1018 (8th Cir. 2006).

37. Likewise, courts have found Section 2 violations occur where district maps "crack" compact minority populations between districts, thwarting their ability to elect a

candidate of choice in a district encompassing the entire minority population. *See Gingles,*
478 U.S. at 46 n.11; *See also Johnson v. De Grandy*, 512 U.S. 997,1007 (1994).

**FACTS**

38.    All or part of five Indian reservations are within the boundaries of the State
of North Dakota. This includes the entirety of the Fort Berthold Indian Reservation,
where the MHA Nation is located, the Spirit Lake Reservation, where the Spirit Lake
Tribe is located, and the Turtle Mountain Reservation, where the Turtle Mountain Band
of Chippewa Indians is located, as well as northern portions of the Standing Rock
Reservation, where the Standing Rock Sioux Tribe is located, and the Lake Traverse
Reservation, where the Sisseton Wahpeton Oyate is located. A map of the North Dakota
reservations is below.



https://www.indianaffairs.nd.gov/tribal-nations.

39.     According to the 2020 Census, North Dakota has a total population of 779,094, of whom 636,160 (81.7%) are non-Hispanic White, 55,727 (7.2%) are Native American (alone or in combination), and 87,207 (11.2%) are members of other racial or ethnic groups.

40.     According to the 2020 Census, North Dakota has a voting-age population of 596,093, of whom 503,153 (84.4%) are non-Hispanic White, 35,031 (5.9%) are Native American (alone or in combination), and 57,909 (9.7%) are members of other racial or ethnic groups.

41.     The North Dakota legislature commenced its most recent redistricting process following the 2020 U.S. Census in August 2021. Redistricting was driven by the North Dakota Legislative Council Redistricting Committee (the "Redistricting Committee"), a subcommittee of the legislature comprised of eight state house representatives, including the chairman, and eight state senators, including the vice chairman. H.B. 1397, 67th Leg., Reg. Sess. (N.D. 2021).

42.     The Redistricting Committee was charged with developing a legislative redistricting plan to submit to the legislative assembly and implemented in time for use in the 2022 primary election. *Id.* Throughout the process, the Redistricting Committee held hearings in which it received testimony from the public and state legislators regarding legislative plans.

43.     Many of the requests of tribal leaders and native organizations were ignored in the process, including requests to hold Redistricting Committee meetings on or near reservations to allow tribal members to participate.

44.     Chairman Douglas Yankton of the Spirit Lake Tribe and other official representatives of the Spirit Lake Tribe, including Gaming Commission Executive Director Collette Brown (who is also an Individual Plaintiff), provided testimony to the Redistricting Committee on August 26, 2021,[1] September 15, 2021,[2] and September 29, 2021,[3] stating the Spirit Lake Tribe's official position that the Spirit Lake Reservation should be placed into a single state house subdistrict that would improve tribal citizens' representation in the State Legislature.

45.     At no point did the Turtle Mountain Band of Chippewa Indians nor its representatives request that the Tribe's reservation be placed into a single-member state house subdistrict.

46.     On September 29, 2021, the Redistricting Committee adopted its draft final statewide legislative plan and for the first time indicated the Committee's intent to split

---

[1] *Aug. 26 Meeting of the Redistricting Committee*, 2021 Leg., 67th Sess. (N.D. Aug. 26, 2021), https://www.legis.nd.gov/assembly/67-2021/interim/23-5024-03000-meeting-minutes.pdf (minutes); *Testimony of Collette Brown at Aug. 26 Meeting of the Redistricting Committee*, 2021 Leg., 67th Sess. (N.D. Aug. 26, 2021), https://www.legis.nd.gov/files/committees/67-2021/23_5024_03000appendixh.pdf.

[2] *Sep. 15 Meeting of the Redistricting Committee*, 2021 Leg., 67th Sess. (N.D. Sep. 15, 2021), https://www.legis.nd.gov/assembly/67-2021/interim/23-5061-03000-meeting-minutes.pdf (minutes); *Testimony of Collette Brown at the Sep. 15 Meeting of the Redistricting Committee*, 2021 Leg., 67th Sess. (N.D. Sep. 15, 2021), https://www.legis.nd.gov/files/committees/67-2021/23_5061_03000appendixd.pdf (testimony).

[3] *Sep. 28-29 Meeting of the Redistricting Committee*, 2021 Leg., 67th Sess. (N.D. Sep. 28-29, 2021), https://www.legis.nd.gov/assembly/67-2021/interim/23-5063-03000-meeting-minutes.pdf (minutes); *Testimony of Douglas Yankton at the Sep. 28-29 Meeting of the Redistricting Committee*, 2021 Leg., 67th Sess. (N.D. Sep. 28-29, 2021), https://www.legis.nd.gov/files/committees/67-2021/23_5063_03000appendixc.pdf (testimony).

District 9 into two state house subdistricts. The final draft plan included 47 state legislative districts, with two divided into single-member state house subdistricts, Districts 4 and 9.

47.     District 9, which comprises the boundaries of Senate District 9 (SD 9), is divided into single-member House Districts: 9A (HD 9A) and 9B (HD 9B). The Turtle Mountain Indian Reservation is located entirely in HD 9A, while some of the Tribe's trust land and members are located in HD 9B.

48.     The plan did not establish a single-member state house district encompassing the Spirit Lake Reservation. Instead, the Spirit Lake Reservation was located in District 15, which encompasses a single-member state senate district and a two-member at-large state house district.

49.     After reviewing the Redistricting Committee's final proposed plan, officials from the Spirit Lake Tribe and Turtle Mountain Band of Chippewa Indians determined that the best way to prevent the votes of citizens of the Tribal Nations from being diluted and to ensure compliance with the Voting Rights Act would be for the Legislature to adopt a joint legislative district that includes both the Spirit Lake Tribe and the Turtle Mountain Band of Chippewa Indians.

50.     On November 1, 2021, Spirit Lake Chairman Yankton and Turtle Mountain Chairman Azure issued a joint letter to Governor Doug Burgum, House Speaker Kim Koppelman, House Majority Leader Chet Pollert, House Minority Leader Joshua Boschee, Senate Majority Leader Rich Wardner, and Senate Minority Leader Joan Heckman detailing the Tribal Nations' concerns about the proposed map and indicating

the Tribal Nations' request to be placed into a single legislative district encompassing both Tribes' reservations. *See* Exhibit 1.

51.     The letter also put each of these officials on notice that the proposed District 9, which includes HD 9A and HD 9B, as they are currently drawn, would violate the Voting Rights Act and provided an analysis of racially polarized voting in North Dakota.

52.     Along with the letter, the Chairmen delivered a proposed draft of a district encompassing their two Tribal Nations as well as a draft map.

53.     On November 8, 2021, the Redistricting Committee held a hearing during the special legislative session to finalize its plan.

54.     At that meeting on November 8, 2021, Senator Richard Marcellais who represents SD 9 proposed an amendment to the Committee's final legislative map, which would have created a joint legislative district containing the Turtle Mountain Reservation and Spirit Lake Reservation.

55.     During the meeting, the committee heard testimony from Chairman Azure, Chairman Yankton, Senator Marcellais, and Representative Marvin Nelson of District 9 regarding the proposed amendment. Both Chairmen again indicated their Tribal Nations' position that the tribes' reservations should be placed into the same district.

56.     The Committee failed to adopt the amendment, as did the full Senate. Rather, on November 10, 2021, the North Dakota State Legislature passed HB 1504. Governor Burgum signed the bill into law the following day.

*Native Americans' Voting Strength Is Diluted by the Configuration of Districts 9A, 9B, and 15*

57.     HB 1504 packs Native American voters in District 9A, while cracking other Native American voters in Districts 9B and 15.

58.     House District 9A has a Native Voting-Age Population of 79.79 percent and is centered in Rolette.

59.     House District 9B has a Native American Voting-Age Population of 32.23 percent, cracking apart Native American populations near St. John and Turtle Mountain Trust lands from those in District 9A.

60.     Spirit Lake's Native American population is submerged into District 15, which has a Native American Voting-Age Population of 23.08 percent.

**Gingles** *Prong 1: Native American Voters Form a Geographically Compact Majority in an Alternative District with Two State House Seats*

61.     Native Americans living on and around the Spirit Lake Reservation and Turtle Mountain Reservation are sufficiently numerous and geographically compact to constitute a majority in an undivided legislative district.

62.     In that proposed district, Native American voters from Turtle Mountain and Spirit Lake reservations would be combined in a single district with a Native American Voting-Age Population of 69.1 percent. Under this configuration, Native American voters in the region would have the opportunity to elect their candidates of choice to both at-large state house seats as well as the senate.

63.     The Native American population on and around the Turtle Mountain and Spirit Lake reservations is geographically compact.

64.    The Spirit Lake and Turtle Mountain reservations are a mere 55 miles apart—a roughly one-hour drive between the reservations.

65.    The below map shows the Spirit Lake reservation and Turtle Mountain reservation (including adjacent trust lands) outlined in black lines, with the more densely populated Native American areas shown in blue.



66.    The Tribes' proposed district would be far more compact than the enacted District 14, which stretches over 150 miles—a nearly three hour drive—from Wolford in Pierce County to Alkaline Lake in Kidder County.

**Gingles *Prong 2: Voting in the Region is Racially Polarized, with Native American Voters Demonstrating Political Cohesion***

67.     Native American voters in North Dakota, including those living on and around the Spirit Lake Reservation and Turtle Mountain Reservation, vote cohesively and overwhelmingly support the same candidates.

68.     For example, Rolette County precinct 09-03 has a Native American Voting-Age Population of 93.7 percent, and in the 2020 presidential election candidate Joe Biden carried the precinct by a margin of 87.2 percent to 11.6 percent.

69.     Benson County precinct 23-02 has a Native American Voting-Age Population of 91.8 percent, and Biden carried it by a margin of 78.6 percent to 19.6 percent.

**Gingles *Prong 3: White Bloc Voting Usually Defeats Native American Preferred Candidates***

70.     In the absence of Section 2 compliant districts, white bloc voting in the region usually defeats the candidate of choice of Native American voters.

71.     Republican candidates usually defeat the Native American-preferred Democratic candidates in reconstituted elections in Districts 9B and 15.

72.     On the other hand, the Native American candidate of choice prevails by high margins in District 9A. In the 2020 presidential election, Native American candidate of choice Biden received 72.7 percent of the vote, compared to 37.0 percent in District 9B and 32.9 percent in District 15. In the 2020 gubernatorial election, Native American candidate of choice Lenz received 64.3 percent of the vote in District 9A, compared to 29.7 percent in District 9B and 25.8 percent in District 15.

*The Totality of Circumstances Demonstrates that Native American Voters Have Less Opportunity than Other Members of the Electorate to Participate in the Electoral Process and Elect Representatives of Their Choice*

73.     A review of the totality of the circumstances reveals that Native American voters in North Dakota have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice. *See* 52 U.S.C. § 10301(b).

*Exclusion of Native Americans from the 2021 Redistricting Process*

74.     The North Dakota Legislature, including the Redistricting Committee, failed to actively and effectively engage tribal citizens in the 2021 Redistricting process.

75.     The Redistricting Committee failed to hold a single committee hearing on tribal lands, despite repeated requests from the Tribal Nations within North Dakota's borders to do so. Instead, all public hearings were held at substantial distances from tribal lands, making attendance and testimony impossible for most tribal citizens, and especially the many tribal citizens without reliable private transportation.

76.     Even when official representatives of the Tribal Nations were able to attend hearings of the Redistricting Committee, they were met with hostility by some legislators.

77.     For example, at a final meeting of the Redistricting Committee on November 8, Turtle Mountain Chairman Azure and Spirit Lake Chairman Yankton testified before the Committee.  The Chairman requested their respective communities of interest be included together in a single legislative district.

78.     Despite the Tribal leaders' requests, legislators repeatedly suggested that they better understood the Tribal Nations' concerns than the Tribes' own Chairmen.

18

79. With the Chairmen still at the meeting, a Representative and member of the Redistricting Committee stated of the Chairmen's request, "I feel . . . that if we had come up with this plan, it would look we were trying to pack them all into one district and to marginalize them and so it's hard for me to listen to them ask to be marginalized, in my opinion."[4] Other legislators made similar comments.

80. Representative Terry Jones made statements at a Tribal and State Relations Committee meeting with the Spirit Lake Tribe on September 1, 2021 that sought to discourage Tribes from exercising their right to request single-member house districts by his equating the request to "the definition of racism" because, in his view, the request for single-member districts means "that in order for [him] to be able to properly represent them [tribal members] that [his] skin had to be brown."[5]

81. The legislators' comments are illustrative of the atmosphere of hostility toward the concerns of Tribal Nations during the 2021 redistricting process.

### Discrimination in Voting Against Native Americans

82. As this Court has repeatedly recognized, North Dakota has a long history of both denying Native Americans the right to vote and diluting Native voting strength. *See, e.g.*, *Spirit Lake Tribe v. Benson Cnty.*, No. 2:10-cv-095, 2010 WL 4226614, at *3 (D.N.D. 2010); Consent Judgment and Decree, *United States v. Benson Cnty.*, Civ. A. No. A2-00-30

---

[4] *Nov. 8 Hearing of the Joint Redistricting Committee*, 67th Leg., 1st Spec. Sess. 3:40:29 (N.D. Nov. 8, 2021), https://video.legis.nd.gov/en/PowerBrowser/PowerBrowserV2/20211108/-1/22649.
[5] *Sep. 1 Meeting of the Redistricting Committee*, 2021 Leg., 67th Sess. 10:38:07 (N.D. Sep. 1, 2021), https://video.legis.nd.gov/en/PowerBrowser/PowerBrowserV2/20210901/-1/21581.

(D.N.D. Mar. 10, 2000); *see also State ex rel. Tompton v. Denoyer*, 72 N.W. 1014, 1019 (N.D. 1897).

83.     Until 1922, North Dakota explicitly barred most Native Americans from voting. Until 1897, Native Americans were statutorily denied the right to vote in North Dakota "unless they had entirely abandoned their tribal relations, and were in no manner subject to the authority of any Indian chief or Indian agent." *Denoyer*, 72 N.W. at 1019. After that law was struck down by the North Dakota Supreme Court as violating the state constitution, the legislature amended the Constitution to allow only "[c]ivilized persons of Indian descent" who "severed their tribal relations two years next preceding" an election to vote. N.D. Const., art. V § 121 (1898). Native Americans were denied the right to vote unless they could show that they "live[d] just the same as white people." *Swift v. Leach*, 178 N.W. 437, 438 (N.D. 1920).

84.     The North Dakota Constitution of 1898 also established a literacy test as a qualification for voting. N.D. Const. art. II, §§ 121, 127 (ratified by vote on Nov. 8, 1898). This practice was commonly used to disenfranchise minority voters and is prohibited by the Voting Rights Act of 1965. 52 U.S.C. § 10303; *see also South Carolina v. Katzenbach*, 383 U.S. 301, 312, 316 (1966) (discussing the discriminatory use of literacy tests and the Voting Rights Act's ban on such tests).

85.     Discrimination against Native American voters continues in North Dakota today.  Over the past three decades, the State has continued to enact laws and adopt practices that discriminate against eligible Native voters.

86.     In 2000, the Justice Department filed an action against Benson County, North Dakota alleging that the county's at-large elections system for electing county commissioners denied Native American voters the opportunity to participate meaningfully in the political process. *See* Consent Judgment at Preamble, *Benson Cnty.*, Civ. A. No. A1-00-30. The parties entered into a consent decree in which Benson County admitted that its at-large system discriminated against Native American voters. The County agreed to adopt a five-district election system, with two majority Native American districts. *Id.* ¶ 6, 15.

87.     In 2010, the Spirit Lake Tribe sued Benson County to prevent the removal of a polling place on the reservation, some 100 years after the Tribe first sued to establish the reservation polling place. In considering the challenge, this Court recognized "[t]he historic pattern of discrimination suffered by members of the Spirit Lake [Tribe]," and found that the removal of the Spirit Lake polling pace likely violated Section 2 of the VRA. *Spirit Lake Tribe*, 2010 WL 4226614, at *3. The polling place was then reestablished on the reservation. *Id.* at *3.

88.     Beginning in 2013, the North Dakota legislature adopted a series of discriminatory voter identification laws targeting Native Americans.

89.     In both 2013 and 2014, the North Dakota legislature amended its voter ID law to restrict the acceptable forms of identification and eliminate certain fail-safe mechanisms for voters who lacked a qualifying ID. Specifically, the law required voters to present identification containing the voter's name, date of birth, and residential street address. *See* H.B. 1332, 63rd Leg. Assembly; Reg. Sess. § 5 (2013); Order Granting Motion

for Preliminary Injunction at *2-3, *Brakebill v. Jaeger*, No. 1:16-cv-008, 2016 WL 7118548, (D.N.D. Aug. 1, 2016). It also eliminated alternative options that had historically been available for voters without ID. *Id.* The North Dakota Legislature passed these discriminatory voter ID laws even after repeated warnings that the identification and residential address requirements would lead to the disenfranchisement of Native Americans.

90.     At the time, many Native American voters living on reservations had not been assigned residential addresses. And though the law purported to include tribal identification cards as qualifying IDs, most tribal IDs included a P.O. Box rather than the tribal citizen's non-existent residential address. As such, the residential address requirement disproportionately affected Native American voters and prevented them from relying on their tribal IDs for voting. *Brakebill,* No. 1:16-cv-008, 2016 WL 7118548, at *4.

91.     In 2016, this Court found that the amended voter ID law discriminated against Native Americans.

92.     Specifically, it found that Native Americans "face substantial and disproportionate burdens in obtaining each form of ID deemed acceptable under the [2013] law," and that eligible Native voters had been disenfranchised because of it. *Brakebill,* No. 1:16-cv-008, 2016 WL 7118548, at *9, 16-17.

93.     Concluding that the Native American plaintiffs were likely to succeed on a challenge to the law under the Equal Protection Clause of the Fourteenth Amendment, this Court enjoined the Secretary of State from enforcing the law in the November 2016

Election without a fail-safe provision for voters who lack a qualifying ID. *Brakebill,* No. 1:16-cv-008, 2016 WL 7118548, at *22. The state did not appeal that decision.

94.     In 2017, the North Dakota Legislature again amended the State's voter identification law to eliminate the fail-safe provision for voters who lack a qualifying ID listing their residential street address.

95.     After the Spirit Lake Tribe, Standing Rock Sioux Tribe, and various individual eligible Native American voters challenged the law again in federal court as discriminating against Native voters, the State agreed to enter into a consent decree. Under the consent decree, the Secretary of State must recognize tribal IDs as valid voter identification and ensure that Native American voters retain an effective fail-safe voting option, including by ensuring that otherwise eligible voters who lack an ID listing their residential address are provided with their address and corresponding documentation sufficient to allow them to vote. Order, Consent Decree, and Judgment, *Spirit Lake Tribe v. Jaeger*, No. 1:18-cv-00222-DLH-CRH (D.N.D. Apr. 27, 2020).

### *Historic Discrimination Against Native Americans in Other Areas*

96.     Native Americans in North Dakota face discrimination in other arenas, which exacerbates the barriers to their effective participation in the political process.

97.     Throughout the nineteenth and early twentieth centuries, the United States carried out official federal policy targeted at forcibly assimilating Native Americans into European-American culture. *See Bear Lodge Multiple Use Ass'n v. Babbit*, 175 F.3d 814, 817 (10th Cir. 1999). Forced assimilation included suppression and attempted destruction of Indigenous religions, languages, and culture.

98.     Assimilationist policies commonly brought violence in the Northern Plains. "In 1890 for example, the United States Cavalry shot and killed 300 unarmed Sioux [Lakota] men, women and children en route to an Indian religious ceremony called the Ghost Dance[.]" *Bear Lodge Multiple Use Ass'n*, 175 F.3d at 817.

99.     Native Americans in North Dakota were a direct target of these discriminatory policies and practices.

100.     Christian and government boarding schools were established throughout North Dakota beginning in the late nineteenth century and persisting through the mid-twentieth century. Native American children were removed from their families and tribes and sent to the boarding schools to be "civilized" and indoctrinated into Christianity. *See e.g.* U.S. Dep't of Interior, *Extracts from the Annual Report of the Secretary of the Interior for the Fiscal Year, 192754* (1927); Native American Rights Fund, *Let All That Is Indian Within You Die!*, 38(2) NARF L. Rev. 1 (2013). These children routinely suffered physical and emotional abuse and neglect. At the same time, they were banned from speaking Indigenous languages and practicing their cultures and religions.

101.     The boarding school policy was incredibly harmful and its effects, including disparities in education and literacy between Native Americans and non-Native Americans, have persisted in North Dakota long after its official end. *See* Lewis Merriam, Tech. Dir. for Inst. for Gov't Research, *The Problem of Indian Administration, Report of a Survey made at the request of Hubert Work, Secretary of the Interior and submitted to him Feb. 21, 1928*; Native American Rights Fund, *Let All That Is Indian Within You Die!*, 38(2) NARF L. Rev. 1 (2013).

102. Native children attending state public schools in the mid-twentieth century also faced significant discrimination, including being subjected to humiliating stereotypes and language discrimination. *See Indian Education: A National Tragedy – A National Challenge*, Special Subcomm. on Indian Educ., 91st Cong., S.R. No. 91-501 (1969). Native students often reported feeling powerless, experiencing depression, and generally feeling alienated form their own cultures. Dropout rates among Native children attending public schools were higher than those for non-native children, while reading levels were lower. At the same time, Native people were generally prevented from serving on school boards. *Id.* at 23-31. Higher dropout rates amongst Native students persisted throughout the end of the twentieth century. *Educational Condition*, N.D. Dep't of Pub. Education, https://web.archive.org/web/20151225031658/https://www.nd.gov/dpi/SchoolStaff/IME/Programs_Initiatives/IndianEd/resources/EducationalCondition/.

103. Native Americans in North Dakota, including the Plaintiff Tribes, were also subjected to discriminatory land allotment policies. Throughout the early-to mid-1900's, millions of acres of tribal land were transferred to private ownership, largely by non-Indians. These allotment policies dramatically reduced the land bases for many tribes, including those in North Dakota. These policies also created a confusing "checkerboard" of state, tribal, and federal jurisdiction, leading to reduced and inconsistent enforcement of criminal laws by non-tribal law enforcement agencies. *See Keepseagle v. Vilsack*, 118 F. Supp. 3d. 98 (D.D.C. 2015), *appeal denied* 2015 WL 9310099 (D.C. Cir. 2015).

104.    The State of North Dakota has played an active role in discrimination against Native Americans since its inception.

105.    Significantly, the State, through the North Dakota Indian Affairs Commission, embraced the discriminatory and harmful forced assimilation and relocation policies of the federal government.

106.    Historic discrimination has hindered the ability of the Native American population in North Dakota to participate effectively in the political process.

*Modern Effects of Discrimination*

107.    Native Americans in North Dakota continue bear the effects of the state and federal government's discriminatory policies and practices in income and poverty, education, employment, and health, which hinders their ability to participate effectively in the political process.

108.    Native Americans in North Dakota are three times more likely than the general population of North Dakota and nearly four times more likely than are whites in the state to live in poverty. According to the 2015-2019 American Community Survey Estimates, the poverty rate for Native Americans in North Dakota is 32.2 percent (nearly 1 in 3), compared 10.7 percent for the state's total population and only 8.2 percent amongst North Dakotans who are white alone.

109.    Approximately half of all Native American children in North Dakota live in poverty—a rate more than five times higher than any other racial group in the state. North Dakota Interagency Council on Homelessness, *Housing the Homeless: North Dakota's*

*10-Year Plan to End Long-Term Homelessness* ii (October 2018), https://www.ndhfa.org/wp-content/uploads/2020/07/HomelessPlan2018.pdf.

110.   Native Americans in North Dakota face a higher rate of homelessness than any other racial group in the state. In 2017, the North Dakota Interagency Council on Homelessness estimated that Native Americans account for at least 21 percent of North Dakota's homeless population, despite making up only 5 percent of the state's population. *Id* at 17.

111.   This 2017 study likely underestimated the actual number of Native Americans who are effectively homeless because it failed to account for the many individuals who live temporarily with family and other tribal members. *Id.* at 17.

112.   Native Americans in North Dakota also fare worse than white North Dakotans in education. Native Americans over the age of 25 are two and a half times as likely as whites to lack a high school diploma. According to the 2019 American Community Survey, approximately 15 percent of Native Americans lack a high school diploma, compared to 6 percent of whites.

113.   Native American students in North Dakota are 4.2 times more likely than white students to be suspended from school. At the same time, white students are 4.3 times more likely than Native students to be enrolled in Advanced Placement classes. ProPublica, *Miseducation: North Dakota*, https://projects.propublica.org/miseducation/state/ND (last accessed Sep. 16, 2021).

114.   Native Americans in North Dakota also suffer worse health outcomes than the State's overall population, on average. For example, Native Americans report being

in poor or fair health at a rate almost double that of North Dakota's total population. North Dakota Dep't of Health, *North Dakota American Indian Health Profile*, Table 21 (Jul. 18, 2014), http://www.ndhealth.gov/HealthData/CommunityHealthProfiles/American%20Indian%20Community%20Profile.pdf. Similarly, Native people in North Dakota aged 18-64 are more than twice as likely as the overall population to have a disability. *Id.* at Table 8. The infant death rate and child and adolescent death rate amongst Native Americans in North Dakota is approximately 2.5 times that of the State's total population. *Id.* at Table 13.

115.    Native Americans in North Dakota are also overrepresented in the state's prison and jail population. According to the Prison Policy Initiative, Native Americans in North Dakota are incarcerated at a rate 8 times that of the state's white population. Prison Policy Initiative, *North Dakota Profile*, https://www.prisonpolicy.org/profiles/ND.html (last accessed Sep. 16, 2021).

116.    These and other socioeconomic factors related to the history of discrimination compound the political disempowerment of Native Americans in North Dakota caused by the discriminatory legislative districting scheme.

***Racially Polarized Voting and the Limited Success of Native American Candidates***

117.    Voting in North Dakota is racially polarized between white and Native voters.

118.    In the 2016 state-wide U.S. House of Representatives contest, Native American voters backed Native American candidate Chase Iron Eyes with 87 percent of

the vote, compared to 13 percent for Kevin Cramer. White voters, however, supported Cramer with 76 percent and Iron Eyes at 24 percent.

119.    In the 2016 state-wide Public Service Commissioner race, the Native American vote backed Native American candidate Hunte Beaubrun 78 percent to 15 percent for Julie Fedorchak. However, white voters preferred Fedorchak with 70 percent of the vote, compared to only 21 percent of the vote in support of Hunte Beaubrun.

120.    In the 2016 state-wide Insurance Commissioner contests, Native American candidate Ruth Buffalo received 87 percent of the Native American vote, while Jon Godfread received approximately 13 percent of the Native American vote. The white vote favored Godfread with 72 percent of the vote, compared to 28 percent for Buffalo.

121.    Native Americans have had little success in being elected to state office in North Dakota outside of the previously Native American-majority District 9.

122.    Upon information and belief, there has never been a Native American statewide elected official.

123.    HB1504 results in a lack of proportionality for Native American voters; the number of state house and senate districts in which they can election their candidate of choice is lower than their share of the state's voting age population.

## CLAIM FOR RELIEF

## COUNT 1

### *Section 2 of the Voting Rights Act, 52 U.S.C. § 10301*

124.    Plaintiffs incorporate by reference the allegations above as if fully set forth herein.

125.    Section 2 of the Voting Rights Act prohibits the enforcement of any qualification or prerequisite to voting or any standard, practice, or procedure that results in the denial or abridgement of the right of any U.S. citizen to vote on account of race, color in a language minority group. 52 U.S.C. § 10301(a).

126.    Native American voters in northeastern North Dakota are "cracked" in District 9B and District 15 where they constitute a minority of the voting age population. The remaining Native American population is packed into District 9A, where Native Americans constitute a supermajority of the voting age population.

127.    The packing and cracking of Native American voters in Districts 9 and 15 dilutes the voting strength of Native voters, in violation of Section 2 of the Voting Rights Act.

128.    An alternative district can be drawn in which Native American voters constitute a geographically compact majority of eligible voters that will reliably elect Native Americans' preferred candidates to two at-large state house seats and one state senate seat.

129.    Voting in northeastern North Dakota is racially polarized, Native voters are politically cohesive, and white bloc voters usually defeats Native voters' preferred candidates.

130.    Under the totality of the circumstances the current State Legislative plan denies Native voters an equal opportunity to participate in the political process and to elect their candidates of choice, in violation of Section 2 of the Voting Rights Act, 52 U.S.C. § 10301.

131.    Absent relief from this Court, Defendants will continue to dilute the votes of the individual Plaintiffs and the members of the Plaintiff Tribes in violation of Section 2 of the VRA.

## REQUESTED RELIEF

WHEREFORE, Plaintiffs ask that this Court:

A.    Declare that HB 1504 violates Section 2 of the Voting Rights Act;

B.    Preliminarily and permanently enjoin Defendants from administering, enforcing, preparing for, or in any way permitting the nomination or election of members of the North Dakota Legislature from unlawful districts;

C.    Set a reasonable deadline for the legislature to enact a redistricting plan that does not dilute, cancel out, or minimize the voting strength of Native American voters;

D.    If the legislature fails to enact a valid redistricting plan before the Court's deadline, order a new redistricting plan that does not dilute, cancel out, or minimize the voting strength of Native American voters;

E.    Award Plaintiffs their costs, disbursements, and reasonable attorneys' fees incurred in bringing this action, pursuant to 42 U.S.C. § 1988 and 52 U.S.C. § 10310(e); and,

F.    Grant such other relief as the Court deems proper.


Respectfully submitted this 7th day of February, 2022.

/s/ Michael S. Carter
_____
Michael S. Carter
OK No. 31961
carter@narf.org
Matthew Campbell
NM No. 138207, CO No. 40808
mcampbell@narf.org
NATIVE AMERICAN RIGHTS FUND
1506 Broadway
Boulder, CO 80301
Telephone: (303) 447-8760 (main)
Fax: (303) 443-7776
*Attorneys for Plaintiffs*


Bryan Sells*
GA No. 635562
bryan@bryansellslaw.com
THE LAW OFFICE OF BRYAN L.
SELLS, LLC
Post Office Box 5493
Atlanta, GA 31107-0493
Telephone: (404) 480-4212 (voice and fax)
*Attorney for Plaintiffs*


/s/ Timothy Q. Purdon
_____
Timothy Q. Purdon
ND No. 05392
TPurdon@RobinsKaplan.com
ROBINS KAPLAN LLP
1207 West Divide Avenue, Suite 200
Bismarck, ND 58501
Telephone: (701) 255-3000
Fax: (612) 339-4181
*Attorney for Plaintiff Spirit Lake Nation*


Mark P. Gaber
DC Bar No. 988077
mgaber@campaignlegal.org
Molly E. Danahy*
DC Bar No. 1643411
mdanahy@campaignlegal.org
CAMPAIGN LEGAL CENTER
1101 14th St. NW, Ste. 400
Washington, DC 20005
Telephone: (202) 736-2200 (main)
*Attorneys for Plaintiffs*


* *pro hac vice* to be submitted