# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NORTH DAKOTA
### EASTERN DIVISION

| | |
|---|---|
| Turtle Mountain Band of Chippewa Indians, *et al.*, | Case No. 3:22-cv-00022-PDW-ARS |
| Plaintiffs, | |
| v. | **PLAINTIFFS' RESPONSE IN OPPOSITION TO THE DEFENDANT'S MOTION TO DISMISS** |
| Alvin Jaeger, in his official capacity as Secretary of State of North Dakota, | |
| Defendant. | |

Plaintiffs respectfully submit this response in opposition to Defendant Jaeger's motion to dismiss. (ECF 17). Jaeger asks this Court to dismiss this case on three grounds. First, he contends—contrary to decades of jurisprudence—that the Voting Rights Act does not provide a private right of action. (*Id.* at 4-7). Second, he contends that the Turtle Mountain Band of Chippewa Indians and Spirit Lake Tribe (collectively "Tribal Plaintiffs") cannot advance a Voting Rights Act claim because they are not "citizens." (*Id.* at 7-8). Third, he contends that the Tribal Plaintiffs lack standing to bring claims under the Voting Rights Act. (*Id.* at 7-13).

These arguments are easily rejected. The first argument is contrary to the plain text of Section 2 as well as decades of jurisprudence. In any event, Plaintiffs bring their claim not only under the Voting Right Act but also under 42 U.S.C. § 1983 to prevent violations of their Section 2 rights, and Jaeger does not challenge the plaintiffs' right to bring their

1

claim under the latter provision. This Court previously rejected Jaeger's second argument in a case regarding North Dakota's voter ID law, concluding that if private organizations like the NAACP have standing to sue to protect their members' voting rights under Section 2, so too must tribes. And the standing arguments are meritless; Jaeger does not contend that the three individual Plaintiffs lack standing, and only one plaintiff with standing is required. *Town of Chester, N.Y. v. Laroe Estates, Inc.*, 137 S. Ct. 1645, 1651 (2017). Jaeger therefore gives this Court no basis on which to dismiss the Complaint. The motion should be denied.

## BACKGROUND

This is an action under Section 2 of the Voting Rights Act ("Section 2"), 52 U.S.C. § 10301 challenging the newly adopted redistricting plan for the North Dakota Legislative Assembly. (ECF 1 at 1). The Plaintiffs are the Turtle Mountain Band of Chippewa Indians, the Spirit Lake Tribe, and three Native American voters. (*Id.* at 4-7). The Defendant is Alvin Jaeger, the Secretary of State of North Dakota, who is responsible for conducting elections for members of the Legislative Assembly. (*Id.* at 7).

The Plaintiffs allege that the newly adopted redistricting plan dilutes the voting strength of Native Americans on the Turtle Mountain and Spirit Lake reservations and in surrounding areas in violation of Section 2. (*Id.* at 29-31). They bring their claim under the Voting Rights Act ("VRA"), 52 U.S.C. § 10310, and the Civil Rights Act of 1871, 42 U.S.C. § 1983 (*id.* at 3). Plaintiffs seek declaratory and injunctive relief prohibiting Jaeger from conducting elections for members of the Legislative Assembly under the dilutive

plan and from failing to conduct elections under a plan that complies with the Voting Rights Act. (*Id.* at 31).

The Plaintiffs filed this action in February 2022. The parties stipulated to an extension of the deadline for Jaeger to answer. (ECF 8). In lieu of an answer, Jaeger filed a motion to dismiss. (ECF 17).

## ARGUMENT

### I. PLAINTIFFS HAVE A PRIVATE RIGHT OF ACTION TO SUE TO ENJOIN THE DISCRIMINATORY DISTRICTING PLAN

#### A. Plaintiffs can enforce their Section 2 claim under 42 U.S.C. § 1983.

The Civil Rights Act of 1871 provides a private right of action for the redress of violations of federal rights committed by state actors. *See* 42 U.S.C. § 1983; *Maine v. Thiboutot*, 448 U.S. 1, 4 (1980) (holding that "the plain language" of Section 1983 "undoubtedly embraces" suits by private plaintiffs to enforce federal statutory rights). The Plaintiffs invoked that right of action here (ECF 1 at 1, 3), and Jaeger does not contend that this Court lacks subject-matter jurisdiction under Section 1983. (ECF 17). Instead, Jaeger contends only that the Plaintiffs lack a private right of action under the Voting Rights Act itself. In the single case he cites for this proposition, the plaintiffs did not assert a claim under Section 1983 and district court did not address whether Section 1983 provides private plaintiffs a right of action to enforce Section 2. *Ark. State Conf. NAACP v. Ark. Bd. of Apportionment,* Case No. 4:2121-cv-1239-LPR, 2022 WL 496908 (E.D. Ark. Feb. 17, 2022), *appeal docketed,* No. 22-1395 (8th Cir. Feb 24, 2022), at *22.

Section 1983 plainly provides a right of action here for both Tribal and Individual Plaintiffs[1] and Jaeger does not dispute this. To determine whether a private plaintiff can enforce a federal statute though Section 1983, a court must first "determine whether Congress *intended to create a federal right*" in the statute that a plaintiff seeks to enforce. *Gonzaga Uni. v. Doe*, 536 U.S. 273, 283 (2002) (emphasis in original). Once a court determines that a federal right exists, that "right is presumptively enforceable by § 1983," and a plaintiff "do[es] not have the burden of showing an intent to create a private remedy because § 1983 generally supplies a remedy for the vindication of rights secured by federal statutes." *Id.* at 284. Defendants can rebut the presumption that a federal right is enforceable through § 1983 only by "demonstrat[ing] that Congress shut the door to

---

[1] While in some instances Section 1983 may not provide a right of action for Tribal Plaintiffs seeking to vindicate sovereign interests, *see Inyo Cnty., Cal. v. Paiute-Shoshone Indians of the Bishop Community of the Bishop Colony*, 538 U.S. 701, 712 (2003), it nonetheless provides Tribal Plaintiffs a right of action here. Tribal Plaintiffs are acting as *parens patriae* asserting *quasi-sovereign* rather than sovereign interests, and 1983 provides a right of action in such instances. *See infra* at III.B.1; *see also e.g., Pfizer, Inc. v. Gov't of India*, 434 U.S. 308, 319 (1978) (holding that a foreign state can sue under anti-trust laws that provide protections to "persons"); *State, Dep't of Health & Soc. Servs., Div. of Fam. & Youth Servs. v. Native Vill. of Curyung*, 151 P.3d 388, 396 (Alaska 2006) (holding that a Tribal Nation can bring a suit as a "person" under § 1983 when suing as *parens patriae* to vindicate the federal statutory rights of tribal members). Further, Tribal Plaintiffs bring their claim under § 1983 to redress harms to their members and the economic harms they suffered due to diversion of resources. *See infra* at III.B.2. This is the same sort of claim commonly asserted by private actors seeking to invoke § 1983, and thus may be brought by Tribal Plaintiffs here. *See, e.g., Muskogee (Creek) Nation v. Okla. Tax Comm'n*, 611 F. 3d 1222, 1234 (10th Cir. 2005) ("the viability of a tribe's § 1983 suit depended on whether the tribe's asserted right was of a sovereign nature"); *Skokomish Indian Tribe v. United States*, 410 F. 3d 506 (9th Cir. 2005) (finding that 1983 allows Tribes to assert claims in a "capacity resembling a 'private person.'"); *see also, Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982); *Arkansas ACORN Fair Housing, Inc. v. Greystone Development, Ltd. Co.*, 160 F.3d 433, 434 (8th Cir. 1998) ("the deflection of an organization's monetary and human resources . . . is itself sufficient to constitute an actual injury").

private enforcement either [1] expressly, through specific evidence from the statute itself"
or "[2] impliedly, by creating a comprehensive enforcement scheme that is incompatible
with individual enforcement under § 1983." *Id.* at 284 n.4 (cleaned up).

Here, Section 2 of the Voting Rights Act is undisputedly a rights-creating statute.
*See* 52 U.S.C. § 10301(a) (prohibiting voting practices which result in the denial of
abridgement of "the right of any citizen of the United States to vote"); *Chisom v. Roemer*,
501 U.S. 380, 392 (1991) (recognizing that Section 2 "grants [individual citizens] a right to
be free from" voting discrimination). Jaeger therefore bears the burden of rebutting the
presumption that Section 2 is enforceable through Section 1983. *Gonzaga*, 536 U.S. at 284.
But Jaeger cannot rebut that presumption here, because, as the Supreme Court has
recognized and the text and structure of the VRA demonstrate, Congress plainly did not
"shut the door to private enforcement" of the Voting Rights Act, *id.* at 284 n.4. *See, e.g.*,
*Allen v. State Bd. of Elections*, 393 U.S. 544, 555 n.18 (1969) ("there is certainly no specific
exclusion of private actions"); 52 U.S.C. § 10310(e) (allowing court-ordered attorneys' fees
in VRA actions for "the prevailing party, other than the United States"); 52 U.S.C. §
10302(a)-(c) (referring to suits filed "by the Attorney General *or an aggrieved person*)
(emphasis added). And, given the decades of simultaneous VRA enforcement by private
parties and the Department of Justice, Section 2's public remedies do not constitute "a
comprehensive enforcement scheme" that is "incompatible with individual enforcement
under § 1983," *Gonzaga*, 536 U.S. at 284 n.4.

Accordingly, Section 2 is enforceable through Section 1983.

### B. Private plaintiffs can also enforce Section 2 under the Voting Rights Act.

Because the Plaintiffs can bring their claim under Section 1983, this Court need not address Jaeger's argument that the Plaintiffs cannot bring their claim under the Voting Rights Act. Even if this Court does reach the issue, Plaintiffs must prevail because binding precedent, the text and structure of the VRA, and congressional history establish that the Section 2 is privately enforceable. The contrary ruling of the Arkansas district court relied upon by Jaeger is deeply flawed.

### 1. Binding precedent establishes a private right of action.

The Supreme Court resolved this issue more than 25 years ago in *Morse v. Republican Party of Va.*, 517 U.S. 186 (1996). That case presented the question of whether there is a private right of action to enforce Section 10 of the Voting Rights Act, which prohibits poll taxes. *See id.* at 190. Justice Stevens' lead opinion recognized that, although Section 2, like Section 5 of the Voting Rights Act, "provides no right to sue on its face, 'the existence of the private right of action under Section 2 . . . has been clearly intended by Congress since 1965.'" *Id.* at 232 (Stevens, J., joined by Ginsburg, J.) (quoting S. Rep. No. 97-417, at 30 (1982)). Section 10 must also be enforceable by private action, Justice Stevens reasoned, because the contrary conclusion would lead to the "anomalous" result that Sections 2 and 5 could be enforced by private action, but Section 10 could not, even though all three provisions "lack[ed] the same express authorizing language." *Id.* Justice Breyer concurred and relied on the same reasoning: "Congress intended to establish a private right of action to enforce § 10, no less than it did to enforce §§ 2 and 5." *Id.* at 240

(Breyer, J., joined by O'Connor and Souter, JJ., concurring). A majority of the Court thus held that private plaintiffs can enforce Section 2.

Jaeger relies on a single district court case that is currently on appeal before the Eighth Circuit in support of his assertion that Section 2 lacks a private right of action. (ECF 17 at 4-7). The reasoning in that case and its holding are deeply flawed. The district court in *Arkansas NAACP* improperly dismissed the reasoning of the five justices in *Morse* as "dicta." *Arkansas NAACP*, 2022 WL 496908, at *17. The determination of five justices that private plaintiffs can enforce Section 2 was necessary to the Court's judgment that the Voting Rights Act also provides a private right of action to enforce Section 10. It is therefore part of the holding of *Morse* and was binding on the district court in *Arkansas NAACP* and remains binding precedent for this Court. *See Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 66–67 (1996) ("When an opinion issues for the Court, it is not only the result but also those portions of the opinion necessary to that result by which we are bound."); *see generally* Bryan A. Garner *et al.*, *The Law of Judicial Precedent* § 4 (2016) ("Dicta vs. Holdings"); *Holding*, Black's Law Dictionary (11th ed. 2019) ("A court's determination of a matter of law pivotal to its decision").

The district court in *Arkansas NAACP* also disregarded the Eighth Circuit's holding in *Roberts v. Wamser*, which binds this Court. *Roberts v. Wamser*, 883 F.2d 617 (8th Cir. 1989). In that Section 2 case, the Eighth Circuit recognized that "a private litigant attempting to protect his right to vote [is] a proper party to effectuate the goals of the [Voting Rights] Act." *Id.* at 621. The Eighth Circuit's reasoning that Section 2 provides a right of action to at least some private plaintiffs was essential to the judgment and is

therefore, as in *Morse*, part of the holding. The district court brushed aside this holding of *Roberts* as "dicta," *Arkansas NAACP*, 2022 WL 496908, at *17, and that, too, was error that this Court should not follow.

Instead, this Court should follow *Morse, Roberts,* and every other court that has directly considered the issue, which have uniformly held that the Voting Rights Act provides a private right of action to enforce Section 2,[2] as well as the hundreds of courts that have implicitly determined that the Voting Rights Act provides a private right of action by reaching the merits of Section 2 cases brought by private plaintiffs. *See* Ellen D. Katz et al., *Section 2 Cases Database*, Univ. of Mich. L. Sch. Voting Rights Initiative (2022), https://voting.law.umich.edu/database (listing 439 cases with judicial decisions between 1982 and 2021 that addressed a substantive Section 2 claim).

---

[2] *See, e.g., Ala. State Conf. of NAACP v. Alabama*, 949 F.3d 647, 652 (11th Cir. 2020) ("The VRA, as amended, clearly expresses an intent to allow private parties to sue the States."), *vacating as moot*, 141 S. Ct. 2618 (2021); *Mixon v. Ohio*, 193 F.3d 389, 398–99 (6th Cir. 1999) ("An individual may bring a private cause of action under Section 2 of the Voting Rights Act."); *Singleton* v. *Merrill*, No. 2:21-cv-1530-AMM, 2022 WL 265001, at *79 (N.D. Ala. Jan. 24, 2022) (three-judge district court) (stating that to hold otherwise "would badly undermine the rationale offered by the Court in *Morse*" and that "[e]ven if the Supreme Court's statements in *Morse* about Section Two are technically dicta, they deserve greater respect than Defendants would have us give"), *appeal docketed*, No. 21-1086 (S. Ct. Feb. 7, 2022); *League of Latin Am. Citizens* v. *Abbott*, No. EP-21-cv-00529-DCG-JES-JVB, 2021 WL 5762035, at *1 (W.D. Tex. Dec. 3, 2021) (three-judge district court) (denying a motion to dismiss and holding that there is a private cause of action to enforce Section 2); *Ga. State Conf. of the NAACP v. Georgia*, 269 F. Supp. 3d 1266, 1275 (N.D. Ga. 2017) (three-judge district court) ("Section 2 contains an implied private right of action"). Moreover, the only court to have considered the issue following the district court's ruling in *Arkansas NAACP* rejected that court's holding that private plaintiffs cannot enforce Section 2, relying on "the extent and weight of the authority holding otherwise." *Alpha Phi Alpha Fraternity Inc.* v. *Raffensperger*, No. 1:21-cv-5337-SCJ, 2022 WL 633312, at *11 n.10 (N.D. Ga. Feb. 28, 2022).

### 2. The text and structure of the Voting Rights Act reflects Congress's intent to provide a private right of action to enforce Section 2.

Under *Alexander v. Sandoval*, 532 U.S. 275 (2001), courts determine whether Congress intended to create a private right of action by: (1) making the "critical" determination of whether the statute in question contains "rights-creating language"; and, if so, (2) assessing whether Congress has "manifest[ed] an intent to create a private remedy." *Id.* at 288-289 (cleaned up). Even if *Morse* and *Roberts* did not establish that private plaintiffs can enforce Section 2, the *Sandoval* framework leads to the same result.

The district court in *Arkansas NAACP*—the only case Defendant Jaeger offers in support of his argument—also erred in its analysis of the text and structure of the Voting Rights Act to determine whether Congress intended to create a private right of action. Here, there is no serious argument that Section 2 lacks rights-creating language. It protects the "right of any citizen . . . to vote" free from racial discrimination. 52 U.S.C. § 10301(a). The statute "grants" individual citizens "a right to be free from" discriminatory voting practices. *Chisom* v. *Roemer*, 501 U.S. 380, 392 (1991) (cleaned up). It explicitly refers to a citizen's "right" and is "phrased in terms of the person benefitted"—the main hallmarks of rights-creating language. *Gonzaga*, 536 U.S. at 284; *accord Osher v. City of St. Louis, Mo.*, 903 F.3d 698, 702–03 (8th Cir. 2018). By focusing on the "individuals protected," Section 2's "right of any citizen" language creates an "implication of an intent to confer rights on a particular class of persons." *Sandoval*, 532 U.S. at 289 (cleaned up). Although the district court in *Arkansas NAACP* did not reach the

critical question of whether Section 2 contains rights-creating language, it indisputably does.

Because Section 2 plainly contains rights-creating language, a strong presumption exists that Congress also intended to create a private remedy to enforce those rights. That is because "the right- or duty-creating language of [a] statute has generally been the most accurate indicator of the propriety of implication of a cause of action." *Cannon v. Univ. of Chi.*, 441 U.S. 677, 690 n.13 (1979). That presumption is even stronger in the context of Section 2 because voting rights typically are considered "private rights." *United States* v. *Raines*, 362 U.S. 17, 27 (1960).

In addition to that strong presumption, two separate provisions of the Voting Rights Act clearly reflect Congress's intent to provide a private remedy to enforce Section 2: Section 3 and Section 14.

     *i.   Section 3*

Section 3 is titled "Proceeding to enforce the right to vote." 52 U.S.C. § 10302. It provides certain specific remedies to "the Attorney General *or an aggrieved person*" in lawsuits brought "under any statute to enforce the voting guarantees of the fourteenth or fifteenth amendment." *Id.* (emphasis added). By providing remedies to aggrieved persons, this language plainly evinces Congress's intent to establish a private right of action to enforce the provisions of the Voting Rights Act, which Congress itself explained was enacted for the purpose of enforcing the voting guarantees of the Fourteenth and Fifteenth Amendments. *See* Pub. L. No. 89-110, Aug. 6, 1965, 79 Stat. 437 (first sentence of 1965 Act stating that it was "An Act . . . [t]o enforce the fifteenth amendment of the

Constitution of the United States"); S. Rep. No. 97-417, at 27, 39 (1982), *as reprinted in* 1982 U.S.C.C.A.N. 177, 205, 217 (noting that 1982 Amendment enacted pursuant to both Fourteenth and Fifteenth Amendments).

The district court in *Arkansas NAACP* erroneously dismissed this Section. Although it conceded that an "aggrieved person" encompasses private plaintiffs, 2022 WL 496908, at *17, it concluded that Section 3's remedies are not available in lawsuits under Section 2 because Section 2 now reaches conduct that does not necessarily violate the Fourteenth of Fifteenth Amendments and any statute that provides broader protection than what is constitutionally prohibited does not qualify. *Id* at *13.

The *Arkansas NAACP* district court's interpretation of Section 3 rests on a fundamental misunderstanding of when a statute "enforce[s] the voting guarantees of the fourteenth or fifteenth amendment." 52 U.S.C. § 10302. Indeed, both the Fourteenth and Fifteenth Amendments give Congress authority to "enforce" the Amendments' protections, U.S. Const. Amend. XIV, § 5 and Amend. XV, § 2, through "prophylactic legislation that proscribes facially constitutional conduct, in order to prevent and deter unconstitutional conduct." *Nevada Dep't of Hum. Res.* v. *Hibbs*, 538 U.S. 721, 727-728 (2003) (holding in the Fourteenth Amendment context that "Congress may enact so-called prophylactic legislation that proscribes facially constitutional conduct, in order to prevent and deter unconstitutional conduct"); *see also South Carolina* v. *Katzenbach*, 383 U.S. 301, 327 (1966) (rejecting the argument that the Fifteenth Amendment permits Congress to "do no more than to forbid violations of the Fifteenth Amendment in general terms"). And Congress expressly characterized the 1982 amendments to Section 2 as

11

prophylactic legislation to prevent constitutional violations. S. Rep. No. 97-417, at 40 ("[T]o enforce fully the Fourteenth and Fifteenth Amendments, it is necessary that Section 2 ban election procedures and practices that result in a denial or abridgment of the right to vote."); H.R. Rep. No. 97-227, at 31 ("Section 2, as amended, is an exercise of the broad remedial power of Congress to enforce the rights conferred by the Fourteenth and Fifteenth Amendments.").

In fact, Section 3 expressly permits a court to provide a remedy where a direct constitutional violation is not shown. Under Section 3(b), for example, a court may suspend the use of a test or device if the court finds in such a proceeding that the test or device is used "for the purpose *or with the effect* of denying or abridging the right of any citizen ...to vote on account of race or color." 52 U.S.C. § 10302(b) (emphasis added); *cf. United States v. Sandoval Cnty., N.M.*, 797 F. Supp. 2d 1249, 1256 (D.N.M. 2011) (finding that, "[n]otably, § 3[a] of the VRA authorizes" the court to appoint observers "as 'appropriate' to enforce the VRA and underlying constitutional guarantees found in the Fifteenth Amendment" and appointing observers to enforce Section 203 of the Voting Rights Act, which protects ballot access for language minority groups).

Section 3(c), known as the "bail-in" provision of the Act, also demonstrates that the "voting guarantees" of the Fourteenth and Fifteenth Amendments are not identical to the Amendments themselves. Section 3(c) permits courts to authorize a preclearance remedy in "proceeding[s] … under any statute to enforce the *voting guarantees* of the fourteenth or fifteenth amendment" where the court *also* finds "violations of the fourteenth or fifteenth amendment." *Id.*; *cf., Jeffers v. Clinton*, 740 F. Supp. 585, 587, 601

(E.D. Ark. 1990) (three-judge district court) (ordering a preclearance remedy under Section 3(c) in a Section 2 challenge to an apportionment plan, even though court found plan violated Section 2's result standard and *not* the Constitution directly, based on *other* constitutional violations that the district court found). To conclude otherwise would read the words "voting guarantees" out of the statute. *See Duncan v. Walker*, 533 U.S. 167, 174 (2001) (It is "cardinal principle of statutory construction" that "[i]t is [a court's] duty to give effect, where possible, to every clause and word of a statute.").

       *ii.  Section 14*

Section 14 is titled "Enforcement Proceedings." 52 U.S.C. § 10310. Like Section 3, it provides certain remedies to private plaintiffs in cases brought under the Voting Rights Act. Section 14(e) authorizes courts to award attorneys' fees to "the prevailing party, *other than the United States*" in "any action or proceeding to enforce the voting guarantees of the fourteenth or fifteenth amendment." *Id.* (emphasis added).

Many federal courts have held that Section 14(e) applies to claims under the Voting Rights Act, generally, and under Section 2, specifically. *See, e.g.*, *Shelby Cnty., Ala. v. Lynch*, 799 F.3d 1173, 1185 (D.C. Cir. 2015) ("Congress intended for courts to award fees under the VRA . . . when prevailing parties helped secure compliance with the statute."); *Dillard v. City of Greensboro*, 213 F.3d 1347, 1353 (11th Cir. 2000) ("This circuit has implicitly construed a violation of § 5 of the Voting Rights Act to be a violation of the 'guarantees of the fourteenth or fifteenth amendment,' . . . and no one argues here that the same implicit extension of [Section 14(e)] would not embrace § 2 claims, as well.") (citation omitted; *Brooks v. Ga. State Bd. of Elections*, 997 F.2d 857, 860-61 (11th Cir. 1993) (finding

that Section 14(e) provides attorney's fees "to enforce civil rights statutes, including the voting rights statutes"); *Navajo Nation v. Arizona Indep. Redistricting Comm'n*, 286 F. Supp. 2d 1087, 1092 (D. Ariz. 2003) ("Under [Section 14(e)] . . . a prevailing party may recover attorney's fees in an action or proceeding to enforce civil rights statutes, including the Voting Rights Act"); *Miss. State Chapter Operation Push v. Mabus*, 788 F. Supp. 1406, 1411 (N.D. Miss. 1992), *aff'd sub nom. Miss. State Chapter, Operation Push, Inc. v. Fordice*, 12 F.3d 208 (5th Cir. 1993) ("The court concluded that a § 2 violation existed. Therefore . . . plaintiffs are prevailing parties within the meaning of [Section 14(e)].") (cleaned up).

And federal courts have routinely awarded attorney's fees to private parties bringing successful Section 2 claims.[3] In fact, the Eighth Circuit has held that plaintiffs were entitled to attorneys' fees under Section 14(e) for their *unsuccessful* Section 2 claim because it shared a sufficiently "close relationship" with the plaintiffs' successful state law claims. *Emery v. Hunt*, 272 F.3d 1042, 1046–47 (8th Cir. 2001).

The district court in *Arkansas NAACP* dismissed the private remedy in Section 14(e) for the same reason that it disregarded the private remedies in Section 3. Relying on the phrase "proceeding[s] to enforce the voting guarantees of the fourteenth or fifteenth amendment," it held that Section 14(e) does not apply to Section 2 claims. *Arkansas*

---

[3] *See, e.g.*, *Veasey v. Abbott*, No. 2:13-cv-193, 2020 WL 9888360, *3 (S.D. Tex. May 27, 2020), *aff'd*, 13 F.4th 362, 365 (5th Cir. 2021); *Mo. State Conf. of NAACP v. Ferguson-Florissant Sch. Dist.*, No. 4:14-cv-2077-RWS, 2020 WL 2747306, *3 (E.D. Mo. May 27, 2020); *NAACP v. East Ramapo*, 462 F. Supp. 3d 368, 418 (S.D.N.Y. 2020), *aff'd sub nom. Clerveaux v. E. Ramapo Cent. Sch. Dist.*, 984 F.3d 213 (2d Cir. 2021); *Pope v. Cnty. of Albany*, 94 F. Supp. 3d 302, 351–52 (N.D.N.Y. 2015); *Bone Shirt v. Hazeltine*, No. CIV. 01-3032-KES, 2006 WL 1788307, *1 (D.S.D. June 22, 2006).

*NAACP*, 2022 WL 496908, at *14. But, that reasoning is just as flawed as its reasoning about Section 3. Indeed, that reasoning was expressly rejected by the Eleventh Circuit in *Dillard v. City of Greensboro*, 213 F.3d 1347, 1353 (11th Cir. 2000). There, the Court held that a Section 2 violation *is* a "violation of the guarantees of the fourteenth or fifteenth amendment" and thus the fee-shifting provision applies to plaintiffs who succeed on Section 2 claims. The Eleventh Circuit explained that this holding "effectuat[ed] the intent of the Senate expressed in its judiciary committee report," *id.* at 1353 n.6, which provided that "Section [10310(e)] allows a court . . . to award attorneys' fees to a prevailing party in suits to enforce the voting guarantees of the Fourteenth and Fifteenth Amendments, and *statutes enacted under those amendments*," *id.* (quoting S. Rep. No. 94-295, at 39 (1975) (emphasis added)).

Although a close analysis of the statutory text was not necessary in light of *Morse* and *Roberts*, the Court should reject Jaeger's invitation to adopt the erroneous conclusions of the *Arkansas NAACP* court.

### 3.  The legislative history of the Voting Rights Act shows that Congress intended to provide a private right of action to enforce Section 2.

The evidence of congressional intent contained in the legislative history of the Voting Rights Act is unequivocal: When Congress last amended Section 2 in 1982, there was universal agreement that private plaintiffs could enforce it.

Two committee reports make this clear. The House Report on the amendment states that "[i]t is intended that citizens have a private cause of action to enforce their rights under Section 2." H.R. Rep. No. 97-227, at 32. And the Senate Report on the

amendment "reiterates the existence of a private right of action under Section 2." S. Rep.
No. 97-417, at 30. The Supreme Court has described these reports as "the authoritative
source for the legislative intent" behind the Voting Rights Act. *Thornburg v. Gingles*, 478
U.S. 30, 43 n.7 (1986); *see also Brnovich v. Democratic Nat'l Comm.*, 141 S. Ct. 2321, 2332-33
(2021) (discussing the "oft-cited" 1982 Senate Report, S. Rep. No. 97-417); *Mo. State Conf.
of the NAACP v. Ferguson-Florissant Sch. Dist.*, 894 F.3d 924, 930 (8th Cir. 2018) (relying on
the legislative history of Section 2); *see, e.g. Buckanga v. Sisseton Indep. Sch. Dist.*, 804 F.2d
469, 471 (8th Cir. 1986). The statements in these reports, moreover, are not drops in an
ocean of legislative history that is otherwise characterized by vigorous debate. To the
contrary, there is no evidence that any member of Congress ever questioned the existence
of a private right of action. That existence was uncontroversial.

Congress also demonstrated its intent through its actions. "Congress is presumed
to be aware of an administrative or judicial interpretation of a statute and to adopt that
interpretation when it re-enacts a statute without change." *Lorillard* v. *Pons*, 434 U.S. 575,
580 (1978); *see, e.g. Texas Dep't of Hous. & Cmty. Affs.* v. *Inclusive Cmtys. Project, Inc.*, 576
U.S. 519, 536 (2015) (concluding that Congress had "ratified the unanimous holdings of
the Courts of Appeals" that plaintiffs can bring disparate- impact claims under the Fair
Housing Act because it was "aware of [the] unanimous precedent" and "made a
considered judgment to retain the relevant statutory text"). When Congress amended
Section 2 in 1982 to make clear that discriminatory intent is not required to establish a
violation, it was aware of nearly two decades of private enforcement litigation. It had no
need to add a private right of action. And when Congress amended the Voting Rights

Act again in 2006, it was aware of two more decades of private litigation *and* the Supreme Court's 1996 decision in *Morse* that recognized a private right of action to enforce Section 2. Congress has thus demonstrated its intent though repeated ratification.

Yet the district court in *Arkansas NAACP* refused to consider this context or the House and Senate reports based on its conclusion, under *Sandoval*, that the text and structure of the Voting Rights Act make it clear that Congress did not intend to provide a private right of action. 2022 WL 496908, at *14. That conclusion is wrong for all of the reasons discussed in the previous sections. But *Sandoval* does not say that courts can never consider legislative history or context to discern legislative intent in any event. The district court should have considered those interpretive tools alongside the text and structure, particularly because the legislative history is so authoritative and contains clear statements of Congress's intent on the issue. Instead, the court just put its head in the sand.

This Court should not. With open eyes, it is not difficult to see the district court's errors in *Arkansas NAACP* and why every other court to consider the private-right-of-action issue has come out the other way. This Court should not follow the *Arkansas NAACP* court's bad example. If the Court chooses to address the issue at all—and it need not—it should conclude that private plaintiffs can enforce Section 2.

## II.   THE TRIBES MAY ASSERT CLAIMS UNDER SECTION 2 TO PROTECT THEIR MEMBERS' VOTING RIGHTS

The Tribes may assert Section 2 claims. Defendant Jaeger contends (citing no supporting authority) that Tribal Plaintiffs Turtle Mountain and Spirit Lake should be

dismissed because they are not "citizen[s] of the United States" and are therefore not entitled to bring claims under Section 2. (ECF 18 at 7). This argument misses the mark. At the outset, the Court need not even reach this argument because Jaeger does not dispute that the Individual Plaintiffs may pursue their Section 2 claim. *See infra* Part III.A (citing authority that only one plaintiff must establish standing).

Even if the Court reaches Defendant Jaeger's claim, it should conclude that the Tribal Plaintiffs may bring their claims. Indeed, this Court has already rejected this precise argument. In *Spirit Lake Tribe v. Jaeger*, No. 1:18-cv-222, 2020 WL 625279, at *4-5 (D.N.D. Feb. 10, 2020), Jaeger contended that the Tribes could not assert Section 2 claims because they were not "persons" or "citizens of the United States." This Court rejected that argument, noting that it "does not test the sufficiency of the second amended complaint but rather attacks the rights of the Tribes to bring this action, [and so] is in reality another attack on the Tribes' standing." *Id.* at *4. On that score, this Court noted that in "many, if not most, voting rights cases an organization is one of the parties to the lawsuit." *Id.* at *5. Those organizations are routinely found to have standing to sue to enforce their members' Section 2 rights, even though they themselves are not citizens or voters. *See, e.g.*, *Common Cause/Georgia v. Billups*, 554 F.3d 1340 (11th Cir. 2009). And Tribal Plaintiffs have organizational standing to bring their claim here. *See infra* Part III.B.2. As such, Tribal Plaintiffs are entitled to bring their claim under Section 2. *See Spirit Lake Tribe*, 2020 WL 625279, at *4. *See also See United States v. Mazurie*, 419 U.S. 544, 557 (1975) (Tribes "are a good deal more than 'private, voluntary organizations.'"); *Alfred L. Snapp & Son, Inc. v. Puerto Rico*, 458 U.S. 592, 611 (1982) (Brennan, J., concurring) ("I can discern no basis

18

either in the Constitution or in policy for denying a State the opportunity to vindicate the federal rights of its citizens."); *Spirit Lake Tribe v. Benson Cnty.*, No. 2:10-cv-095, 2010 WL 4226614, at *1 (D.N.D. Oct. 21, 2010) (adjudicating claim by Spirit Lake brought under Section 2); *cf. Navajo Nation v. San Juan Cnty.*, 929 F.3d 1270 (10th Cir. 2019) (Navajo Nation pursuing claims under the Fourteenth Amendment and Section 2 of the Voting Rights Act); *Pfizer, Inc. v. Gov't of India*, 434 U.S. 308, 319 (1978) (holding that a foreign state can sue under anti-trust laws that provide protections to "persons").[4]

## III.    PLAINTIFFS HAVE STANDING

### A.  The individual plaintiffs have standing.

When there are multiple plaintiffs in a case, "[a]t least one plaintiff must have standing to seek each form of relief requested in the complaint." *Town of Chester*, 137 S. Ct. at 1651; *accord Spirit Lake Tribe*, 2020 WL 625279, at *3. And when one plaintiff has demonstrated standing, a court need not consider whether other plaintiffs also have standing to seek the same relief. *Arlington Heights v. Metro. Housing Dev. Corp.*, 429 U.S. 252, 264, and n. 9, (1977) ("[W]e have at least one individual plaintiff who has demonstrated standing . . . . Because of the presence of this plaintiff, we need not consider whether the other individual and corporate plaintiffs have standing to maintain the suit"); *see, e.g., Trump v Hawaii*, 138 S. Ct. 2392, 2416 (2018) (examining the standing of

---

[4] This accords with the plain text of Section 2, which does not limit lawsuits to enforce its requirements to "persons" or "citizens" but rather merely prohibits the *State* from *discriminating* against persons and citizens. Like any other claim, an organization that suffers an injury from a violation—such as through diversion of resources or on behalf of affected members—may sue even if it was not the direct target of the allegedly unlawful act.

individual plaintiffs but not the standing of state or association plaintiffs); *Jones v. Gale*, 470 F.3d 1261, 1265 (8th Cir. 2006) ("'[W]here one plaintiff establishes standing to sue, the standing of the other plaintiffs is immaterial' to jurisdiction.") (quoting *Nat'l Wildlife Fed'n v. Agric. Stabilization & Conservation Serv.*, 955 F. 2d 1199, 1203 (8th Cir. 1992)).

Here, the plaintiffs raise only one claim, and they all seek the same relief. (ECF 1 at 29-31). The plaintiffs include three individuals and two Indian tribes. (*Id.* at 5-7). Jaeger challenges the standing of the Indian tribes, but he does not question the standing of the individual plaintiffs. (ECF 17). Nor could he. According to the complaint, those individuals are voters in legislative districts 9A and 15—the two districts that are alleged to be "packed" and "cracked" in violation of the Voting Rights Act. They plainly have standing here under well-established law. *See, e.g., Roberts*, 883 F.2d at 621 (holding that "a private litigant attempting to protect his right to vote" has standing under Section 2); *Larry v. Arkansas,* 2018 WL 4858956, at *6 (W.D. Ark. Aug. 3, 2018) (collecting cases).

Because of the presence of these three individual plaintiffs, this Court need not consider whether the tribes also have standing. This Court would have jurisdiction in any event.

### B.  The Tribal plaintiffs have standing.

The Tribal Plaintiffs likewise have standing. Article III of the United States Constitution provides this Court with subject matter jurisdiction over "cases" and "controversies" for any action which a plaintiff has standing to bring. U.S. Const. art. III § 2. The "constitutional minimum of standing contains three elements": (1) injury in fact;

(2) with a causal connection fairly traceable to the defendant; and (3) that is redressable by the court. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992).

### 1.   The Tribes Have Standing Under the Doctrine of *Parens Patriae*.

As sovereign governments, the Tribes have standing to bring this suit under the doctrine of *parens patriae*. To establish standing under *parens patriae*, the sovereign, first, "must assert an injury to what has been characterized as a 'quasi-sovereign' interest . . ." *Snapp*, 458 U.S. at 601. According to the United States Supreme Court in *Snapp*, this quasi-sovereign interest includes "the health and well-being—both physical and economic—of its residents" and there is "a quasi-sovereign interest in not being discriminatorily denied its rightful status within the federal system." *Id.* at 607.

*Snapp* involved a challenge by the Commonwealth of Puerto Rico as *parens patriae* on behalf of 787 of its farmworker citizens, alleging discriminatory violations of multiple federal statutes. The Court explained Puerto Rico having a "substantial interest in securing its residents from the harmful effects of discrimination. This interest is peculiarly strong in the case of Puerto Rico simply because of the fact that invidious discrimination frequently occurs along ethnic lines." *Id.* at 593. The Court also noted that while there must be injury to a substantial proportion of the population,

> [t]he Court has not attempted to draw any definitive limits on the proportion of the population of the State that must be adversely affected by the challenged behavior. Although more must be alleged than injury to an identifiable group of individual residents, *the indirect effects of the injury must be considered as well in determining whether the [sovereign] has alleged injury to a sufficiently substantial segment of its population.*

*Id.* at 607 (emphasis added). And although only 787 jobs were directly at issue in the case, the Court in *Snapp* looked at the injury more broadly, stating, that "we recognize a similar state interest in securing residents from the harmful effects of discrimination. This Court has had too much experience with the political, social, and moral damage of discrimination not to recognize that a State has a substantial interest in assuring its residents that it will act to protect them from these evils." *Id.* at 609.

The Eighth Circuit has recognized the ability of tribes to sue as *parens patriae. See e.g., Oglala Sioux Tribe v. Fleming*, 904 F.3d 603, 610 (8th Cir. 2018) (leaving the lower court's finding of tribal *parens patriae* standing intact and reversing on other grounds); *Delorme v. United States*, 354 F.3d 810, 816 (8th Cir. 2004) (holding that a hereditary chief lacked standing because he didn't clarify "whether he claims standing as the representative of a tribal government . . . as the tribal government seeking *parens patriae* standing . . . or as an individual"); *Standing Rock Sioux Indian Tribe v. Dorgan*, 505 F.2d 1135, 1137 (8th Cir. 1974). And other circuits have allowed tribes to sue as *parens patriae. See, e.g., Confederated Tribes of the Chehalis Reservation v. Thurston Cnty. Bd. of Equalization*, 724 F.3d 1153 (9th Cir. 2013); *Cheyenne and Arapaho Tribes v. First Bank & Trust Co.*, 560 Fed. Appx. 699, 703-04 (10th Cir. 2014) (assuming, but not deciding, *parens patriae* standing for tribes).

Jaeger contends that the Tribal Plaintiffs lack *parens patriae* standing because they are not advancing the interests of all their members, rather only those who live on the Turtle Mountain and Spirit Lake Reservations. (ECF 18 at 12). This argument is misplaced for at least two reasons. First, the Tribal Plaintiffs advance their claim in this case on

behalf of a substantial number of their members. The Spirit Lake Reservation has been drawn within District 15 and is the only tribal reservation within the District. District 15 has a Native American Voting Age population of 2,513, and a total Native American population of 4,465. Given the tribal member enrollment of 7,559, a substantial number of the Spirit Lake tribal members have a direct interest in this case. District 9 contains the Turtle Mountain Reservation, which is the only tribal reservation within the District. District 9 has a Native American Voting Age population of 5,815, and a total Native American population of 9,316.

The number of tribal members residing within Districts 9 and 15 represents a substantial number of the Tribes' members. This far outnumbers the number and proportion of citizens directly injured in the *Snapp* case, and is sufficient to be considered a substantial proportion of the population to satisfy *parens patriae* standing. This case is nothing like *Santee Sioux Tribe*, cited by Jaeger (ECF 18 at 11), where the Eighth Circuit rejected the notion of *parens patriae* standing on behalf of "a dozen or so members of the Tribe." *United States v. Santee Sioux Tribe of Neb.*, 254 F.3d 728, 734 (8th Cir. 2001).

Second, the Tribal Plaintiffs advance their claim in this case on behalf of all members within their sovereign territorial jurisdiction. Their Section 2 claim arises out of the placement of the entirety of the two Reservations within the state legislative map. Their claim is thus on behalf of all members within their geographic territory. Jaeger emphasizes that the Tribal Plaintiffs allege no claims "on behalf of the many thousands of tribal members not living on or near one of their respective reservations," (ECF 18 at 12-13), but that is beside the point. A state may sue as *parens patriae* to ensure that it

receives its "equitable share of an interstate river's water," *South Carolina v. North Carolina*, 558 U.S. 256, 274 (2010), regardless of the fact that it has citizens—like those serving in the military or in college—who temporarily live out-of-state and do not use the river's water. If Jaeger's argument had merit, *no sovereign* could ever maintain a *parens patriae* action because no sovereign's citizens are at all times within their territorial jurisdiction. In this case, like in the quintessential example of a riparian dispute between states, the Tribal Plaintiffs' claims are behalf of all members within their territorial jurisdiction, and Jaeger's focus on those members residing outside the Reservations is misplaced.[5]

Jaeger also contends that the Tribal Plaintiffs lack a quasi-sovereign interest apart from those of its members. (ECF 18 at 13). But the complaint details the efforts and desire of the Tribes, through their Chairmen, to attain a legislative district "encompassing their two Tribal Nations," (ECF 1 ¶ 52), in order to protect the ability of their members to exercise their voting rights on an equal basis. The reasonable inference from these allegations—confirmed by common sense—is that the Tribes have a quasi-sovereign

---

[5] Even tribal members who do not live with Districts 9 and 15 are affected by the actions of the Legislature. If the tribal members currently in Districts 9 and 15 have their vote diluted in violation of the Voting Rights Act, the lack of representation will injure all tribal members, within and outside of the districts. The State Legislature may adopt laws that impact the rights and resources of the Tribes and their members. Tribal members who reside outside the districts still enjoy benefits of tribal membership, such as healthcare benefits, the right to vote in tribal elections, scholarship benefits, etc. State legislation can directly impact the ability of the Tribes to provide services to their members, including members living off-reservation. This case affects the interests of not just a substantial proportion, but all Turtle Mountain and Spirit Lake tribal members. Therefore, the Tribes have standing as *parens patriae* in this case.

interest in maintaining influence in the legislature, which can only be achieved if their members' Section 2 rights are respected.[6] Plaintiffs are not obligated to plead legal theories or hyper-technical recitations of the phrase "quasi-sovereign" in order to plead facts sufficient to establish standing.

## 2.   The Tribes Have Organizational Standing.

The Tribes have organizational standing to sue. A plaintiff has standing when it is forced to divert resources in response to a defendant's unlawful conduct. *See Havens Realty Corp v. Coleman*, 455 U.S. 363, 379 (1982). "At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we presume that general allegations embrace those specific facts that are necessary to support the claim." *Lujan*, 504 U.S. at 561. Tribes' ability to invoke organizational standing has been recognized in order for Tribes to seek redress for injuries suffered by tribal members. See, e.g., *S. Fork Band v. U.S. Dep't of Interior*, 643 F. Supp. 2d 1192, 1200 (Nev. 2009) ("The court finds that provided Plaintiff tribes . . . can satisfy both the constitutional and prudential limits of standing, their standing can be viewed as analogous to organizational standing.") *aff'd in part, rev'd in part on other grounds*, 588 F.3d 718 (9th Cir. 2009).

This Court has also recognized organizational standing and the ability of Tribes to have standing under this theory. In *Spirit Lake Tribe*, Jaeger challenged the standing of the

---

[6] Moreover, the type of injury suffered by the tribal members – having their fundament right to vote diluted in violation of federal law, is precisely the type described by the *Snapp* Court as "the quasi-sovereign interest in not being discriminatorily denied its rightful status within the federal system." *Snapp* at 607.

Spirit Lake Tribe and the Standing Rock Sioux Tribe to seek an injunction preventing Jaeger from enforcing a discriminatory voter identification law. The Court noted that membership organizations like the NAACP and others are routinely held to have organizational standing in Section 2 voting rights cases. *Spirit Lake Tribe*, 2020 WL 625279, at *5. "The Court can see no reason why a federally recognized Indian Tribe would not have standing to sue to protect the voting rights of its members when private organizations like the NAACP and political parties are permitted to do so." *Id.*

Moreover, in *Spirit Lake Tribe*, this Court concluded that the Tribes had standing because they had diverted resources responding to the alleged violation of their members' voting rights. *Spirit Lake Tribe*, 2020 WL 625279, at *4 ("Having determined that the Tribes have standing on a diversion of resources basis, the Court need not determine whether they have associational standing or standing as parens patriae." (citing *Common Cause/Ga. V. Billups*, 554 F. 3d 1340, 1351 (11th Cir. 2009)).

In this matter, the Tribes have been forced to divert resources in response to the North Dakota State Legislature's refusal to follow the Voting Rights Act. Despite being requested multiple requests from tribes in the state, the Legislative Redistricting Committee refused to hold redistricting hearings on or near tribal reservations. (ECF 1 ¶ 43). Therefore, representatives from both Tribes traveled across the state to Bismarck on multiple occasions to provide written and oral testimony in favor of a legally compliant redistricting map that would not violate the voting rights of their members. (ECF 1 ¶ 44).

Specifically, Collette Brown, Spirit Lake's Gaming Commission Executive Director, traveled from the Spirit Lake Reservation to Bismarck on two separate occasions

to provide oral and written to the Legislative Redistricting Committee. Also, on September 29, 2021, Spirit Lake Chairman Douglas Yankton, Sr. similarly provided testimony to the Redistricting Committee. (ECF 1 ¶ 43).

On November 8, 2021, Chairman Yankton and Turtle Mountain Chairman Jamie Azure submitted oral and written testimony to the Redistricting Committee warning that the Committee's proposed map, if adopted, would violate the Voting Rights Act. The Chairmen further requested at that the meeting that their respective reservations be drawn together into a single district, which request was denied. The testimony of the Chairmen at the November 8 meeting included a joint letter from the Chairmen to the Governor and members of the Legislature providing racially polarized voting and voting performance analysis showing how the Committee's proposed map would violate the Voting Rights Act, and how the Tribes' proposed map would comply with it. (ECF 1 ¶¶ 50-55).

This diversion of resources by both Tribes, to develop testimony and analysis, and being forced to make multiple trips to Bismarck to testify before the Redistricting Committee in order to protect the fundamental voting rights of their members, establishes the Tribes' organizational standing in this case.

### 3.  The Tribes Have Associational Standing.

The Tribes also have associational standing. To establish associational standing on behalf of its members, an association must demonstrate: "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief

requested requires the participation of individual members in the lawsuit." *Hunt v. Wash. State Apple Advertising Comm'n*, 432 U.S. 333, 343 (1977). The ability to assert standing no less applies to Tribes than it does to an association on behalf of its members. *See S. Fork Band v. U.S. Dep't of Interior*, 643 F. Supp. 2d 1192, 1200 (D. Nev. 2009) ("Thus, Plaintiff tribes may have standing to sue in their 'own right to seek judicial relief from injury to itself and to vindicate whatever rights and immunities the association itself may enjoy." (quoting *Warth v. Seldin*, 422 U.S. 490, 511 (1975)), *aff'd in part, rev'd in part on other grounds*, 588 F.3d 718 (9th Cir. 2009).

Regarding the first prong, "[t]he association must allege that its members, or any one of them, are suffering immediate or threatened injury as a result of the challenged action of the sort that would make out a justiciable case had the members themselves brought suit." *Id.* at 342. Here, tribal members from both Tribes who reside in the Legislative Districts in question have standing to sue in their own right. Each tribal member from both Tribes residing in the affected districts has suffered an in injury in fact by the diluting of the voting strength in violation of Section 2 of the Voting Rights Act, as alleged in the Complaint. This is further evidenced by the fact that tribal members from both Tribes are currently parties to this case, and the only challenge to their claim by Jaeger is that Section 2 of the Voting Rights Act does not create a private right of action, which has been addressed *supra* Part I. A finding for Plaintiffs on that issue means that the standing of the individual tribal members from each Tribe is satisfied, and so too is the first prong for associational standing.

The second associational standing prong requires that the interest the Tribes' seeks to protect are germane to the Tribes' purpose. The Tribes have a direct interest in protecting the rights of their tribal members by ensuring that the voting rights of their tribal members are not violated, particularly when the voting rights violations are being suffered by tribal members who live on the Tribes' respective reservations, over which the Tribes respectively exercise jurisdiction as sovereign governments.[7]

The third prong for associational standing requires that the individual members of the Tribes need not be required to participate in the lawsuit in order for it to proceed. Participation of the individual tribal members is unnecessary in this case because the Tribes can obtain the relief necessary to redress injuries to members and the members will lose nothing by not bringing suit themselves. The Tribes seek to enjoin Jaeger from operating elections in Legislative Districts that have been drawn in violation of the Voting Rights Act, and for a legally compliant districting plan to be instituted. Individual tribal members all would have the same relief, and would not make any arguments in support

---

[7] *See* PREAMBLE TO CONST. AND BYLAWS OF THE TURTLE MOUNTAIN BAND OF CHIPPEWA INDIANS ("We, the people of the Turtle Mountain Band of Chippewa Indian of Belcourt, North Dakota, in order to develop and enjoy the advantages of democratic processes and opportunities to promote our general welfare, education, and prosperity, to promote good and law-abiding citizens, do ordain and establish this constitution and Bylaws for the Turtle Mountain Band of Chippewa Indians."). *See also* PREAMBLE TO SPIRIT LAKE TRIBE CONST. AND BYLAWS ("We, the members of the Spirit Lake Tribe, in order to promote justice, insure tranquility, encourage the general welfare, safeguard our interests and secure the blessings of freedom and liberty for ourselves and for our posterity, do hereby amend and revise our Tribal Constitution, reorganize our Tribal Council, and we do ordain and establish this Constitution and set of Bylaws as rules for its deliberation.").

that the Tribes have not. Thus, the Tribes' members would lose nothing by not bringing suit themselves. Therefore, the Tribes have demonstrated associational standing.

## CONCLUSION

The Court should deny Jaeger's motion to dismiss.

Dated this 13th day of May, 2022

/s/ Michael S. Carter
Michael S. Carter
OK No. 31961
carter@narf.org
Matthew Campbell
NM No. 138207, CO No. 40808
mcapbell@narf.org
NATIVE AMERICAN RIGHTS FUND
1506 Broadway
Boulder, CO 80301
Telephone: (303) 447-8760 (main)
Fax: (303) 443-7776

Samantha B. Kelty
AZ No. 024110, TX No. 24085074
kelty@narf.org
NATIVE AMERICAN RIGHTS FUND
1514 P St. NW, Suite D
Washington, D.C. 20005
(202) 785-4166

*Attorneys for Plaintiffs*

Bryan Sells*
bryan@bryansellslaw.com
THE LAW OFFICE OF BRYAN L.
SELLS, LLC
Post Office Box 5493
Atlanta, GA 31107-0493
Telephone: (404) 480-4212 (voice and fax)

*Attorney for Plaintiffs*

* *pro hac vice*

Mark P. Gaber
DC Bar No. 988077
mgaber@campaignlegal.org
Molly E. Danahy*
DC Bar No. 1643411
mdanahy@campaignlegal.org
CAMPAIGN LEGAL CENTER
1101 14th St. NW, Ste. 400
Washington, DC 20005
Telephone: (202) 736-2200 (main)

*Attorneys for Plaintiffs*

Timothy Q. Purdon
ND No. 05392
TPurdon@RobinsKaplan.com
ROBINS KAPLAN LLP
1207 West Divide Avenue, Suite 200
Bismarck, ND 58501
Telephone: (701) 255-3000
Fax: (612) 339-4181

*Attorney for Plaintiffs Spirit Lake Tribe and Turtle Mountain Band of Chippewa Indians*

31