**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA
EASTERN DIVISION**

| | |
|---|---|
| Turtle Mountain Band of Chippewa Indians, Spirit Lake Tribe, Wesley Davis, Zachery S. King, and Collette Brown | Case No. 3:22-cv-00022 |
| Plaintiffs, | |
| vs. | **DEFENDANT'S MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT** |
| Michael Howe, in his official capacity as Secretary of State of North Dakota, | |
| Defendant. | |

**INTRODUCTION**

Defendant Michael Howe, in his official capacity as Secretary of State of North Dakota ("Defendant" or "Defendant Howe") submits this memorandum in support of *Defendant's Motion for Summary Judgment*, filed herewith. Defendant Howe requests the Court grant summary judgment in his favor, dismissing the Plaintiffs' Complaint (Doc. 1) in its entirety with prejudice. After a thorough legislative redistricting process following the 2020 U.S. Census, the North Dakota Legislative Assembly passed and the North Dakota Governor signed into law House Bill 1504. The new law created State legislative districts, including the districts and subdistricts challenged in this action: Senate District 9, House Subdistrict 9A, House Subdistrict 9B, and District 15. Plaintiffs allege the challenged districts and subdistricts violate Section 2 of the Voting Rights Act by allegedly stacking Native American voters into House Subdistrict 9A, while allegedly cracking Native American voters in House Subdistrict 9B, and District 15. However, there is no genuine issue of material fact and Defendant is entitled to judgment as a matter of law because Plaintiffs have not established the first or third *Gingles* preconditions, which must be

established in order to pursue a Section 2 vote dilution claim.  Further, Plaintiffs' proposed remedial maps, and any variation thereof, are not permissible under the Voting Rights Act and would constitute a racial gerrymander in violation of constitutional principles.

## UNDISPUTED FACTS AND BACKGROUND

### I.  <u>Legislative Redistricting In North Dakota</u>

Legislative redistricting in North Dakota is governed in part by the Constitution of North Dakota.  Section 1, Article IV of the Constitution of North Dakota provides the "senate must be composed of not less than forty nor more than fifty-four members, and the house of representatives must be composed of not less than eighty nor more than one hundred eight members. These houses are jointly designated as the legislative assembly of the state of North Dakota."  Under Section 2, Article IV, the Legislative Assembly is required to "fix the number of senators and representatives and divide the state into as many senatorial districts of compact and contiguous territory as there are senators." N.D. Const., Art. IV, Sec. 2.  The senatorial districts "continue until the adjournment of the first regular session after each federal decennial census, or until changed by law."  *Id.*  The Legislative Assembly is required to "guarantee, as nearly as is practicable, that every elector is equal to every other elector in the state in the power to cast ballots for legislative candidates."  *Id.*  A senator and at least two representatives are apportioned to each senatorial district, however, Section 2, Article IV expressly permits the creation of subdistricts for elections of members of the House of Representatives, as was done in this case in District 9.  *Id.*  In that regard, the Constitution of North Dakota states, "[a] senator and at least two representatives must be apportioned to each senatorial district and be elected at large or from subdistricts from those districts. The legislative assembly… may provide for the election of senators at large and representatives at large or from subdistricts from those districts."  *Id.*

In addition to the state constitutional requirements, North Dakota Century Code Section 54-03-01.5 states that legislative redistricting plans must meet the following requirements:

1. The senate must consist of forty-seven members and the house must consist of ninety-four members.

2. Except as provided in subsection 3, one senator and two representatives must be apportioned to each senatorial district. Representatives may be elected at large or from subdistricts.

3. *    *    *.[1]

4. Legislative districts and subdistricts must be compact and of contiguous territory.

5. Legislative districts must be as nearly equal in population as is practicable. Population deviation from district to district must be kept at a minimum. The total population variance of all districts, and subdistricts if created, from the average district population may not exceed recognized constitutional limitations.

N.D.C.C. § 54-03-01.5.

## II.    2021 Legislative Redistricting Process

### A.    U.S. Census Data

The United States Census Bureau ("Census Bureau") is required by Public Law 94-171, enacted by Congress in 1975, to provide redistricting data tabulations ("Public Law 94-171 data") to state redistricting officers and bodies no later than one year from census day.  PL 94–171, December 23, 1975; 13 U.S.C § 141(c).  The Public Law 94-171 data from the Census Bureau is necessary for states to perform redistricting work.  Following the 2020 Census, the Public Law 94-171 data was required to be transmitted to the states by April 1, 2021.  *See* 13 U.S.C § 141(a) and

---

[1] North Dakota Century Code Section 54-03-01.5(3) and Article IV, Section 2 of the North Dakota Constitution allow two senatorial districts to be combined under certain circumstances, creating multimember senate districts with two senators and four representatives.  However, these provisions are not relevant to the present case.

(c).  However, on February 12, 2021, the Census Bureau announced that due to COVID-19 related delays and prioritizing the delivery of the apportionment results, the Public Law 94-171 data would not be available to the states by the April 1, 2021 deadline, but would be available by September 30, 2021.[2]  Despite the delay in receiving crucial data from the federal government, the State of North Dakota moved quickly to begin and ultimately complete the necessary redistricting work, as discussed below.

### B.      Legislative Committee Work

On April 21, 2021, North Dakota Governor Doug Burgum signed House Bill 1397, which established a legislative management redistricting committee ("Redistricting Committee") that was required to develop and submit to the legislative management by November 30, 2021 a redistricting plan and legislation to implement the plan.  Affidavit of David Phillips ("Phillips Aff."), *Exhibit 1[3]*.

On July 29, 2021, in a public meeting, the members of the Redistricting Committee received training on the use of the state-procured mapping software, called Maptitude.  Phillips Aff., *Exhibit 2*.  On August 12, 2021, the Census Bureau released the Public Law 94-171 data relating to the 2020 Census in a format that could be incorporated into Maptitude.[4]  Caliper

---

[2] https://www.census.gov/newsroom/press-releases/2021/statement-redistricting-data-timeline.html#:~:text=FEB.,30%2C%202021

[3] Various publicly available records are attached to the Phillips Affidavit. For the Court's convenience, where applicable, a hyperlink to the public record on the North Dakota Legislative Assembly website is also provided in the Phillips Affidavit.

[4] *See* https://www.census.gov/newsroom/press-releases/2021/news-conference-2020-census-redistricting-data.html; *see also* https://www.caliper.com/learning-redistricting/index.php/articles/when-will-i-receive-my-2020-redistricting-data/

Corporation, the developer of the Maptitude software, finished incorporating the 2020 Public Law 94-171 data for North Dakota into Maptitude on August 16, 2021.[5]

There is another legislative committee that also held relevant public meetings relating to redistricting: the Tribal and State Relations Committee.  Pursuant to North Dakota Century Code Section  54-35-23(3), the Tribal and State Relations Committee conducts "joint meetings with the North Dakota tribal governments' task force to study tribal-state issues, including government-to-government relations, human services, education, corrections, and issues related to the promotion of economic development."  On August 17, 2021, the Tribal and State Relations Committee held a public meeting at Turtle Mountain Community College, located in Belcourt, North Dakota on the Turtle Mountain Indian Reservation.  Phillips Aff., *Exhibit 3*.  At the meeting, Alysia LaCounte, General Counsel of Turtle Mountain Band of Chippewa Indians testified, and Nicole Donaghy, Executive Director of North Dakota Native Vote, provided written testimony.  Phillips Aff., *Exhibit 3* at p. 1, and *Exhibit 4*.

On August 26, 2021, the Redistricting Committee held a public meeting at the North Dakota State Capitol.  Phillips Aff., *Exhibit 5*.  At the meeting, Ben Williams from the National Conference of State Legislatures provided a presentation regarding redistricting fundamentals, the 2020 Census, legal doctrines that govern redistricting, and redistricting criteria.  Phillips Aff., *Exhibit 5* at pp. 1-2 and *Exhibit 6*.  Also at the meeting, Emily Thompson from the North Dakota Legislative Council presented a background memorandum for the Redistricting Committee, laying out the background, history, and applicable state and federal law relating to redistricting.  Phillips Aff., *Exhibit 5* at p. 2 and *Exhibit 7*.  Emily Thompson also presented a visual illustration of

---

[5] https://www.caliper.com/learning-redistricting/index.php/articles/when-will-i-receive-my-2020-redistricting-data/

constitutional and statutory mapping requirements.  Phillips Aff., ***Exhibit 5*** at p. 2 and ***Exhibit 8***. Also at the August 26, 2021 meeting of the Redistricting Committee, written testimony was provided by Collette Brown (Gaming Commission Executive Director at the Spirit Lake Casino and Resort) (Phillips Aff., ***Exhibit 5*** at p. 2 and ***Exhibit 9***), Karen Ehrens (Secretary of the League of Women Voters of North Dakota) (Phillips Aff., ***Exhibit 5*** at p. 2 and ***Exhibit 10***), Matt Perdue on behalf of North Dakota Farmers Union (Phillips Aff., ***Exhibit 5*** at p. 2 and ***Exhibit 11***), and Rick Gion (Director of North Dakota Voters First) (Phillips Aff., ***Exhibit 5*** at p. 2 and ***Exhibit 12***).

On August 31, 2021, the Tribal and State Relations Committee held a public meeting at the MHA Nation Interpretive Center, located in New Town, North Dakota on the Fort Berthold Indian Reservation.  Phillips Aff., ***Exhibit 13***.  The Tribal and State Relations Committee held another public meeting on September 1, 2021 at the Spirit Lake Casino and Resort, located in St. Michael, North Dakota on the Spirit Lake Nation Reservation.  Phillips Aff., ***Exhibit 14***.

On September 8, 2021, the Redistricting Committee held a public meeting in Fargo, North Dakota.  Phillips Aff., ***Exhibit 15***.  On September 15 and 16, 2021, the Redistricting Committee held a two-day public meeting at the North Dakota State Capitol.  Phillips Aff., ***Exhibit 16***.  At the meeting, written testimony was provided by Nicole Donaghy (Executive Director North Dakota Native Vote) (Phillips Aff., ***Exhibit 16*** at p. 2 and ***Exhibit 17***), Collette Brown (Gaming Commission Executive Director at the Spirit Lake Casino and Resort) (Phillips Aff., ***Exhibit 16*** at p. 1 and ***Exhibit 18***), Mike Faith (Chairman for the Standing Rock Sioux Tribe) (Phillips Aff., ***Exhibit 16*** at p. 1 and ***Exhibit 19***), and Charles Walker (Councilman for the Standing Rock Sioux Tribe ) (Phillips Aff., ***Exhibit 16*** at p. 1 and ***Exhibit 20***).  Matthew Campbell, a staff attorney with the Native American Rights Fund also testified.  ***Exhibit 16*** at p. 2.

On September 22 and 23, 2021, the Redistricting Committee held a two-day public meeting at the North Dakota State Capitol.  Phillips Aff., *Exhibit 21*.  At the meeting, attorney Claire Ness from the North Dakota Legislative Council made a presentation on legal considerations for subdistricting.  Phillips Aff., *Exhibit 21* at p. 1 and *Exhibit 22*.  Also at the meeting, written testimony was provide by Mark Fox (Phillips Aff., *Exhibit 21* at p. 2 and *Exhibit 23*), Chairman of the Tribal Business Council of the Mandan, Hidatsa and Arikara Nation ("MHA Nation").

On September 28 and 29, 2021, the Redistricting Committee held a two-day public meeting at the North Dakota State Capitol.  Phillips Aff., *Exhibit 24.*  At the meeting, written testimony was provided by Mike Faith (Chairman for the Standing Rock Sioux Tribe) (Phillips Aff., *Exhibit 24* at p. 4 and *Exhibit 25*), Mark Fox (Chairman of the Tribal Business Council of the MHA Nation) (Phillips Aff., *Exhibit 24* at p. 4 and *Exhibit 26*), Douglas Yankton (Sr., Chairman of the Spirit Lake Nation) (Phillips Aff., *Exhibit 24* at p. 4 and *Exhibit 27*), and Lisa DeVille (member of the MHA Nation) (Phillips Aff., *Exhibit 24* at p. 3 and *Exhibit 28*).  In relation to the meeting, attorney Claire Ness from the North Dakota Legislative Council sent an email to the Redistricting Committee members, providing summaries of various court cases relating to Section 2 of the Voting Rights Act.  Phillips Aff., *Exhibit 24* at p. 4 and *Exhibit 29*.

### C.    Final Report Of The Redistricting Committee

On November 1, 2021, as required by House Bill 1397, the Redistricting Committee submitted its final report regarding redistricting to the legislative management, with a recommendation to pass House Bill 1504, which included the descriptions of the proposed legislative districts.  Phillips Aff., *Exhibit 30* at pp. 19-30.  The final report noted the Redistricting Committee solicited and received testimony from multiple individuals representing tribal interests, tribal nations, and Native American rights organizations.  *Id.* at p. 29.  That testimony:

• Noted the growth of Native American populations in North Dakota;

• Urged the creation of subdistricts for Native American voters to comply with the federal Voting Rights Act and prevent dilution of votes cast by Native Americans;

• Requested tribal members be considered communities of interest;

• Urged the committee to provide equitable, more direct, and more responsive representation for Native Americans;

• Urged the committee not to split reservations into multiple districts;

• Noted multiple Native American candidates have had unsuccessful campaigns for membership in the House;

• Asserted there has been a history of discrimination in North Dakota against Native Americans; and

• Asserted a history of racial bloc voting has prevented Native American voters from electing their candidates of choice.

*Id.*

The final report also notes the Redistricting Committee received updates from committee members on the Tribal and State Relations Committee, which received similar testimony. *Id.* The final report also indicates the Redistricting Committee reviewed the 2020 Census data for tribal reservations, including the total population, total voting-age population, American Indian population, and American Indian voting-age population for each of the five reservations in North Dakota. *Id.* Further, the final report notes the Redistricting Committee received information from the Legislative Council staff and testimony from others on constitutional and statutory provisions regarding the use of race in redistricting, including in relation to the 14th Amendment to the United States Constitution and the Voting Rights Act, and applicable legal tests. *Id.*

8

The final report also notes that the Redistricting Committee members engaged in multiple discussions regarding subdistricts, including the subdistricts in District 9, with discussion of whether to draw subdistrict boundaries based on race, discussion of the ability of subdistricts to prevent dilution of Native Americans' votes, discussion of a preference for legislatively drawn district boundaries over court-drawn boundaries that may result from litigation, discussion of subdistricts providing communities of interest with an opportunity to select their candidates of choice. *Id.* at p. 30.

Ultimately, the Redistricting Committee recommended in its final report the passage of House Bill No. 1504 to establish 47 legislative districts, including subdistricts in District 9[6]. *Id.*

D.     **Legislative Assembly Work And Rejection Of The Marcellais Amendment**

Governor Burgum issued Executive Order 2021-17, which convened a special session of the Legislative Assembly on November 8, 2022 to, among other things, "provide for redistricting of government pursuant to Article IV, Section 2, of the North Dakota Constitution following the 2020 census".  Phillips Aff., ***Exhibit 31***.  On November 8, 2022, a Joint Redistricting Committee held hearings on House Bill 1504.  Phillips Aff., ***Exhibit 32***.  As reflected in the meeting minutes, Senator Richard Marcellais proposed an amendment to House Bill 1504, which would have created District 9 with a border around the Turtle Mountain Reservation and around the Spirit Lake Reservation, connected by a thin land bridge, which is similar to the remedial maps proposed by Plaintiffs for District 9 in this lawsuit. (*Id.* at pp. 12-16).  Maps of the proposed District 9 under the Marcellais Amendment are included in the meeting minutes (*Id.* at pp. 14-16) as Figures 1 through 3.  The Joint Redistricting Committee rejected the Marcellais Amendment, and ultimately

---

[6] District 4 also contains subdistricts, but District 4 and its subdistricts are not at issue in this case.

recommended passing the map that became the final map passed by the North Dakota Legislative Assembly.

Also at the November 8, 2022 meeting, written testimony was submitted by Douglas Yankton, Sr. (Chairman of the Spirit Lake Nation) (*Id*. at pages pp. 17-24), Jamie Azure (Chairman of the Turtle Mountain Band of Chippewa Indians) (*Id*. at pp. 25-32), and Rick Gion on behalf of North Dakota Voters First (*Id.* at p. 33).

On November 9, 2022, the House of Representatives debated and voted on House Bill 1504 in a floor session. The floor debate included a division of the bill into Divisions A and B.  Division A included the language dividing Districts 4 and 9 into subdistricts.   Division B included the remainder of the bill.   If Division A had failed, Districts 4 and 9 would not have included subdistricts.  The House of Representatives voted in favor of both Division A and Division B. The House voted in favor of House Bill 1504.

On November 10, 2021, the Senate debated and voted on House Bill 1504 in a floor session. The floor debate included a division of the bill similar to the division in the House. The Senate voted in favor of Division A and Division B.  During the Senate debate, Senator Richard Marcellais moved his amendment, but it was rejected by the Senate after debate.  The Senate voted in favor of House Bill 1504, without amendment.

### E.    Final Districts/Maps At Issue In This Case

House Bill 1504 was signed by Governor Doug Burgum on November 11, 2021 and became law when filed with the Secretary of State the next day.   Doc. 19-1.   The district descriptions were codified as North Dakota Century Code Section 54-03-01.14 after technical corrections were made.

Maps of the final statewide redistricting recommended by the Redistricting Committee, and ultimately codified in law, are contained in the legislative record and the relevant maps are attached to the Phillips Aff. as ***Exhibit 33***.  For the Court's convenience and reference, the Legislative Branch website also contains the approved maps for each district[7], as well as a static version[8] and interactive version[9] of the full statewide map.

At issue in this case are Senate District 9 (with its House Subdistricts 9A and 9B) and District 15.  *See* Phillips Aff. as ***Exhibit 33***.  One senator is elected at large from Senate District 9.  One member of the House is elected from House Subdistrict 9A and one member of the House is elected from House Subdistrict 9B.  One senator and two members of the House are elected at large from District 15.

## PLAINTIFFS' ALLEGATIONS

The Plaintiffs in this lawsuit are two federally recognized Tribes (Turtle Mountain Band of Chippewa Indians and Spirit Lake Tribe) with reservations located in the legislative districts at issue, and several individual Native Americans (Wesley Davis, Zachery S. King, and Collette Brown) who allegedly reside in the legislative districts at issue.  The Turtle Mountain Indian Reservation is located in Rollette County, North Dakota, and is contained entirely within Senate District 9 and House District 9A.  *Id.* at pp. 1, 11.  The Spirit Lake Reservation has portions in Benson, Eddy, Nelson, Wells, and Ramsey Counties, North Dakota, and is contained entirely within District 15 (which has no subdistricts).  *Id.* at pp. 1, 18.

---

[7] https://www.ndlegis.gov/assembly/67-2021/special/approved-legislative-redistricting-maps
[8] https://www.ndlegis.gov/files/district-maps/2023-2032/finalmaphb1504.pdf
[9]https://ndgov.maps.arcgis.com/home/webmap/templates/OnePane/basicviewer/embed.html?web map=abb67d432e9242c4800374ba87763c80&gcsextent=-101.40,47.50,-101.20,49.30&displayslider=true&displaydetails=true&displaysearch=true

Plaintiffs have sued Defendant Howe in his official capacity as Secretary of State of North Dakota.[10] The North Dakota Secretary of State is the State's supervisor of elections and is responsible for "supervis[ing] the conduct of elections," and "publish[ing] . . . a map of all legislative districts." N.D. Cent. Code §§ 16.1-01-01(1); 16.1-01-01(2)(c).  He is tasked with "maintain[ing] the central voter file," which "must contain . . . the legislative district . . . in which the [voter] resides." N.D. Cent. Code §§ 16.1-02-01; 16.1-02-12(6).  As the supervisor of elections, the North Dakota Secretary of State has broad duties to administer Chapter 16.1 of the North Dakota Century Code relating to elections.  *See* N.D. Cent. Code § 16.1-01-01.

Plaintiffs allege under the redistricting plan adopted by the State of North Dakota in 2021, "Native American voters in northeastern North Dakota are 'cracked' in District 9B and District 15 where they constitute a minority of the voting age population.  The remaining Native American population is packed into District 9A, where Native Americans constitute a supermajority of the voting age population."  Doc. 1, ¶ 126.  Plaintiffs claim this results in dilution of the votes of the individual Plaintiffs (Wesley Davis, Zachery S. King, and Collette Brown, and of other members of Plaintiffs Turtle Mountain Band of Chippewa Indians and Spirit Lake Tribe, allegedly in violation of Section 2 of the Voting Rights Act.  *Id.* at ¶ 131.  Plaintiffs' Complaint contains a single count, and it is based solely on Section 2 of the Voting Rights Act.  *Id.* at ¶¶ 124-31.  In their prayer for relief, Plaintiffs seek a declaration that House Bill 1504 violates Section 2 of the Voting Rights Act, an injunction preventing Defendant Howe from administering, enforcing, preparing for, or permitting the nomination or election of members of the Legislative Assembly

---

[10] This action was originally commenced against Alvin Jaeger, in his official capacity as Secretary of State of North Dakota.  After the commencement of this action, Michael Howe won the general election for Secretary of State of North Dakota on November 8, 2022 and assumed the office on January 1, 2023.  In accordance with Federal Rule of Civil Procedure 25(d), the Court issued an order (Doc. 90) substituting Michael Howe for Alvin Jaeger as defendant.

from the challenged districts, an order for the Legislative Assembly to enact a new redistricting plan by a reasonable deadline, or an order establishing a new redistricting plan if the Legislative Assembly fails to meet the deadline.  Doc. 1, p. 31.  In their Supplemental Complaint (Doc. 44), Plaintiffs added the following additional supplemental request for relief:  "Order a special election for a newly configured state legislative district in November 2024 to ensure that Native American voters in Turtle Mountain and Spirit Lake are not forced to wait until 2026—six years into the decennial redistricting cycle—in order to be afforded an equal opportunity to elect their candidates of choice to the state senate."  Doc. 44, p. 6.

In their Complaint and Supplemental Complaint, Plaintiffs seek the creation of a new alternatively configured multimember District 9 (with no subdistricts such that the electors in the district elect one senator and two members of the House), which encompasses and combines both the Turtle Mountain Reservation and the Spirit Lake Reservation.  Doc. 1, ¶ 128; Doc. 44, ¶¶ 21, 29.  Plaintiffs provided two specific proposed alternative remedial district maps in the expert report of one of their disclosed experts, Dr. Loren Collingwood.  Phillips Aff., **Exhibit 34**, at pp. 31, 38. Both of these alternative remedial district maps, and any other conceivable map that encompasses and combines both the Turtle Mountain Reservation and the Spirit Lake Reservation, resembles an electoral barbell, with two distinct and geographically distant reservations connected by a narrow land bridge, with the land bridge containing few Native Americans.  This is well illustrated in the report of Defendant's expert Dr. M.V. (Trey) Hood III, which contains depictions of Plaintiffs' two proposed alternative remedial district maps, with the Native American population shown in green concentrated in and around the reservation in each end of the electoral barbell. **Exhibit 35**, Phillips Aff., at pp. 10-11. As discussed below, Plaintiffs' alternative remedial district

maps, and any other conceivable map that encompasses and combines both the Turtle Mountain

Reservation and the Spirit Lake Reservation, constitutes an unconstitutional racial gerrymander.

## LAW AND ARGUMENT

### I.      Summary Judgment Standard

The Eighth Circuit Court of Appeals has explained the summary judgment standard as

follows:

> Summary judgment is appropriate only when the pleadings, depositions and
> affidavits submitted by the parties indicate no genuine issue of material fact and
> show that the moving party is entitled to judgment as a matter of law.  The party
> seeking summary judgment must first identify grounds demonstrating the absence
> of a genuine issue of material fact.  Such a showing shifts to the non-movant the
> burden to go beyond the pleadings and present affirmative evidence showing that a
> genuine issue of material fact exists.  The non-moving party must do more than
> simply show that there is some metaphysical doubt as to the material facts.  The
> non-movant "must show there is sufficient evidence to support a jury verdict in his
> favor.  Factual disputes that are irrelevant or unnecessary will not be counted, and
> a mere scintilla of evidence supporting the non-movant's position will not fulfill
> the non-movant's burden.

*Uhiren v. Bristol-Meyers Squibb Company, Inc.*, 346 F.3d 824, 827 (8th Cir. 2003)(citations and

quotations omitted).

In the present case, there are no genuine issues of material fact reasonably in dispute in

relation to the relief being requested by Plaintiffs, and Defendant is entitled to judgment as a matter

of law.

### II.     Section 2 of the Voting Rights Act

The sole claim made by Plaintiffs in this lawsuit is that legislative District 9 (including

Subdistricts 9A and 9B) and legislative District 15 violate Section 2 of the Voting Rights Act.  *See*

Doc. 1, ¶¶ 124-31.  Section 2(a) of the Voting Rights Act provides, "[n]o voting qualification or

prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State

or political subdivision in a manner which results in a denial or abridgment of the right of any

citizen of the United States to vote on account of race or color. . . ." 52 U.S.C. § 10301(a). Section

2(b) provides clarification, stating:

> A violation . . . is established if, based on the totality of circumstances, it is shown
> that the political processes leading to nomination or election in the State or political
> subdivision are not equally open to participation by members of a [protected] class
> of citizens . . . in that its members have less opportunity than other members of the
> electorate to participate in the political process and to elect representatives of their
> choice.

52 U.S.C. § 10301(b).

### A.  Elements Of A Section 2 Vote Dilution Claim

The United States Supreme Court has identified three preconditions (the *Gingles*

preconditions), which are necessary to proceed with a vote dilution claim under Section 2 of the

Voting Rights Act. *Thornburg v. Gingles*, 478 U.S. 30, 50-51 (1986). The three *Gingles*

preconditions are:

> 1. "[T]he minority group...is sufficiently large and geographically compact to
> constitute a majority in a single-member district,"
>
> 2. "[T]he minority group...is politically cohesive," and
>
> 3. "[T]he white majority votes sufficiently as a bloc to enable it—in the absence of
> special circumstances...—usually to defeat the minority's preferred candidate."

*Id*.

> If all three preconditions are established, then a court must consider the totality of
> the circumstances and determine, based upon a searching practical evaluation of
> the past and present reality, whether the political process is equally open to minority
> voters. This determination is peculiarly dependent upon the facts of each case,' and
> requires an intensely local appraisal of the design and impact of the contested
> electoral mechanisms.  In undertaking this practical evaluation, courts look to the
> non-exhaustive list of "typical factors" identified in the Senate Report
> accompanying the 1982 amendments to the VRA ("Senate Factors").

*Missouri State Conf. of the Nat'l Ass'n for the Advancement of Colored People v. Ferguson-Florissant Sch. Dist.*, 201 F. Supp. 3d 1006, 1016 (E.D. Mo. 2016), *aff'd*, 894 F.3d 924 (8th Cir. 2018) (internal citations and quotations omitted).  The Senate Factors include:

1. The history of official voting-related discrimination in the state or political subdivision;

2. The extent to which voting in the elections of the state or political subdivision is racially polarized;

3. The extent to which the state of political subdivision has used voting practices or procedures that tend to enhance the opportunity for discrimination against the minority group, such as unusually large election districts, majority-vote requirements, and prohibitions against bullet voting;

4. The exclusion of members of the minority group from candidate slating processes;

5. The extent to which minority group members bear the effects of discrimination in areas such as education, employment, and health, which hinder their ability to participate effectively in the political process;

6. The use of overt or subtle racial appeals in political campaigns; and

7. The extent to which members of the minority group have been elected to public office in the jurisdiction.

S.Rep. No. 97-417, 97th Cong., 2d Sess. (1982), pages 28-29.

For purposes of this summary judgment motion, Defendant does not dispute the second *Gingles* precondition is met – that Native American voters are politically cohesive.  Further, while Defendant intends to challenge some of the Senate Factors/totality of the circumstances claims and intends to hold Plaintiffs to their burden of proof in that regard in the event this action proceeds to trial, Defendant does not challenge these allegations for purposes of summary judgment.  For

purposes of this summary judgment motion, Defendant *does* assert that Plaintiffs cannot establish the first or third *Gingles* preconditions, and thus Plaintiffs' Complaint cannot survive summary judgment. Further, the remedial plans sought by Plaintiffs are impermissible under the Voting Rights Act and under the United States Constitution.

1.    **The First *Gingles* Precondition Is Not Met**

The first *Gingles* precondition is that "the minority group...is sufficiently large and geographically compact to constitute a majority in a single-member district." *Gingles*, 478 U.S. at 50. This precondition is only met with respect to the challenged districts and subdistricts which were actually created by the State of North Dakota in 2021 (District 9, Subdistrict 9A, Subdistrict 9B, and District 15), not with respect to the remedial maps sought by Plaintiffs.

The Native American population in and near the Turtle Mountain Reservation is sufficiently large and geographically compact to constitute a majority of the voting age population (77%) in the single member Subdistrict 9A, wherein one member of the House is elected. Phillips Aff., ***Exhibit 33***. The same Native American population in and near the Turtle Mountain Reservation is sufficiently large and geographically compact to constitute a majority of the voting age population (51.7%) in the single member Senate District 9, wherein one senator is elected. Phillips Aff., ***Exhibit 35*** at p.2.

However, the Native American population in Subdistrict 9B is *not* sufficiently large or geographically compact to constitute a majority of the voting age population (29.4%) in the Subdistrict 9B, wherein a single member of the House is elected. Phillips Aff., ***Exhibit 33***. Similarly, the Native American population in and near the Spirit Lake Reservation is not sufficiently large or geographically compact to constitute a majority of the voting age population (20.4%) in the District 15, a multimember district wherein two members of the House and one

senator are elected.  Phillips Aff., ***Exhibit 33***.  Further, with a Native American population of only 3,134 and a Native American voting age population of only 1,706 (Phillips Aff., ***Exhibit 36***), the Spirit Lake Reservation does not contain enough Native Americans to constitute a majority in any possible single member House subdistrict (subdistricts must contain approximately 8,288 residents), or single member Senate District (which must contain approximately 16,576 residents) to maintain the required substantial population equality. *See* Phillips Aff., ***Exhibit 37*** at p. 1, ¶ 2; *see also Reynolds v. Sims*, 377 U.S. 533, 578 (1964).

The foregoing is already reflected in the actual district maps that were properly created and enacted by the State of North Dakota in 2021.  Due to the fact that Native American populations are geographically concentrated in and around the Turtle Mountain Reservation and the Spirit Lake Reservation, there is no way to modify the district lines to pull a relevant number of additional Native American voters into either District 9 or District 15 without racially gerrymandering a new multimember district that connects the two geographically distant reservations with a narrow land bridge.  Centroid to centroid the distance between the two reservations is 77 miles.  Phillips Aff., ***Exhibit 35*** at p. 10, n. 18. Connecting the two reservations in a single district is in fact the <u>*only*</u> way to increase the Native American population in a single district, and is the method used in both demonstrative remedial district maps proposed by Plaintiffs (Phillips Aff., ***Exhibit 35*** at pp. 10-11) and the Marcellais Amendment (Phillips Aff., ***Exhibit 32*** at pp. 12-16).

## 2.   <u>The Third *Gingles* Precondition Is Not Met</u>

The third *Gingles* precondition is that "the white majority votes sufficiently as a bloc to enable it—in the absence of special circumstances...—usually to defeat the minority's preferred candidate."  *Gingles*, 478 U.S. at 51.  Plaintiffs' expert Dr. Collingwood conducted a performance analysis in order to determine if the Native American candidate of choice is typically defeated for

those races where racially polarized voting is present.  Phillips Aff., **_Exhibit 35_** at p. 2.  Using Dr. Collingwood's own analysis of various past races, if the current map of District 9, Subdistrict 9A, and Subdistrict 9B were in effect, the Native American candidate of choice would have been defeated by the white voting bloc only 38.2% of the time.  Phillips Aff., **_Exhibit 35_** at pp. 2-3, and Table 1.  Plaintiffs' own expert's analysis confirms that District 9 and its subdistricts are functioning such that Native American voters can typically elect their candidates of choice.

There is no genuine issue of material fact with respect to the third _Gingles_ precondition insofar as it is applied to District 9, Subdistrict 9A, and Subdistrict 9B.  With respect to District 15 (and the Spirit Lake Reservation contained therein), the Native American candidates of choice might usually be defeated by the white voting bloc, however, that is to be expected with such a small population of Native American voters, which is not large enough to form a majority in either a subdistrict or a district.  As discussed above, the only way to increase the Native American population in a district that includes the Spirit Lake Reservation (currently in District 15) is to create a new racially gerrymandered multimember district that connects the Spirit Lake Reservation with the geographically distant Turtle Mountain Reservation by way of a narrow land bridge.

### 3.  <u>Plaintiffs' Proposed Remedial Maps, And Any Variation Thereof, Are Not Permissible Under The Voting Rights Act</u>

The first and third _Gingles_ preconditions are not met, as discussed above, and thus the Court need not consider any remedial redistricting plans beyond the proper redistricting plan implemented by the State of North Dakota in 2021.  The Eighth Circuit Court of Appeals has explained:

> The Supreme Court has described the _Gingles_ preconditions as "threshold conditions" that must be established before liability can be assessed. And, only after "a Section 2 violation is found" should a district court turn to the task of "developing a constitutional remedy." _Bone Shirt_, 461 F.3d at 1022. Nevertheless, FFSD takes the position that the first _Gingles_ precondition cannot be satisfied if the

single-member districts that the NAACP proposed would give black voters no greater chance to elect a candidate of their choice than the current at-large system. But as we have said, "at the initial stage of the *Gingles* precondition analysis, the plaintiffs are only required to produce a *potentially* viable and stable solution." Id. at 1019 (emphasis in original). Of course, the district court must still determine that the proposed solution demonstrates that the minority group is "sufficiently large and geographically compact to constitute a majority of a single member district," or, in other words, that it is "potentially viable and stable." However, at this stage of the proceedings, NAACP is not required to proffer the best option for remedying the asserted violation. *See id.* ("As the district court correctly noted, the *Gingles* preconditions are designed to establish liability, and not a remedy."); *see also Gingles*, 478 U.S. at 50 n.17, 106 S.Ct. 2752 (explaining that the purpose for this requirement is that, "[u]nless minority voters possess the *potential* to elect representatives in the absence of the challenged structure or practice, they cannot claim to have been injured by that structure or practice."). The first precondition "seeks to establish whether a workable solution is possible," *Bone Shirt*, at 1019, and is met when "the minority group [is] able to demonstrate that it is sufficiently large and geographically compact to constitute a majority in a single member district." *Gingles*, 478 U.S. at 49, 106 S.Ct. 2752.

*Missouri State Conf. of the Nat'l Ass'n for the Advancement of Colored People v. Ferguson-Florissant Sch. Dist.*, 894 F.3d 924, 934–35 (8th Cir. 2018). As discussed above, the only remedial district maps proposed by Plaintiffs, and the only type of remedy sought, involves creation of a new racially gerrymandered multimember district that connects the Spirit Lake Reservation with the geographically distant Turtle Mountain Reservation by way of a narrow land bridge.

Courts in the Eighth Circuit have explained:

In formulating a remedial plan, the first and foremost obligation of the district court is to correct the Section 2 violation. Second, the court's remedy should achieve population equality while avoiding, when possible, the use of multi-member districts and it should be narrowly tailored. Third, the remedial plan must not violate Sections 2 or 5 of the VRA. Finally, the plan should not intrude on state policy any more than is necessary to uphold the requirements of the Constitution.

*Lower Brule Sioux Tribe v. Lyman Cnty.*, No. 3:22-CV-03008-RAL, 2022 WL 4008768, at *26 (D.S.D. Sept. 2, 2022) (citing *Cottier v. City of Martin*, 551 F.3d 733, 743 (8th Cir. 2008); *Swann v. Charlotte–Mecklenburg Bd. of Educ.*, 402 U.S. 1, 15 (1971); *Covington v. North Carolina*, 270 F. Supp. 3d 881, 889 (M.D.N.C. 2017)).

20

Unlike the plan implemented by the State of North Dakota, the remedial district plan sought by Plaintiffs and all variations thereof rely on a multi-member district to elect a senator and two members of the House.  Courts prefer single member districts for remedial districts, such as are implemented in District 9, Subdistrict 9A, and Subdistrict 9B.  *Id.*

Additionally, Plaintiffs are seeking to create a single new district that encompasses both the Turtle Mountain Reservation and the Spirit Lake Reservation, creating a Native American supermajority for all three legislative seats, which exceeds the requirements of Section 2 of the Voting Rights Act and the Constitution.   Plaintiffs first demonstrative plan has a Native American voting age population of 66.1%, while their second demonstrative plan has a Native American voting age population of 69.1%.  Phillips Aff., ***Exhibit 34*** at pp. 31, 38.  The United States Supreme Court "has held… that § 2 can require the creation of a 'majority-minority' district, in which a minority group composes a numerical, working majority of the voting-age population…." *Bartlett v. Strickland*, 556 U.S. 1, 129 S. Ct. 1231, 1236 (2009) (citing *Voinovich v. Quilter*, 507 U.S. 146, 154–155 (1993)).   Native American voters must only be given an opportunity to elect the candidates of their choice (*see Bartlett v. Strickland*, 556 U.S. 1 (2009)) with a majority voting age population, which is present in District 9 due to the population of the Turtle Mountain Reservation and which is reflected in the data establishing that Native American candidates of choice are only defeated 38.2% of the time in District 9, Subdistrict 9A, and Subdistrict 9B.  Phillips Aff., ***Exhibit 35*** at pp. 2-3, and Table 1.  Unlike Turtle Mountain, the only way to enable the Native American voters in the Spirit Lake Reservation to usually elect their candidate of choice is to racially gerrymander a district that combines the Spirit Lake Reservation with the geographically distant Turtle Mountain Reservation with a narrow land bridge.

### III.    Plaintiffs' Proposed Remedial Maps, And Any Variation Thereof, Would Constitute A Racial Gerrymander In Violation Of Constitutional Principles

United States Supreme Court has recognized various traditional redistricting principles which states must consider in the redistricting process, consistent with the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution.  These traditional redistricting principles were first referenced in *Shaw v. Reno*, 509 U.S. 630 (1993) and were expanded in later case law to include:

1) compactness.[11]

2) contiguity[12]

3) preservation of counties and other political subdivisions.[13]

4) preservation of communities of interest.[14]

5) preservation of cores of prior districts.[15] and

6) protection of incumbents. [16]

Plaintiffs have not alleged that any the challenged districts or subdistricts violate any of the foregoing traditional redistricting principles.  Additionally, the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution requires that state legislative districts have substantial population equality.  *Reynolds v. Sims*, 377 U.S. 533, 578 (1964).  In the present case, there is no allegation that any of the challenged districts deviate too far from the ideal district population size of 16,576 (*see* Phillips Aff., ***Exhibit 37*** at p. 1, ¶ 2).  Further, there is no allegation that the challenged subdistricts deviate impermissibly from the ideal subdistrict population size of 8,288 (half of the population of a full district).  *Id.*  However, Plaintiffs' proposed remedial maps

---

[11] *Shaw v. Reno*, 509 U.S. 630 (1993).

[12] *Id.*

[13] *Id.*

[14] *Miller v. Johnson*, 515 U.S. 900, 916 (1995); *Abrams v. Johnson*, 521 U.S. 74, 92 (1997).

[15] *Karcher v. Daggett*, 462 U.S. 725, 740 (1983)

[16] *Id.*

do violate traditional redistricting principles, and thus are not narrowly tailored to serve a compelling state interest, and would constitute unconstitutional racial gerrymandering. *See Shaw v. Reno*, 509 U.S. 630 (1993).

"[Section] 2 does not require a State to create, on predominantly racial lines, a district that is not "reasonably compact." *Bush v. Vera*, 517 U.S. 952, 979 (1996) (citing *Johnson v. De Grandy*, 512 U.S. 997, 1008 (1994)). The United States Supreme Court has explained, "[i]f, because of the dispersion of the minority population, a reasonably compact majority-minority district cannot be created, § 2 does not require a majority-minority district; if a reasonably compact district can be created, nothing in § 2 requires the race-based creation of a district that is far from compact." *Bush*, 517 U.S. at 979.

The case *Sensley v. Albritton*, 385 F.3d 591, 595–98 (5th Cir. 2004) is instructive. Discussing the traditional redistricting principle of compactness, the court explained, "[a]s the geographical shape of any proposed district necessarily directly relates to the geographical compactness and population dispersal of the minority community in question, it is clear that shape is a significant factor that courts can and must consider in a *Gingles* compactness inquiry." *Id.* at 596. In *Sensley*, the district court had correctly found the shape of the proposed districts to be relevant insofar as it was indicative of the non-compactness of the minority population in those proposed districts. *Id.* at 597. The proposed plans included "two areas of highly-concentrated African–American population, which are roughly 15 miles apart from one another, were then linked together by a narrow corridor of land to form a new District 6." *Id.* The court noted the "result in each proposed plan was an irregularly-drawn District 6 whose extended and distorted shape—resulting specifically from excluding non-blacks while simultaneously adding "excess" blacks from other communities—constitutes strong evidence that the black minority

populations contained therein are not 'reasonably compact.'"   *Id.*   "The population dispersal of

one of the resulting districts resembles an electoral barbell: two areas of heavy African–American

concentration situated at each end and a narrow and sparsely-populated rural corridor running

approximately 18 miles between these two communities, connecting them together."   *Id.* at 597,

n. 4.  Further:

> As the district court pointed out, in order to connect these two towns together, the
> Plaintiffs were required to ignore traditional districting principles such as
> maintaining communities of interest and traditional boundaries. *See Abrams,* 521
> U.S. at 91, 117 S.Ct. 1925 ("[T]he § 2 compactness inquiry should take into account
> traditional districting principles such as maintaining communities of interest and
> traditional boundaries.") (quotations omitted). For example, the district court noted
> that recrafting District 6 required the Plaintiffs to lump together two groups of
> African–American citizens who were from two distinct communities—the Towns
> of Marion and Farmerville—which are separated by considerable distance
> (approximately 18 miles) and share few community interests.

*Id.* at 598.

Similar to the *Sensley* case, in the present case, Plaintiffs are attempting to connect two

different communities of Native Americans with a narrow land bridge, in what resembles an

electoral barbell.  As can be clearly seen on ***Exhibit 35,*** Phillips Aff., at pp. 10-11, in Plaintiffs'

proposed remedial maps, the Native American residents are highly concentrated at each end of the

barbell on or near the two reservations, with almost no Native Americans in the long land bridge

in between.   The Native American populations are highly disbursed under these Plaintiffs'

proposals, and the shape of the proposed district is indicative of a non-compact district, and of a

non-compact minority population within the proposed district.  The non-compactness evident by

the shape of Plaintiffs' proposed remedial districts is also established through scientific

measurements of compactness, when compared to the State's enacted redistricting plan.  *See*

***Exhibit 35***, Phillips Aff., at pp. 6-7, 8-9.

Additionally, Plaintiffs' proposed remedial maps fail to preserve political subdivisions and communities of interest, as they combined the populations of two distinct and geographically separated Native American Tribes, which each have their own separate sovereign government, unique histories, unique populations, and unique community interests.

Further, Plaintiffs' proposed remedial maps score worse than the State's enacted redistricting plan on population deviation and core retention. *See **Exhibit 35***, Phillips Aff., at pp. 6, 8-9.

Plaintiffs' proposed remedial maps do not properly account for the traditional redistricting principles, and on their face constitute an unconstitutional racial gerrymander. Plaintiffs' Voting Rights Act claim cannot override the Fourteenth Amendment to the United States Constitution, and should be rejected by the Court on summary judgment.

## CONCLUSION

For the foregoing reasons, Defendant Howe, requests the Court grant summary judgment in his favor, dismissing the Plaintiffs' Complaint (Doc. 1) in its entirety with prejudice.

Dated this 1st day of February, 2023.

By:___ */s/ David R. Phillips*_____
David R. Phillips
Special Assistant Attorney General
ND Bar # 06116
300 West Century Avenue
P.O. Box 4247
Bismarck, ND 58502-4247
(701) 751-8188
dphillips@bgwattorneys.com

Attorney for Defendant Michael Howe, in his official capacity as Secretary of State of North Dakota

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing **DEFENDANT'S MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT** was on the 1st day of February, 2023, filed electronically with the Clerk of Court through ECF:

Michael S. Carter
OK No. 31961
Matthew Campbell
NM No. 138207, CO No. 40808
Native American Rights Fund
1506 Broadway
Boulder, CO 80301
carter@narf.org
mcampbell@narf.org

Molly E. Danahy
DC Bar No. 1643411
Campaign Legal Center
1101 14th St. NW, Ste. 400
Washington, DC 20005
mdanahy@campaignlegal.org

Mark P. Gaber
DC Bar No. 98807
Campaign Legal Center
1101 14th St. NW, Ste. 400
Washington, DC 20005
mgaber@campaignlegal.org

Bryan L. Sells
GA No. 635562
The Law Office of Bryan L. Sells, LLC
PO BOX 5493
Atlanta, GA 31107-0493
bryan@bryansellslaw.com

Nicole Hanson
N.Y. Bar No. 5992326
Campaign Legal Center
1101 14th St. NW, Ste. 400
Washington, DC 20005
nhansen@campaignlegalcenter.org

Samantha Blencke Kelty
AZ No. 024110

TX No. 24085074
Native American Rights Fund
1514 P Street NW, Suite D
Washington, DC 20005
kelty@narf.org

Timothy Q. Purdon
ND No. 05392
ROBINS KAPLAN LLP
1207 West Divide Avenue, Suite 200
Bismarck, ND 58501
TPurdon@RobinsKaplan.com

By:___/s/ David R. Phillips_____
       DAVID R. PHILLIPS