**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NORTH DAKOTA**

| | |
|---|---|
| TURTLE MOUNTAIN BAND OF CHIPPEWA INDIANS, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>MICHAEL HOWE, in his official capacity as Governor of the State of North Dakota, et al.,<br><br>Defendant. | Civil No. 3:22-cv-00022-PDW-ARS |

### PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Michael S. Carter
Matthew Campbell
Native American Rights Fund
1506 Broadway
Boulder, CO 80302
(303) 447-8760

Samantha B. Kelty
Native American Rights Fund
950 F Street NW, Ste. 1050
Washington, DC 20004
(202) 785-4166

Mark P. Gaber
Molly E. Danahy
Nicole Hansen
Campaign Legal Center
1101 14th St. NW, Ste. 400
Washington, DC 20005
(202) 736-2200

Bryan Sells (admitted *pro hac vice*)
The Law Office of Bryan L. Sells, LLC
PO Box 5493
Atlanta, GA 31107
(404) 480-4212

*Counsel for Plaintiffs*

Timothy Q. Purdon
Robins Kaplan LLP
1207 West Divide Avenue, Ste. 200
Bismarck, ND 58501
(701) 339-4181

*Counsel for Plaintiff Spirit Lake Nation*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................... ii

INTRODUCTION ............................................................................................................ 1

FACTUAL BACKGROUND ............................................................................................ 3

   I.    The prior North Dakota legislative districting plan and election results ........................... 3

   II.   The 2021 Redistricting ............................................................................................ 4

   III.  District 9's white-majority electorate and the unusual circumstances of the 2018 election ............................................................................................................... 6

   IV.  The November 2022 election ................................................................................... 9

   V.   Plaintiffs' Demonstrative District ........................................................................... 10

   VI.  Spirit Lake and Turtle Mountain have shared non-racial interests related to legislative representation ...................................................................................................... 13

   VII.  White bloc voting usually defeats Native American voters' candidates of choice. ........ 14

LEGAL STANDARD ..................................................................................................... 17

ARGUMENT ................................................................................................................ 17

   I.    Plaintiffs have satisfied the first *Gingles* precondition. .............................................. 20

      A.  Plaintiffs' demonstrative district is majority NVAP. ................................................ 20

      B.  Plaintiffs' demonstrative district is reasonably compact and joins Native American voters with shared non-racial interests. ................................................................ 20

         1.  Plaintiffs' Demonstrative District 9 is reasonably compact and respects traditional districting criteria. ........................................................................ 21

         2.  Turtle Mountain and Spirit Lake are geographically proximate and their voters share common needs and interests. ................................................................. 27

   II.   Plaintiffs have satisfied—or at the very least shown genuine disputes of material facts—as to the third *Gingles* precondition. ............................................................ 30

   III.  Defendant's contention that Plaintiffs' Demonstrative District 9 is a racial gerrymander has no basis in evidence and is belied by Supreme Court precedent. ........ 36

CONCLUSION .............................................................................................................. 40

CERTIFICATE OF SERVICE ......................................................................................... 42

# TABLE OF AUTHORITIES

**Cases**

*Abbott v. Perez,* 138 S. Ct. 2305 (2018) ........................................................22

*Bone Shirt v. Hazeltine*, 461 F.3d 1011 (8th Cir. 2006) ..................18, 19, 20, 31, 32, 40

*Bone Shirt v. Hazeltine*, 387 F. Supp. 2d 1035 (D.S.D. 2005) ....................................19

*Bone Shirt v. Hazeltine*, 336 F. Supp. 2d 976 (D.S.D. 2004) .............................19, 31

*Brand v. National Union Fire Ins. Co. of Pittsburgh, PA*, 934 F.3d 799 (8th Cir. 2019) ...........17

*Bush v. Vera*, 517 U.S. 952 (1996) ...............................................................39

*Cooper v. Harris*, 581 U.S. 285 (2017) .....................................................21, 36

*Georgia v. Ashcroft*, 539 U.S. 461 (2003) ...........................................................4

*Johnson v. De Grandy*, 512 U.S. 997 (1994) ...............................................21, 31

*League of United Latin American Citizens v. Perry*,
    548 U.S. 399 (2006)........................................18, 19, 21, 27, 28, 29, 36

*Miller v. Johnson*, 515 U.S. 900 (1995)...........................................................39

*Missouri State Conference of NAACP v. Ferguson-Florissant School District*,
    894 F.3d 924 (8th Cir. 2018) ...................................................................18

*Old Person v. Cooney*, 230 F.3d 1113 (9th Cir. 2000) ...........................................31

*Robinson v. Ardoin*, 37 F.4th 208 (5th Cir. 2022) ...............................................25

*Ruiz v. City of Santa Maria*, 160 F.3d 543 (9th Cir. 1998).................................31, 34

*Sensley v. Albritton*, 385 F.3d 591 (5th Cir. 2004) ...............................................38

*Session v. Perry*, 298 F. Supp. 2d 451 (E.D. Tex. 2004) ........................................22

*Shaw v. Reno*, 509 U.S. 630 (1993) ...............................................................38

*Thornburg v. Gingles*, 478 U.S. 30 (1986) .................................................18, 31, 34

*Walz v. Randall*, 2 F.4th 1091 (8th Cir. 2021)...................................................17

*Wright v. Sumter County Board of Elections & Registration*,
    657 F. App'x 871 (11th Cir. 2016) ............................................................30

**Statutes and Regulations**

N.D. Const. art. IV, § 2 ...........................................................................23

52 U.S.C. § 10301...................................................................................18

Fed. R. Civ. P. 56(a) ..................................................................................................................3, 17

## INTRODUCTION

For the first time since 1990, there is no Native American serving in the North Dakota state senate. And in 2022, Native American voters in northeast North Dakota saw their ability to elect state house representatives drop from two seats to one seat. This is the result of a classic example of vote dilution, attributable to packing a supermajority of Native citizens into District 9A—which has the fifth highest Native population among the thirty-one Native American majority district nationwide—while simultaneously cracking the remaining Native population across neighboring Districts 9B and 15. As the stark evidence of the 2022 election results demonstrates, the 2021 redistricting map minimized the voting strength of Native American voters in North Dakota even as the Native American share of the statewide population increased since the last decennial Census.

Defendant's motion for summary judgment should be denied. Relying on the expert report of Dr. M.V. "Trey" Hood, Defendant contends that Plaintiffs failed to satisfy two of the three preconditions necessary to establish a violation of the Voting Rights Act ("VRA"). But Plaintiffs submitted expert testimony from Dr. Loren Collingwood demonstrating that both conditions are satisfied: the Native American population in the region is sufficiently large and geographically compact to form a majority Native American district from which three legislators would be elected, and white bloc voting usually operates to defeat Native voters' candidates of choice. This evidence is sufficient to create a genuine dispute of material fact, precluding summary judgment.

Even more damning to Defendant's motion, however, is that Dr. Hood now disputes his own opinions—opinions on which Defendant's motion rests. After the motion was filed, Dr. Hood testified at his deposition that the grounds upon which Defendant has moved are incorrect. He testified that Plaintiffs' Demonstrative District 9 satisfies the majority-minority requirement and is reasonably compact, and that he incorrectly gave equal weight to all the election results he

evaluated in determining whether white bloc voting usually operates to defeat Native voters' candidates of choice in the region. He further testified that when the most probative contests are considered, Plaintiffs easily satisfy this precondition. Likewise, he testified that his *own analysis* of white bloc voting in District 9 shows that Plaintiffs have met their burden when he adds in the most recent elections—elections he agrees are probative and should be included, but which he ran out of time to include in his own analysis.

Furthermore, Defendant *himself* has now reversed course with respect to this precondition. Just yesterday, Defendant moved for summary judgment in *Walen v. Burgum* (No. 1:22-cv-00031-PDW-RRE-DLH). There, Defendant contends that Subdistrict 9A was necessary because enacted District 9 *violates the VRA*. *See id.* ECF No. 102 at 39 ("*Walen* MSJ"). In particular, Defendant asserts that the third *Gingles* precondition is satisfied in District 9. *See id.* ("[R]emoval of the subdivision in District 9 would result in Native American populations that would usually not be able to elect their candidate of choice . . . ."); *id.* at 40 (contending that, with respect to enacted District 9, "the preferred candidate of the Native American population in and around . . . Turtle Mountain would be regularly defeated by the White population."). There no longer appears to be any dispute that *Gingles* prong three is satisfied in District 9. The only remaining question is whether the VRA requires (1) a district configuration that reduces Native American voters' opportunity to elect from three legislative seats to just a one (the enacted plan), or (2) a configuration that maintains Native American voters' opportunity to elect in three legislative seats (Plaintiffs' demonstrative plan). Were there doubt, trial will show the answer is the latter.

Finally, despite concluding in his report that Plaintiffs' Demonstrative District 9 might be a racial gerrymander, Dr. Hood testified that he has no evidence to support this conclusion, is not actually claiming the district is gerrymandered, and the district does not subordinate traditional

districting principles to racial considerations. In sum, both Defendant's and Plaintiffs' experts—and even Defendant himself—now dispute the facts upon which Defendant's motion rests. Defendant has not and cannot demonstrate that he is "entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The motion should be denied.

## FACTUAL BACKGROUND

### I.     The prior North Dakota legislative districting plan and election results

The reservations of the Turtle Mountain Band of Chippewa Indians ("Turtle Mountain") and the Spirit Lake Nation ("Spirit Lake") are both located in northeast North Dakota. Prior to the 2021 redistricting, Rolette County—where the Turtle Mountain reservation is located—was its own state legislative district, District 9. The Spirit Lake reservation was in District 23. This region in the 2012-2020 ("benchmark") plan is shown below:

**2012-2020 "Benchmark" Legislative Plan Regional View**



Ex. 2 at App. G (Collingwood Rebuttal). From 1990 until 2022, District 9 elected a Native American candidate to the state senate, as well as two state representatives who were the candidates of choice of Native American voters. Ex. 2 at 5-7 (Collingwood Rebuttal). Senator Richard

Marcellais, a Turtle Mountain member, represented District 9 from 2006 until 2022. Ex. 2 at 6 (Collingwood Rebuttal).

## II.     The 2021 Redistricting

The Joint Redistricting Committee introduced House Bill 1504 as the proposed legislative redistricting plan and held a hearing on November 8, 2021. ECF No. 60-32. The new redistricting plan accounts for population changes as reflected in the 2020 Census. For example, the 2020 Census data revealed that benchmark District 9 was 4,389 people short of the ideal district size. Ex. 2 at 5 (Collingwood Rebuttal); Ex. 9 at 1 (N.D. Legislative Council Population Change Summary). The Census data also showed that the Native American population grew from 5.1% of the statewide VAP in 2010 to 5.9% in 2020. Ex. 2 at 6 (Collingwood Rebuttal).

The proposed map substantially changed the districts in northeastern North Dakota and in particular the districts in which the Turtle Mountain and Spirit Lake reservations are located. Parts of Towner and Cavalier Counties—the VAP of which are 96.0% and 95.6% white respectively— were added to District 9. Ex. 2 at App. E, App. G (Collingwood Rebuttal); Ex. 1 at 16 (Collingwood Initial Report). By extending District 9 east into overwhelmingly white counties, the enacted plan dramatically changed the demographic makeup of the district, reducing its NVAP by twenty percentage points, from 74.4% to 54.5%. Ex. 1 at 31 (Collingwood Initial Report).[1] Among the 31 Native American-majority state legislative districts in the country, the enacted version of District 9 has the second lowest NVAP share nationwide. Ex. 2 at 5 (Collingwood

---

[1] This includes people who identify as exclusively or part Native American. The legislature's reports and Defendant's expert Dr. Hood use only the exclusively Native American data; by that measure District 9 is now just 51.7% Native American. ECF No. 60-35 at 2 (Hood Report). Although the proper metric in VRA cases is to include all people who identify with the minority group as Dr. Collingwood has done, *see Georgia v. Ashcroft*, 539 U.S. 461, 473 n.1 (2003), the distinction does not make a material difference here, *see* Ex. 2 at 3 n.1 (Collingwood Rebuttal).

Rebuttal). The average NVAP of a majority-Native American legislative district nationwide is 68.1% and the median is 66.7%. Ex. 2 at 5 (Collingwood Rebuttal). The Spirit Lake reservation was separated from all of the counties with which it previously shared a district and placed in District 15, neighboring District 9. *Compare* Ex. 2 at App G *with* App. E (Collingwood Rebuttal).

Citing the VRA, the legislature divided District 9 into two subdistricts each with one state representative seat, District 9A and 9B, Ex. 19 at 17:16-18:23 (Nov. 9, 2021, Redistricting Comm. Hr'g Tr.). Presumably this was because, as Defendant asserts in the *Walen* matter, the full District 9 violated the VRA. *Walen* MSJ at 40. The enacted map for the region is shown below:

**2021 Enacted Plan Regional View**



Ex. 2 at App. E (Collingwood Rebuttal). District 9A has a Native American VAP of 79.8%. This is the fifth highest NVAP among the 31 Native American-majority state legislative districts nationwide. Ex. 2 at 5 (Collingwood Rebuttal). The remaining Native American population in northeastern North Dakota is split across Districts 9B and 15. District 9B has a NVAP of 29.4%. ECF No. 60-33 at 3. District 15 has a NVAP of 20.39%. ECF No. 60-33 at 4.

A map illustrating the fragmenting of northeastern North Dakota's Native American voters among Districts 9A, 9B, and 15 is shown below, with concentrations of Native Americans shown in blue and the district lines shown in red.

**Enacted Plan Fragmenting of Native American Population**



Ex. 2 at App. A (Collingwood Rebuttal).

Both Chairman Azure of Turtle Mountain and Chairman Yankton of Spirit Lake testified to the Joint Redistricting Committee on November 8, 2021 in support of an amendment offered by Sen. Marcellais to redraw District 9 to join Benson and Rolette Counties in a district that would retain Native American voters' opportunity to elect a state senator and two state representatives rather than reducing their opportunity to elect a single state representative in one subdistrict. ECF No. 60-32 at 12. The legislature rejected that amendment and adopted House Bill 1504.

## III. District 9's white-majority electorate and the unusual circumstances of the 2018 election

Although the redrawn District 9 has a small majority NVAP (down twenty percentage points from the benchmark district), its voting electorate is, under usual circumstances, substantially majority white. Ex. 2 at 5 (Collingwood Rebuttal). The chart below shows the demographic composition of the voting electorate in District 9 for the past five election cycles:

**Enacted District 9 Electorate Demographic Composition**

| Election | White Electorate Share | Native American Electorate Share |
|---|---|---|
| 2014 | 67% | 33% |
| 2016 | 63% | 37% |
| 2018 | 50% | 50% |
| 2020 | 63% | 37% |
| 2022 | 60% | 40% |

Ex. 2 at 4 (Figure 1) and 5 (¶1) (Collingwood Rebuttal). Notably, the 2018 election marked a stark departure from the usual electoral conditions in District 9. As Plaintiffs' expert Dr. Collingwood reports, Native American voter turnout nationwide, in North Dakota, and specifically in District 9, is typically substantially lower than white voter turnout. Ex. 2 at 3-4 (Collingwood Rebuttal). In District 9, Native American voter turnout is "usually in the neighborhood of 20-30 percentage points" lower than white turnout. Ex. 2 at 4 (Collingwood Rebuttal). For all categories of voters, turnout in presidential election cycles exceeds turnout in midterm election cycles as a general matter. Ex. 2 at 4 (Collingwood Rebuttal).

The 2018 North Dakota election was different. As the graph below shows, Native American turnout in 2018 skyrocketed to 57.6% in District 9, exceeding statewide overall turnout and approaching (but not reaching) white turnout in the district. Ex. 2 at 4 (Collingwood Rebuttal).



7

Ex. 2 at 4 (Figure 1) (Collingwood Rebuttal). As Dr. Collingwood explains, "[i]n all the many elections in different jurisdictions that I have studied, I have never seen a Native American turnout number begin to approach 60% in a federal, state, or local contest. Rather, the figures often hover around 30% - which is in line with my estimates in every other election year in LD-9." Ex. 2 at 4 (Collingwood Rebuttal). Furthermore, the pattern of midterm versus presidential cycle turnout for Native Americans is "strikingly inverted" with respect to the 2018 election. *Id*. Dr. Hood similarly testified that he could not think of another example where a group had a twenty-percentage-point higher turnout in a midterm than in a presidential election. Ex. 3 at 83:13-20 (Hood Dep.).

As Chairman Azure of Turtle Mountain and Chairman Yankton of Spirit Lake explain, the 2018 election featured "unique circumstances" Ex. 4 ¶ 26 (Azure Decl.); Ex. 5 ¶ 27 (Yankton Decl.). The state's voter ID law, which required proof of residential street addresses—something many Native American voters lacked—had previously been enjoined by this Court but was permitted to go in effect by the U.S. Supreme Court just before the 2018 election. Ex. 4 ¶¶ 24-26 (Azure Decl.); Ex. 5 ¶¶ 25-27 (Yankton Decl.). As a result, "substantial amounts of money spent by national, local, and regional organizations focused on educating and turning out Native voters." Ex. 4 ¶ 27 (Azure Decl.); Ex. 5 ¶ 34 (Yankton Decl.). In addition, national celebrities like Dave Matthews Band and Mark Ruffalo toured North Dakota Reservations and held get-out-the-vote events. Ex. 4 ¶ 28 (Azure Decl.); Ex. 5 ¶ 35 (Yankton Decl.). This type of sustained spending and electoral education focused on Native American voters had never occurred prior to the 2018 election and has not happened since. Ex. 4 ¶ 29 (Azure Decl.); Ex. 5 ¶ 36 (Yankton Decl.). The turnout among Native American voters in 2018 was "extraordinarily unusual" and the result of "substantial outrage among Native American voters at what seemed clearly to us to be a blatant effort to suppress our voting power." Ex. 4 ¶¶ 30-31 (Azure Decl.); Ex. 5 ¶¶ 37-38 (Yankton Decl.).

**IV.     The November 2022 election**

The first election under the new legislative redistricting plan was held on November 8, 2022. In District 9, incumbent Sen. Marcellais—who is Native American and the candidate of choice of Native American voters—lost his bid for re-election to his white challenger by a margin of 53.7% to 46.1%. Ex. 1 at 17 (Collingwood Initial Report). Sen. Marcellais carried Rolette County by 60.1% to 39.7% but lost in the newly added white-majority counties by a margin of 79.9% to 19.8% (Cavalier County) and 65.0% to 34.7% (Towner County). Ex. 10 (2022 District 9 Election Results). In District 9A, Jayme Davis—a Native American who was the candidate of choice of Native Americans—won election over her white opponent by 68.6% to 31.1%. Ex. 11 (2022 District 9A Election Results); *see also* Ex. 1 at 15 (Collingwood Initial Report). But in District 9B, incumbent Marvin Nelson—the candidate of choice of Native American voters—lost to his opponent by 56.5% to 37.6%. Ex. 12 (2022 District 9B Election Results); *see also* Ex. 1 at 16 (Collingwood Initial Report). Notably, white voters in Towner County supported Mr. Nelson—who is a white Democrat— at a rate more than 12 percentage points higher than they did Mr. Marcellais, a Native American Democrat. Ex. 1 at 16 (Collingwood Initial Report).

In District 15, Plaintiff Collette Brown—who is Native American and the candidate of choice of Native American voters in the district—lost to her white opponent by 65.5% to 33.9%. Ex. 13 (2022 District 15 Election Results); *see also* Ex. 1 at 26 (Collingwood Initial Report). Ms. Brown carried the Benson County portion of the district by a wide margin (63.4% to 36.0%) but was defeated in every other county in the district by an even wider margin. Ex. 13 (2022 District 15 Election Results). In the race for state representative, two white candidates were elected, with 41.6% and 38.6%—over the Native American candidate Heather Lawrence-Skadsem, who was the candidate of choice of Native American voters in the district. Ex. 13 (2022 District 15 Election

Results); *see* also Ex. 1 at 26 (Collingwood Initial Report). Ms. Lawrence-Skadsem easily carried Benson County but lost the remainder of the district. Ex. 13 (2022 District 15 Election Results).

Under the benchmark plan, Native American voters in northeastern North Dakota succeeded in electing their candidate of choice to all three seats in District 9. Under the 2021 enacted plan, Native American voters in the region were able to elect just *one* candidate of choice—Jayme Davis—to the state house in District 9A. Ex. 2 at 7 (Collingwood Rebuttal). Because of the configuration of districts in the new redistricting plan, for the first time in over thirty years, no member of a North Dakota Native American Tribe serves in the state senate today. Ex. 2 at 6 (Collingwood Rebuttal).

## V.     Plaintiffs' Demonstrative District

Plaintiffs' Demonstrative Plan 1 creates a new District 9 centered primarily in Rolette and Benson Counties. The district ("Demonstrative District 9") is shown in both a regional view and set into the enacted plan:

**<u>Plaintiffs' Demonstrative Plan 1 Regional View</u>**



**Plaintiffs' Demonstrative Plan 1 Statewide View**



Demonstrative District 9 has a NVAP of 66.1%, which is near exactly the median NVAP of the 31 Native American majority state legislative districts nationwide, and lower than the NVAP of District 9 in the benchmark plan. Ex. 2 at 5 (Collingwood Rebuttal). In Demonstrative District 9, the candidates of choice of Native American voters would have prevailed in 32 of 35 tested contests. Ex. 1 at 32-37 (Collingwood Initial Report).

Demonstrative District 9 does not split any voting precincts or municipalities. Ex. 2 at 16 (Collingwood Rebuttal). Its population deviation is +3.14%, lower than twenty-three of the other districts in the enacted plan. Ex. 2 at 9 (Collingwood Rebuttal). As both Dr. Collingwood and Dr. Hood explain, although the water boundaries of Devil's Lake and the Sheyenne River have a distortionary lowering effect on Plaintiffs' Demonstrative District 9's mathematical compactness scores, *see* Ex. 2 at 10 (Collingwood Rebuttal); Ex. 3 at 136:6-137:4, 155:2-157:6 (Hood Dep.),

the district still scores as more compact than several other districts in the enacted plan, Ex. 2 at 9-11 (Collingwood Rebuttal); Ex. 3 at 146:24-147:19 (Hood Dep.).

At his deposition, Defendant's expert Dr. Hood agreed that Demonstrative District 9 adheres to traditional districting criteria:

> Q:   [P]laintiffs' proposed District 9 satisfies the population deviation legislative goal, correct?
> A:   Correct.
> Q:   We talked about how, under your own metric for Virginia and applied here, that the district is sufficiently or reasonably compact, correct?
> A:   Correct.
> Q:   And with respect to county splits, we noted that there was an error in your report with respect to the number of counties, right, that the enacted plan splits?
> A:   Correct. That's correct.
> Q:   And demonstrative District 9 has the same number of county splits as does District 15, which is also under challenge in this case, right?
> A:   Correct.
>       And it has the same number of county splits as the state house map for [enacted] District 9, correct?
> A:   Correct.
> Q:   It splits Eddy County only to adhere to the boundaries of the Spirit Lake Nation, correct?
> A:   Correct.
> Q:   And that's the same split of Eddy County that the enacted District 15 makes, correct?
> A:   Correct.
> . . .
> Q:   And we discussed how plaintiffs' demonstrative plan restores Towner County to its prior configuration in terms of core retention, moving it to District 15 entirely.
> A:   That is true.
> Q:   And we've discussed how the enacted map has features in terms of land bridges or necks or connecting points in districts that are a fair bit smaller than what you termed the land bridge in plaintiffs' demonstrative District 9, right?
> A:   Correct.
> Q:   And a number of the enacted districts in the map span much larger – either similar or larger geographic distances than does . . . demonstrative District 9, correct?
> A:   That's correct, yes.
> Q:   And . . . enacted District 9, in fact, from east to west is just about as long as plaintiffs' demonstrative District [9] is from north to south, correct?

A:     From what I remember, yes.

. . .

Q:     Okay. We discussed how Benson County and Rolette County are closer
       geographically than Rolette County is to Cavalier County, right?

A:     That's true, yes.

Ex. 3 at 188:23-192:2 (Hood Dep.).

## VI.    Spirit Lake and Turtle Mountain have shared non-racial interests related to legislative representation.

Spirit Lake and Turtle Mountain—as well as their members and voting public—share many common characteristics and interests that relate to their common representational needs in the state legislature. The two reservations are just 55 miles apart. Ex. 2 at 17 (Collingwood Rebuttal). As the chairmen of the two tribes explain, their residents have "shared values and beliefs" and "share the experience of living in rural North Dakota tribal communities." Ex. 4 ¶ 8 (Azure Decl.); Ex. 5 ¶ 9 (Yankton Decl.). In that respect, they share "similar socio-economic statuses" and have "similar representational needs from our state legislature related to economic investment, state-sponsored services, and legislative appropriations that differ from other North Dakota rural communities, where agricultural and energy interests predominate, and from the state's urban areas." Ex. 4 ¶ 8 (Azure Decl.); Ex. 5 ¶ 9 (Yankton Decl.). Turtle Mountain and Spirit Lake "partner together in many political, economic, educational, and public safety organizations," such as United Tribes of North Dakota, United Tribes Technical College, North Dakota Tribal College System, National Congress of American Indians, North Dakota Native Tourism Alliance, and the National Indian Gaming Association. Ex. 4 ¶ 9 (Azure Decl.); Ex. 5 ¶ 10 (Yankton Decl.). The two tribes have shared interactions with the North Dakota government, including through the North Dakota Indian Affairs Commission and the legislature's Tribal and State Relations Committee. Ex. 4 ¶ 10 (Azure Decl.); Ex. 5 ¶ 11 (Yankton Decl.).

13

The two tribes often join together to "pursue similar policy objectives," including in the state legislature and the state government on "funding for tribal colleges, negotiating the tribal-state gaming compact, taxation on tribal lands, hunting and fishing regulation, tribal and state law enforcement, and funding for education, foster care, health care, etc." Ex. 4 ¶ 11 (Azure Decl.); Ex. 5 ¶ 12 (Yankton Decl.). Legislation often has similar effects on both tribes, including currently pending House Bill 1536 to enact a state Indian Child Welfare Act. Ex. 4 ¶ 12 (Azure Decl.); Ex. 5 ¶ 13 (Yankton Decl.). Both tribal chairmen serve on the North Dakota Indian Affairs Commission, which seeks to "keep the public informed about the current laws and legislative issues that impact Indian country." Ex. 4 ¶ 13 (Azure Decl.); Ex. 5 ¶ 14 (Yankton Decl.). The tribes work together with respect to United Tribes Technical College, on which both chairmen serve on the Board, and in that capacity lobby the legislature for funding, including workforce development grants and funding for non-member students. Ex. 4 ¶¶ 14-15 (Azure Decl.); Ex. 5 ¶¶ 15-16 (Yankton Decl.).

## VII.   White bloc voting usually defeats Native American voters' candidates of choice.

White bloc voting usually defeats Native American voters' candidates of choice in Districts 9, 9B, and 15. As Dr. Collingwood explains, three categories of elections are most probative for determining whether the white majority block votes against Native American voters' candidates of choice: (1) "endogenous" elections, or elections for the office that is at issue (here state legislative elections as opposed to statewide, or "exogenous" elections), (2) more recent elections, and (3) elections featuring a Native American candidate. Ex. 2 at 5 (Collingwood Rebuttal); Ex 1 at 21 (Collingwood Initial Report). At his deposition, Dr. Hood agreed that these elections were more probative. Ex. 3 at 39:3-44:8 (Hood Dep.). Dr. Hood testified that exogenous elections "should be given far less weight," Ex. 3 at 41:25-42:17 (Hood Dep.), and agreed that the 2022

14

state senate election in which Senator Marcellais was defeated is the "single most probative contest" for assessing white bloc voting in District 9 "because it features an endogenous election with a Native American candidate and it's the most recent." Ex. 3 at 45:15-24 (Hood Dep.).

Dr. Collingwood explains that white bloc voting defeats the Native American preferred candidates in 100% of the endogenous elections in District 9, in 100% of the most recent (2022) elections in District 9, 71% of elections in the most recent two cycles 2022 and 2020, and in 60% of elections in District 9 featuring a Native American candidate. Ex. 2 at 7 (Collingwood Rebuttal). Dr. Collingwood further explains that the 2018 elections exhibited "special circumstances" and "it would be appropriate to entirely disregard the 2018 elections" or at least give them "very little weight" in assessing white bloc voting. Ex. 2 at 8 (Collingwood Rebuttal). If the 2022, 2020, and 2016 elections are all considered—and even if afforded equal weight rather than differentiating based upon probative value—then Dr. Collingwood reports that white bloc voting would prevent the Native American preferred candidates from winning in 12 of 21 contests, or 57% of the time. Ex. 2 at 8 (Collingwood Rebuttal).

Dr. Collingwood further explains that when District 9 and 9B are summed together, the white-preferred candidate wins 58% of the time. Ex. 2 at 7 (Collingwood Rebuttal). Although Dr. Hood included packed District 9A in his calculations, he later testified that he "didn't necessarily disagree" that it made more sense to exclude District 9A from the combined calculation given District 9A's overwhelmingly high NVAP. Ex. 3 at 96:4-15, 98:10-99:6 (Hood Dep.). Dr. Hood agreed that including the results for District 9 and 9B and excluding the results of packed District 9A would show that white bloc voting usually defeats Native American preferred candidates in District 9. Ex. 3 at 98:10-99:6 (Hood Dep.). Further, as Dr. Collingwood explains, given the regional focus of the claim in this case—affecting several districts and a subdistrict—the "most

sensible approach" is to consider District 9 and 15 together for purposes of assessing white bloc voting. Ex. 2 at 7 (Collingwood Rebuttal). By that measure white voters block Native American voters' preferred candidate from winning 64% of the time in the region. *Id*. This is true even without giving additional weight to the more probative endogenous, recent, and racially contested elections, which show even more powerful white bloc voting defeating Native American voters' preferred candidates. Ex. 2 at 7 (Collingwood Rebuttal).

Dr. Hood conducted his own analysis of white bloc voting in District 9 in his expert report for Defendants in the related *Walen v. Burgum* case (Case No. 1:22-cv-00031-PDW-RRE-DLH). Ex. 14 at 5-6 (Hood Walen Report). In that report, Dr. Hood examined six exogenous elections—three from 2018 and three from 2020—and concluded that Native American-preferred candidates won four of the six, and thus that white bloc voting did not prevent Native American voters' preferred candidates from prevailing in enacted District 9. At his deposition, however, Dr. Hood testified that he "did not get to a full analysis" and "did not perform any kind of statistical analysis on the 2022 elections" because he had insufficient time to do so before his expert report was due. Ex. 3 at 101:19-102:8 (Hood Dep.). He testified that he agreed it would have been "preferable" to include the 2022 elections because "they certainly are the most recent set of elections." Ex. 3 at 102:9-16 (Hood Dep.). Dr. Hood then identified during his deposition four 2022 contests he thought were particularly probative and should be added to his analysis: the 2022 elections for U.S. Senate, Attorney General, District 9 state senator, and Public Service Commissioner (which included a Native American candidate). Ex. 3 at 108:8-16 (Hood Dep.). Dr. Hood testified that if the four 2022 elections he agreed should be added to his analysis were included, "that would show 60% defeat rate for the Native American preferred candidates in District 9," which would demonstrate that white voters usually defeat the candidates preferred by Native American voters

in enacted District 9. Ex. 3 at 109:13-111:15 (Hood Dep.). Including the additional elections that Dr. Hood himself identified thus creates a material dispute between Dr. Hood's testimony—which confirms the conclusions reached by Plaintiffs' expert Dr. Collingwood—and the written opinion offered by Dr. Hood with respect to the effect of white bloc voting in the district. It is therefore unsurprising that Defendant *himself* has reversed course since filing his motion and confirmed that the third *Gingles* precondition is satisfied in District 9. *See Walen*, ECF No. 102 at 39-40.

In sum, Plaintiffs, Defendant, and both experts now agree that white voters in Districts 9, 9B and 15 usually defeat Native American voters' preferred candidates. Ex. 2 at 8 (Collingwood Rebuttal); Ex. 1 at 26 (Collingwood Initial Report); ECF No. 60-35 at 4 (Hood Report); Ex. 15 at HOOD-0256 (Ex. 6 of Hood Dep. showing calculations); *Walen*, ECF No. 102 at 39-40.

## LEGAL STANDARD

Summary judgment is proper "when the record establishes that there is 'no genuine dispute as to any material fact' and the moving party is 'entitled to judgment as a matter of law.'" *Brand v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA*, 934 F.3d 799, 802 (8th Cir. 2019) (quoting Fed. R. Civ. P. 56(a)). "Courts must construe the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in favor of that party." *Id.* Summary judgment is not appropriate where the court must "weigh the evidence, make credibility determinations, or attempt to discern the truth of any factual issue." *Walz v. Randall*, 2 F.4th 1091, 1099 (8th Cir. 2021).

## ARGUMENT

Defendant's motion for summary judgment should be denied. The evidence—including the deposition testimony of *Defendant's* expert Dr. Hood—shows that Plaintiffs have satisfied both of the *Gingles* preconditions that are subject of Defendant's motion, and thus Defendant has failed to meet his burden to show he is entitled to judgment as a matter of law.

Section 2 of the VRA, 52 U.S.C. § 10301, prohibits the dilution of minority voters' voting strength in redistricting plans. "Dilution of racial minority group voting strength may be caused by the dispersal of [minority voters] into districts in which they constitute an ineffective minority of voters or from the concentration of [minority voters] into districts where they constitute an excessive majority." *Thornburg v. Gingles*, 478 U.S. 30, 46 n.11 (1986). The former is called "cracking" and the latter "packing." As the Eighth Circuit has explained, a minority group that is a "bare numerical majority" of a district may "still face actual impediments and disadvantages" to electoral participation that result from "the history of discrimination and disenfranchisement." *Missouri State Conf. of NAACP v. Ferguson-Florissant Sch. Dist.*, 894 F.3d 924, 933 (8th Cir. 2018). Thus, a majority-minority district may violate Section 2 when the "citizen voting-age majority . . . lack[s] real electoral opportunity." *League of United Latin American Citizens v. Perry*, 548 U.S. 399, 428 (2006) ("*LULAC*").

The Court's inquiry under Section 2 "requires an 'intensely local appraisal' of the challenged district," *LULAC*, 548 U.S. at 437, and is "peculiarly dependent upon the facts of each case," *Gingles*, 478 U.S. at 79 (quoting *Rogers v. Lodge*, 458 U.S. 613, 621 (1982)). In states with multi-member state legislative districts, like North Dakota, that "intensely local appraisal" may require creating a multi-member Section 2 minority opportunity district, it may require the creation of subdistricts for the state house elections, or it may require a mix of both statewide. The Section 2 remedy depends on local conditions in each district and on which configuration affords the minority group an equal opportunity to elect candidates of their choice. For example, in *Bone Shirt v. Hazeltine*, the Eighth Circuit affirmed a ruling that South Dakota's state legislative plan violated Section 2 by minimizing the number of legislators Native American voters could elect. 461 F.3d 1011, 1023-24 (8th Cir. 2006). In *Bone Shirt*, the district court ordered a remedial plan that

18

included one multi-member NVAP majority district (District 27), because the election data showed

that district would permit Native American voters to elect their preferred candidates for all three

legislative positions. *Bone Shirt v. Hazeltine*, 387 F. Supp. 2d 1035, 1039, 1041 (D.S.D. 2005)

(remedial order). The remedial map also included two subdistricts, however—District 26A and

28A—in which the electoral data showed Native American voters could elect their candidates of

choice to a single house seat but not the second house seat or the senate seat. *Id.* at 1039; *see also*

*Bone Shirt v. Hazeltine*, 336 F. Supp. 2d 976, 989 (D.S.D. 2004) (trial order). The NVAP of the

two subdistricts and one multi-member district adopted by the court ranged from 65.6% to 74.4%.

*Id.* (Plan E). Moreover, District 28A combined two separate Native American Reservations—the

Cheyenne River Reservation and the Standing Rock Reservation. *Id.* The Eighth Circuit affirmed

the district court's remedial order. *Bone Shirt*, 461 F.3d at 1023-24.

　　　　To succeed on a Section 2 claim, plaintiffs must first meet three elements known as the

*Gingles* preconditions:

> (1) [T]he racial group is sufficiently large and geographically compact to constitute
> a majority in a single-member district; (2) the racial group is politically cohesive;
> and (3) the majority votes as a bloc to enable it usually to defeat the minority's
> preferred candidate.

*Bone Shirt*, 461 F.3d at 1018 (quoting *LULAC*, 548 U.S. at 425) (bracket in original).

　　　　Both experts agree and Defendant concedes that voting in the region is racially polarized

and thus that the second *Gingles* prong is met. Ex. 1 at 14-16, 22 (Collingwood Initial Report);

ECF No. 60-35 at 2, 4 (Hood Report); Mem. in Support of Mot. for Summ. J. at 16, ECF 59.

Defendant moves only with respect to the first and third *Gingles* preconditions. The motion is

without merit and should be denied.

I.     **Plaintiffs have satisfied the first *Gingles* precondition.**

    A.     **Plaintiffs' demonstrative district is majority NVAP.**

Plaintiffs have satisfied the first *Gingles* precondition. Plaintiffs' Demonstrative Plan 1 contains a proposed District 9 with a NVAP of 66.1%. Ex. 2 at 5 (Collingwood Rebuttal). This easily surpasses the *Gingles* prong one required majority-minority district showing.

Defendant, however, contends that *Gingles* prong one is not met because the *enacted* versions of Districts 9B and 15 are not majority NVAP. ECF No. 59 at 17-18. This misapprehends the purpose of the first *Gingles* precondition, which focuses on a potential *alternative* district, not whether the *challenged* districts are majority-minority. *Bone Shirt*, 461 F.3d at 1018 (explaining that first *Gingles* precondition is about a "proposed" district). Dr. Hood abandoned his expert report's conclusion regarding the first *Gingles* precondition at his deposition, agreeing that the "conclusion about *Gingles* prong 1 here in your report isn't actually about *Gingles* prong 1; it's just an observation that the enacted District 15 isn't itself a majority Native voting age population district." Ex. 3 at 158:1-159:12 (Hood Dep.); *See also* Ex. 2 at 8-9 (Collingwood Rebuttal).

Defendant's focus on the demographic makeup of the *enacted* districts is therefore misplaced; it is undisputed that Plaintiffs' have proffered majority NVAP demonstrative districts.

**B.     Plaintiffs' demonstrative district is reasonably compact and joins Native American voters with shared non-racial interests.**

Next, Defendant asserts that Plaintiffs cannot establish *Gingles I* because their demonstrative district is not reasonably compact. But Plaintiffs' expert analysis, Defendant's expert testimony, and Supreme Court precedent all confirm that Demonstrative District 9[2] is

---

[2] Plaintiffs focus their discussion on Demonstrative Plan 1 for simplicity, but the same arguments largely apply to both demonstrative plans.

reasonably compact and joins Native Americans with shared non-racial interests. At the least this creates a dispute of fact with respect to Defendant's motion, precluding summary judgment.

The first *Gingles* precondition requires Plaintiffs to demonstrate that Native American voters can constitute the majority of voters "in some reasonably configured legislative district." *Cooper v. Harris*, 581 U.S. 285, 301 (2017); *see also LULAC*, 548 U.S. at 430 ("[T]he first *Gingles* condition requires the possibility of creating more than the existing number of reasonably compact districts with a sufficiently large minority population to elect candidate of its choice." (quoting *Johnson v. De Grandy*, 512 U.S. 997, 1008 (1994)).[3]

### 1. Plaintiffs' Demonstrative District 9 is reasonably compact and respects traditional districting criteria.

Here, Plaintiffs' expert analysis demonstrates that Demonstrative District 9 is reasonably compact for VRA purposes, in its shape and its adherence to traditional districting criteria. Indeed, Dr. Hood conceded as much at his deposition after Defendant moved for summary judgment.

As Dr. Collingwood explains, Plaintiffs' Demonstrative District 9 scores higher on mathematical compactness metrics than several congressional districts the Supreme Court has held to be "reasonably compact" for purposes of *Gingles* prong one. Ex. 2 at 12 (Collingwood Rebuttal). In *LULAC*, the Supreme Court considered the compactness aspect of *Gingles* prong one in the context of two Texas congressional plans—one drawn by a federal court and used in the 2002 election and a subsequent legislatively adopted plan used in the 2004 election. 548 U.S. at 409. The Court affirmed the lower court's holding that the 2002 court-drawn plan, known as "Plan 1151C," contained six "reasonably compact" Latino opportunity districts for VRA purposes in

---

[3] *De Grandy* articulated this standard in the context of single-member districts. Here, given the comparison of subdistricts to multimember districts, it is more useful to consider the number of *seats* where Native voters have an opportunity to elect.

south and west Texas. *Id.* at 423, 435; *see Session v. Perry*, 298 F. Supp. 2d 451, 488 (E.D. Tex. 2004) (identifying Districts 15, 16, 20, 23, 27, and 28 as the "reasonably compact" Latino opportunity districts for purposes of VRA compliance). Those districts are shown below:



Ex. 2 at 12 (Collingwood Rebuttal). As Dr. Collingwood found, Plaintiffs' Demonstrative District 9 has a higher Reock score than two of the districts the *LULAC* Court found to be reasonably compact for purposes of the VRA, and a higher Polsby-Popper score than four of the six districts.[4]

Likewise, Plaintiffs' Demonstrative District 9 is substantially more compact than a district the Supreme Court recently upheld. In *Abbott v. Perez*, the Supreme Court held that the 2013 Texas legislature had good reasons to believe that then-enacted District 35 met the *Gingles* preconditions. 138 S. Ct. 2305, 2331-32 (2018). District 35—upheld by the Supreme Court—is shown below:

---

[4] Reock and Polsby-Popper are different mathematical measures of compactness frequently used by political scientists. *See*, *e.g.*, Ex. 2 at 9-10 (Collingwood Rebuttal Report). As noted *supra* at 11, the water boundaries in Demonstrative District 9 have a distortive lowering effect these mathematical scores, which is more pronounced with respect to the Polsby-Popper score. *See* Ex. 2 at 10 (Collingwood Rebuttal Report).

**Texas Plan C235 District 35**



Ex. 2 at 13 (Collingwood Rebuttal). By mathematical scores—and by using one's eyes—it is clear that Plaintiffs' Demonstrative District 9 is substantially more compact than then-enacted Texas District 35. Ex. 2 at 13 (Collingwood Rebuttal).

Plaintiffs' Demonstrative District 9 exceeds the threshold for "reasonable compactness" applied to VRA districts by the Supreme Court, which should resolve the issue. It is at least sufficient to create a dispute of fact with respect to Defendant's motion. *See also* Ex. 3 at 151:8-25 (Hood Dep.) (Dr. Hood testifying that comparing a demonstrative plan to VRA districts upheld by the Supreme Court is the type of analysis he has done in the past but did not do here).

Notably, Plaintiffs' Demonstrative District 9 scores higher on mathematical compactness scores than several other state legislative districts in the 2021 enacted plan. Ex. 2 at 9-11 (Collingwood Rebuttal); Ex. 3 at 146:24-147:19 (Hood Dep.). Unless Defendant contends that enacted districts with lower scores than Plaintiffs' Demonstrative District 9 are unlawful, he cannot claim that Plaintiffs' proposed district is not reasonably compact. *See* N.D. Const. art. IV, § 2 (requiring that districts be "compact and contiguous"). Indeed, Dr. Hood—who had previously testified as an expert on the subject of compactness in Virginia redistricting litigation—testified at

his deposition that under his previous methodology, all of the enacted North Dakota districts *and* Plaintiffs' Demonstrative District 9 are "reasonably compact." Ex. 3 at 143:25-144:8 (Hood Dep.); *see id.* at 189:2-6 ("Q: [U]nder your own metric from Virginia and applied here, . . . [Plaintiffs' demonstrative] district is sufficiently or reasonably compact, correct? A: Correct.").[5]

Plaintiffs' Demonstrative District 9 adheres to other traditional districting criteria as well. As Dr. Collingwood explains, the district splits the same number of counties (three) as does enacted District 15 and the enacted state house version of District 9 (9A and 9B). Ex. 2 at 19-20 (Collingwood Rebuttal). Demonstrative District 9 has the same Eddy County split as the enacted map to follow the Spirit Lake Reservation boundary—a principle the legislature declared important. Ex. 2 at 20 (Collingwood Rebuttal). Plaintiffs' Demonstrative Plan 1 splits zero voting precincts and zero municipalities. Ex. 2 at 16 (Collingwood Rebuttal); Ex. 3 at 174:12-19 (Hood Dep.). Demonstrative District 9 spans about the same distance north-to-south as the enacted District 9 does east-to-west. Ex. 2 at 18 (Collingwood Rebuttal). And a number of North Dakota's legislative districts are geographically large—including many that are larger than Plaintiffs' Demonstrative District 9—because of the sparse population in rural areas of the state. Ex. 2 at 18 (Collingwood Rebuttal); Ex. 3 at 170:12-172:19 (Hood Dep.).

Defendant nonetheless contends that Plaintiffs' Demonstrative District 9 is not compact because it contains a "narrow land bridge." ECF No. 59 at 13 (quoting Hood Rep. at 6). At his deposition, Dr. Hood conceded that the "land bridge" to which Defendant referred was the Pierce

---

[5] Moreover, Dr. Hood likewise agreed that comparing Plaintiffs' Demonstrative District 9 to the enacted District 9, which he did in his report, was not the correct approach. *See* Ex. 3 at 148:6-16 (Hood Dep.) ("Q: The enacted version of District 9 is a rectangle, more or less, right? A: Fair, yes. Q: And do you understand the question, in terms of compactness for Voting Rights Act purposes, to be a comparison to a perfect rectangle, or is it about whether or not the district is reasonably compact standing alone? A: My understanding is that it would be reasonably compact standing on its own.").

County voting precinct—kept whole—that links Rolette to Benson County in Plaintiffs' Demonstrative District 1. Ex. 3 at 174:1-11 (Hood Dep.); Ex. 16 (County Precinct Maps). Notably, Dr. Hood acknowledged that Rolette and Benson Counties are geographically closer to one another than Rolette and Cavalier Counties (the counties linked together in the enacted plan). Ex. 3 at 177:3-20 (Hood Dep.). And he agreed that the "land bridge" in Plaintiffs' Demonstrative District 9 is larger than a number of other "land bridges" and connecting points in other enacted districts in the state. Ex. 3 at 176:17-177:2 (Hood Dep.); *see also* Ex. 2 at 14-16 (Collingwood Rebuttal) (Dr. Collingwood showing other North Dakota districts with connections ranging from 659 *feet* to 2.5 miles). Indeed, as Dr. Collingwood explains, the Pierce County precinct included in Plaintiffs' Demonstrative District 9 "spans 180 square miles and is itself larger than a majority of the other districts in the plan." Ex. 2 at 13 (Collingwood Rebuttal). A precinct separating two proximate counties that is kept whole and is geographically larger than a majority of districts in the plan cannot plausibly be labeled a "narrow land bridge." Especially not in comparison to the much thinner connections approved by the Supreme Court, as evidenced in the maps shown above.

Moreover, there is at least a dispute of fact as to whether Plaintiffs' demonstrative plan facilitates core retention, another criterion relied on by Defendant to assert that Plaintiffs have failed to establish the first *Gingles* prong. First, the Fifth Circuit has afforded "little value" to Dr. Hood's "core retention" analysis in another case in which he testified last year because it found that there was no reason that the "previous districting should be used as a measuring stick for compactness" under *Gingles* prong one. *Robinson v. Ardoin*, 37 F.4th 208, 220-21 (5th Cir. 2022). As such, even if there were no dispute, Dr. Hood's opinion regarding the core retention of Demonstrative District 9 would be insufficient to establish that Defendant is entitled to judgment as a matter of law. Second, as Dr. Collingwood explains, the demonstrative district retains sixty-

three percent of the population that previously resided in District 9—a core retention figure greater than eight other districts in the enacted plan. Ex. 2 at 21 (Collingwood Rebuttal). And Dr. Hood's discussion of core retention overstates the demonstrative district's effect on the enacted map, by comparing it to the benchmark plan rather than the enacted plan, which *also* moved Spirit Lake out of its prior district. Ex. 2 at 22-23 (Collingwood Rebuttal). Only 13% of the residents of Demonstrative District 9 (2,195 people) are newly moved compared to the enacted plan; 87% either were previously in District 9 or were also moved to a new district in the enacted plan. Ex. 2 at 22-23 (Collingwood Rebuttal). Thus, while core retention is not a particularly useful criterion in the *Gingles* prong one context, there is at least a dispute of fact regarding this issue.

Finally, unlike the enacted plan, which splits the Turtle Mountain Reservation from its trust lands between Districts 9A and 9B, Plaintiffs' Demonstrative District 9 keeps the Reservation and the trust lands together—a feature Dr. Hood agreed at his deposition was important and could be a community of interest consideration. Ex. 3 at 169:5-24 (Hood Dep.). Below is the map illustrating how the enacted plan splits the Reservation from the trust lands (shown in tan):



26

Ex. 2 at 21 (Collingwood Rebuttal).

Ultimately, the best explanation of how Plaintiffs' Demonstrative District 9 is reasonably compact and adheres to traditional districting principles comes from *Defendant's* expert Dr. Hood. His colloquy on the topic at his deposition, quoted at length *supra* at 12-13, suffices to defeat Defendant's motion on these issues. *See* Ex. 3 at 188:23-192:2 (Hood Dep.).

### 2. Turtle Mountain and Spirit Lake are geographically proximate and their voters share common needs and interests.

There is sufficient evidence that Turtle Mountain and Spirit Lake are geographically proximate and share common needs and interests to, at a minimum, create a genuine dispute of fact as to Defendants' claim that the first *Gingles* precondition is not met. As Dr. Collingwood and the two tribes' chairmen explain, the two communities are just 55 miles apart. Ex. 2 at 16-17 (Collingwood Rebuttal); Ex. 4 ¶ 6 (Azure Decl.); Ex. 5 ¶ 7 (Yankton Decl.).[6] As Dr. Hood admits, it is impossible to avoid these types of distances in rural North Dakota legislative districts, given the sparse population. Ex. 3 at 170:12-172:19 (Hood Dep.). In light of the geography of the state and the two Tribal Nation's shared interests, *see supra* at 13-14, this does not represent the type of "enormous geographical distance," that the Supreme Court has held precludes a finding that the first *Gingles* prong is met. *LULAC*, 548 U.S. at 435.

As discussed above, in *LULAC* the Court was tasked with evaluating two separate congressional plans. After the court-enacted Plan 1151C went into effect for the 2002 elections, *see supra* at 21-22, the legislature adopted a new plan, known as "Plan 1374C," in 2003. *LULAC*, 548 U.S. at 413. In order to shore up the District 23 incumbent who had nearly lost the 2002 election because of "an increasingly powerful Latino population," *id.* at 423, the legislature made

---

[6] Dr. Hood reports the "[c]entroid to centroid" measurement, which has the effect of making the reservations appear over 20 miles further apart than they are. ECF No. 59 at 18.

changes that dropped District 23's "Latino share of the total voting-age population [to] just over 50%." *Id.* at 424. To make up for the degradation in Latino opportunity in District 23, the legislature added a newly configured District 25. *Id*. Map 1374C is shown below:

**Texas Plan 1374C**



Ex. 18 (Tex. Legislative Council Plan 1374C).

The Court found that the 2003-enacted District 25 was not compact because it was "a long, narrow strip that winds its way from McAllen and the Mexican-border towns in the south to Austin, in the center of the State and 300 miles away," and because "[t]he Latino communities at the opposite ends of District 25 have divergent 'needs and interest,' owing to differences in socio-economic status, education, employment, health, and other characteristics." *LULAC*, 548 U.S. at 424 (internal quotation marks omitted); *see also id.* at 435 ("We emphasize it is the enormous geographic distance separating the Austin and Mexican-border communities, coupled with the

28

disparate needs and interests in these populations—not either factor alone—that renders District 25 noncompact for § 2 purposes.").

Even if 55 miles were a sufficient geographic distance to implicate the first *Gingles* precondition, however, the *LULAC* Court made clear that the presence of shared needs and interests overcomes geographic distance in evaluating whether a district is reasonably compact. *See* 548 U.S. at 435. There, the Court found that the previously-enacted District 23 satisfied the first *Gingles* prong despite stretching 500 miles from El Paso to Laredo, because "the Latino population in old District 23 is, for the most part, in closer geographic proximity than is the Latino population in new District 25" and because of Latino voters' shared interests in both communities. *Id.* at 424, 435; *id.* at 500 (Roberts, C.J., concurring in part and dissenting in part).

Here, Defendant has not proffered any evidence to suggest that the two Tribes have substantially disparate representational needs sufficient to preclude a finding that together they constitute a community of interest that ought to be preserved. *Cf. LULAC*, 548 U.S. at 435 (finding district compact where "there has been no contention that the different pockets of the Latino population . . . have divergent needs and interests . . . ."). By contrast, Chairman Azure of Turtle Mountain and Chairman Yankton of Spirit Lake have explained how the Native Americans of both tribes share a host of needs and interests having nothing to do with race. This includes a unique rural experience that differs from other rural North Dakotans who are united by agricultural and energy interests. Ex. 4 ¶ 8 (Azure Decl.); Ex. 5 ¶ 9 (Yankton Decl.). Moreover, the communities share "similar socio-economic statuses," and "similar representational needs from our state legislature related to economic investment, state-sponsored services, and legislative appropriations." *Id.*; *see generally* Ex. 20 (W. McCool Report). The Tribes partner across a host of educational, tourism, and gaming organizations. Ex. 4 ¶ 9 (Azure Decl.); Ex. 5 ¶ 10 (Yankton

Decl.). Spirit Lake and Turtle Mountain also work together to pursue legislative objectives such as "funding for tribal colleges, negotiating the tribal-state gaming compact, taxation on tribal lands, hunting and fishing regulation, tribal and state law enforcement, and funding for education, foster care, health care, etc." Ex. 4 ¶ 11 (Azure Decl.); Ex. 5 ¶ 12 (Yankton Decl.). And the Tribes have shared needs and interests with respect to their legislative representation on a host of issues unrelated to race, making their combination appropriate under *Gingles* prong one. *See LULAC*, 548 U.S. at 434-35 (noting that shared interests beyond race is an appropriate basis to combine geographically dispersed minority voters).

As Dr. Hood's testimony shows, Demonstrative District 9 satisfies the first *Gingles* precondition, precluding summary judgment in favor of Defendant on that issue.

## II. Plaintiffs have satisfied—or at the very least shown genuine disputes of material facts—as to the third *Gingles* precondition.

Where the parties are in dispute, summary judgment on *Gingles* prong three is typically inappropriate because it requires "weighing the evidence." *Wright v. Sumter Cnty. Bd. of Elections & Registration*, 657 F. App'x 871, 872-73 (11th Cir. 2016) (reversing grant of summary judgment that rested upon discounting one expert's calculations, choosing which elections to consider, and improperly weighing past elections more than recent elections"). Here, the evidence shows that Plaintiffs have satisfied the third *Gingles* precondition, or at the very least there are genuine disputes of material fact that would require the Court to weigh the evidence presented by the parties' experts. This is apparent both from Dr. Collingwood's analysis in his attached reports, Dr. Hood's deposition testimony, and now Defendant's own position in *Walen*. As such, Defendant is not entitled to summary judgment on the third *Gingles* precondition.

To determine whether white bloc voting exists, such that the third prong is satisfied, courts must look to "election results from the majority-white district" in a region, *i.e.*, the district that is

alleged to have a cracked minority population, and not on neighboring "packed" districts. *Bone Shirt*, 461 F.3d at 1027 (Gruender, J., concurring) ("If the State's approach were correct, packing would be both the problem and the solution—i.e., having illegally packed Indians into one district, the State could then point out that Indians are sometimes able to elect their preferred candidate in the packed district"); *see also Bone Shirt*, 336 F. Supp. 2d at 1011 (same); *De Grandy*, 512 U.S. at 1003-04 (focusing on whether white voters vote as bloc "to bar minority groups from electing their chosen candidates except in a district where a given minority makes up the voting majority"); *Old Person v. Cooney*, 230 F.3d 1113, 1122 (9th Cir. 2000) (noting that counting results of majority minority district in *Gingles* prong three would "permit white bloc voting in a majority-white district to be washed clean by electoral success in neighboring majority-Indian districts").

After selecting the appropriate district(s) to analyze, the Court must analyze election results in those districts according to their relative probative value—not simply sum all elections and afford them equal weight. "Endogenous and interracial elections are the best indicators of whether the white majority usually defeats the minority candidate." *Bone Shirt*, 461 F.3d at 1020-21. Moreover, "[t]he more recent the election, the higher its probative value." *Id.* at 1021. Exogenous elections—here, those for statewide office reconstituted within the challenged district—"are not as probative as endogenous elections," though they can "hold some probative value." *Id.*

Finally, in assessing the third precondition the Court must also consider whether "special circumstances . . . may explain minority electoral success in a polarized contest." *Gingles*, 478 U.S. at 57 & n.26. Special circumstances will remove an election from consideration in *Gingles* prong three if "the election was not representative of the typical way in which the electoral process functions." *Ruiz v. City of Santa Maria*, 160 F.3d 543, 557 (9th Cir. 1998). "Only minority electoral

success in typical elections is relevant to whether a Section 2 majority voting bloc usually defeats the minority's preferred candidate." *Id.* at 558. Here, the evidence is in Plaintiffs' favor.

*First*, Dr. Collingwood explains that "in each category of election that is considered most probative, there is a clear and compelling pattern of white voters usually defeating Native American voters' candidates of choice in District 9." Ex. 2 at 6 (Collingwood Rebuttal). This is so in 100% of the endogenous contests and 100% of the most recent 2022 elections. Ex. 2 at 7 (Collingwood Rebuttal). If the 2022 and 2020 elections are considered together, white voters block the election of Native American voters' preferred candidates in 71% of elections. Ex. 2 at 7 (Collingwood Rebuttal). In elections featuring Native American candidates across all election cycles considered, the Native American candidates lose 60% of the time. Ex. 2 at 7 (Collingwood Rebuttal). This is sufficient to demonstrate that the white majority "typically votes in a bloc to defeat the minority candidate" in District 9. *Bone Shirt*, 461 F.3d at 1020.

In reaching the opposite conclusion in his expert report, Dr. Hood (and, Defendant, in his motion in this case) merely added all possible elections together and gave every election equal weight to conclude that the Native American-preferred candidates win more often than not. But doing so places far too great of weight on the exogenous, statewide, and older elections that overstate the potential for Native American-preferred candidates—and certainly Native American candidates—to win. At his deposition, Dr. Hood conceded that this was not the correct approach. Rather, he testified that exogenous elections "should be accorded far less weight," that more recent elections are more probative, and that elections featuring Native American candidates are also more probative. Ex. 3 at 39:3-44:8 (Hood Dep.). Importantly, Dr. Hood agreed that the defeat of Native American Sen. Richard Marcellais in the 2022 election in District 9 is the "single most probative contest" for assessing the third *Gingles* precondition "because it features an endogenous

election with a Native American and it's the most recent." Ex. 3 at 45:15-24 (Hood Dep.). Thus even the testimony of Defendant's expert points strongly in favor of a *Gingles* prong three showing.

Further, as Dr. Collingwood explains and as the case law establishes, *see supra*, Dr. Hood's review of Dr. Collingwood's data is flawed because he added District 9A—with its near 80% NVAP—into his calculations for *Gingles* prong three. Ex. 2 at 7 (Collingwood Rebuttal); ECF No. 60-35 at 3 (Hood Report). Dr. Hood acknowledged that the 100% win rate for Native American voters in District 9A "doesn't tell us what's happening in the cracked—the allegedly cracked populations outside District 9A," and testified that he "do[es]n't disagree necessarily" that a better approach to his analysis is to remove District 9A form the calculus and focus on Districts 9 and 9B. Ex. 3 at 95:19-97:7 (Hood Dep.). Dr. Hood agreed that doing so would yield a 58% defeat rate in the districts for Native American preferred candidates. Ex. 3 at 98:10-99:6 (Hood Dep.); *see also* Ex. 2 at 7 (Collingwood Rebuttal). Focusing the analysis on District 9 and 15, Dr. Collingwood's analysis shows a 64% combined defeat rate for Native American preferred candidates. Ex. 2 at 7 (Collingwood Rebuttal).

*Second*, Dr. Hood's report and Defendant's motion do not account for the special circumstances that define the 2018 elections. As explained above, the 2018 elections were not close to the typical electoral environment in North Dakota or District 9 with respect to Native American turnout. *See supra* at 7-8; *see also* Ex. 2 at 4, 8 (Collingwood Rebuttal). As Dr. Collingwood explained, "I have studied and conducted many turnout analyses . . . in areas with large shares of Native American eligible voters. In all the many elections in different jurisdiction[s] I have studied, I have never seen a Native American turnout number" like the 57.6% among Native Americans in District 9 in 2018. Ex. 2 at 4 (Collingwood Rebuttal). Dr. Collingwood explained

this was highly unusual as well because it inverted the normal presidential to midterm turnout pattern and changed the electoral composition of District 9 from its ordinary 60-67% white share to being split evenly 50-50% between white voters and Native American voters. Ex. 2 at 4-5 (Collingwood Rebuttal). Chairmen Azure and Yankton explain that the 2018 election, with its intense focus on Native American turnout from regional, state, and national groups with considerable financial resources, the presence of national celebrities holding get-out-the-vote concerts on the reservations, and the outrage among Native Americans at what they viewed as an effort to suppress their voting strength with the "residential street address" voter ID requirement, made the election unlike any before or since. Ex. 4 ¶¶ 24-31 (Azure Decl.); Ex. 5 ¶¶ 25-38 (Yankton Decl.). Indeed, Dr. Hood could not think of another example where a group had such higher turnout in a midterm than in a presidential election. Ex. 3 at 82:21-83:20 (Hood Dep.).

If the 2018 elections are excluded as special circumstances as Dr. Collingwood advises, Ex. 2 at 8 (Collingwood Rebuttal); *see also Ruiz*, 160 F.3d at 558 ("Only minority electoral success in typical elections is relevant to whether a Section 2 majority voting bloc usually defeats the minority's preferred candidate"), and the 2022, 2020, and 2016 elections are considered in combination—even weighing the elections equally—then Native American voters' preferred candidates in District 9 lose 57% of the time. Ex. 2 at 8 (Collingwood Rebuttal); Ex. 3 at 90:10-23 (Hood Dep.); *see Gingles*, 478 U.S. at 61 (finding *Gingles* prong three satisfied based upon data from three probative election cycles).

*Third*, Dr. Hood's own independent analysis—updated by him during his deposition—shows that *Gingles* prong three is satisfied in District 9. Although Dr. Hood's expert report in this case merely responds to Dr. Collingwood's analysis, in the related *Walen* matter he produced an expert report conducting an independent analysis of all three *Gingles* preconditions for Districts 9,

34

9A, and 9B. Ex. 14 (Hood Walen Report). In that report, he analyzed six elections from 2018 and 2020, and found that Native American voters' preferred candidates were defeated in two of the six. Ex. 14 at 6 (Hood Walen Report). When asked at his deposition why he had not included any 2022 elections in his analysis—considering that his handwritten notes included at least the 2022 District 9 result showing Sen. Marcellais' loss—Dr. Hood testified: "I did not get to a full analysis" because he ran out of time before his report was due. Ex. 3 at 101:9-102:16 (Hood Dep.). He further testified that including the 2022 elections was "preferable" as the "most recent set of elections." *Id*. Dr. Hood then identified four additional 2022 contests that he thought should be included and agreed, presuming Dr. Collingwood's reported results for 2022 were correct, that these results would change Dr. Hood's own determination with respect to *Gingles* prong three. Ex. 3 at 108:8-16; 109:13-111:15 (Hood Dep.). With the addition of the 2022 elections he selected as most probative, Dr. Hood determined that his analysis "would show 60 percent defeat rate for the Native American preferred candidates in District 9." Ex. 3 at 109:24-111:3 (Hood Dep.).

> Q:    And a 60 percent defeat rate for Native preferred candidates would constitute usually being defeated by white bloc voting, correct?
> A:    Well, I guess it would meet the definition of more typically than not.
> Q:    And that's the definition that you apply to your *Gingles* prong 3 analysis?
> A:    Correct, yes.

Ex. 3 at 111:8-15 (Hood Dep.).

Moreover, Defendant has abandoned the position taken in his motion and now affirmatively contends that the third *Gingles* precondition is satisfied and that elections held in the full District 9 violate the VRA. *Walen*, ECF No. 102 at 39-40. This is not surprising in light of Dr. Collingwood's analysis, Dr. Hood's testimony, the 2022 election results. But this about-face means that both parties—and their experts—now agree the third *Gingles* precondition is satisfied in District 9, precluding Defendant's request for summary judgment to the contrary.

*Fourth*, and finally, Defendant does not dispute that *Gingles* prong three is satisfied in Districts 9B and 15. ECF No. 60-35 at 4 (Hood Report); Ex. 1 at 26 (Collingwood Initial Report); Ex. 14 at 6 (Hood Walen Report); Ex. 2 at 8 (Collingwood Rebuttal). This likewise precludes the entry of summary judgment in favor of Defendants on third *Gingles* precondition.

## III.   Defendant's contention that Plaintiffs' Demonstrative District 9 is a racial gerrymander has no basis in evidence and is belied by Supreme Court precedent.

Defendant's claim that Demonstrative District 9 is a racial gerrymander is unsupported by the evidence and belied by Supreme Court precedent. A party alleging a racial gerrymander must show that race was the "predominant factor" in the decision to "place a significant number of voters within or without a particular district. *Cooper*, 581 U.S. at 291. This requires a showing that other factors, like compactness, respect for political subdivisions, and others, were "subordinated . . . to racial considerations." *Id.* (internal quotation marks omitted). Even if race does predominate in the drawing of a district, compliance with Section 2 of the VRA is a compelling interest that precludes a district from being deemed an Equal Protection violation. *Id.* at 292.

Defendant contends that Plaintiffs' Demonstrative District 9 is a racial gerrymander because it "do[es] not properly account for the traditional redistricting principles" and "combine[s] the populations of two distinct and geographically separated Native American Tribes." ECF No. 59 at 25. But as the above discussion regarding *Gingles* prong one shows, Plaintiffs' Demonstrative District 9 satisfies the traditional redistricting criteria as well or better than enacted Districts 9, 9A, 9B, and 15, and many other enacted districts. It also beats out districts that the Supreme Court has found to comply with traditional districting principles for VRA purposes. *See supra* Part I. Moreover, Spirit Lake and Turtle Mountain have a host of shared needs and interests having nothing to do with race, and thus are properly combined in a VRA district. *See LULAC*, 548 U.S. at 434-35.

36

All Defendant cites for his supposition that Demonstrative District 9 is a racial gerrymander is Dr. Hood's statement that the district raises such "questions" in his expert report. ECF No. 59 at 21-25. But at his deposition, Dr. Hood testified that he is "not saying that" it *is* a racial gerrymander, that he "do[es]n't believe [he] can make that determination," and that he doesn't "have the evidentiary basis to say that." Ex. 3 at 199:22-200:12 (Hood Dep.). He further testified:

> Q:     And your testimony with respect to traditional districting criteria is not that plaintiffs' demonstrative district subordinates those criteria in favor of a racial classification, right? You don't have that evidence?
> A:     No, I didn't say that.

Ex. 3 at 203:2-8 (Hood Dep.). Dr. Hood further agreed that "just the fact that there are two Native American tribes in a district does not on its own mean that the district is a racial gerrymander," that "Native American reservations are more than just racial groups, [ ] they are sovereign nations," that they have non-racial interests, and that "Native American tribes might have shared interests that relate to issues with respect to representation in the state legislature." Ex. 3 at 198:10-14, 202:4-17 (Hood Dep.). But Dr. Hood testified that *he* could not speak to the presence or absence of nonracial shared interests between Spirit Lake and Turtle Mountain. Ex. 3 at 17:15-23 (Hood Dep.) ("Q: And so you're not opining on anything related to those two tribes with respect to their shared interests or common interests or socioeconomic status or anything of the like. Is that right? A: Correct. Q: And you wouldn't have any knowledge or basis to do that, right? A: Correct.").

Ultimately Dr. Hood testified it was just as likely that the *legislature's* version of District 9 was a racial gerrymander by stretching eastward to pick up white voters:

> Q:     And it can be a racial gerrymander to include white voters in a district instead of other races of voters, right?
> A:     That is correct, certainly.
> Q:     And so to the extent that enacted District 9 stretches across to include rural white voters instead of Native American voters, under your view, that too could be an indication of a racial gerrymander?
> A:     Potentially.

Ex. 3 at 197:25-198:9 (Hood Dep.).

Defendant next cites *Sensley v. Albritton*, 385 F.3d 591 (5th Cir. 2004), in support of his claim that Demonstrative District 9 is a racial gerrymander. In *Sensley*, the court rejected the plaintiffs' demonstrative plan because it was "irregular," had an "extended and distorted shape," with a "narrow corridor [ ] carefully drawn to avoid areas of higher Caucasian population concentration[s]," and at certain points was "only a city block wide." *Id.* at 597 & n.4. The plan split municipal boundaries and connected Black voters who "share[d] few community interests." *Id.* at 598. As Dr. Hood acknowledged, Plaintiffs' Demonstrative District 9 does none of these things. *See supra* at 12-13. Moreover, the court's concern regarding the 15-mile distance between connected populations in *Sensley*, *id.* at 597, must be understood in the context of the map at issue—a nine-district parish police jury board. *Id.* at 591. It is unremarkable that a 15-mile distance might weigh against compactness for a nine-member county police board plan, but it would be unreasonable to apply the same yardstick to a sparsely populated, rural North Dakota state legislative district. *See, e.g.*, Ex. 3 at 170:12-172:19 (Hood Dep.).

Plaintiffs' Demonstrative District 9 bears no resemblance to the districts the Supreme Court has invalidated as racial gerrymanders. In *Shaw v. Reno*, for example, the Court rejected North Carolina District 12 as a racial gerrymander, describing it as "160 miles long and, for much of its length, no wider than the [interstate] corridor" that "winds in snakelike fashion through tobacco country, financial centers, and manufacturing areas until it gobbles in enough enclaves of black neighborhoods." 509 U.S. 630, 635-36 (1993). Later, the Court in *Cooper* rejected a modern iteration of the same district ruled unconstitutional in *Shaw*, because it similarly went block-by-block adding Black voters and subtracting white voters in a way the Court held was only explainable by race. 137 S. Ct. at 1474-76. In *Miler v. Johnson*, the Court invalidated a Georgia

38

congressional district that carefully included Black voters and excluded white voters block-by-block. 515 U.S. 900, 909 (1995). And in *Bush v. Vera*, the Court invalidated a Texas congressional district that appeared "like a jigsaw puzzle . . . in which it might be impossible to get the pieces apart." 517 U.S. 952, 965, 973 (1996). The maps are shown below:

**Shaw Invalidate District**



**Cooper Invalidated District**



**Miller Invalidated District**

**Bush Invalidated District**



Defendant also suggests that Plaintiffs' Demonstrative District 9 is not proper because its NVAP is 66.1% rather than the bare majority NVAP of the enacted District 9. ECF No. 59 at 21. But, as discussed above, the enacted District 9 is dilutive and its actual electorate is supermajority white in normal electoral conditions. *See supra* at 7. Moreover, a 66.1% NVAP is exactly in line with the national median for Native American majority legislative districts. *See* Ex. 2 at 5 (Collingwood Rebuttal). It is likewise similar to the NVAP of enacted District 4A, which

39

Defendant is defending in *Walen* as required by the VRA. Ex. 17 (N.D. Legislative Council District 4A Data). Moreover, Demonstrative District 9's NVAP accords with the remedial plan the Eighth Circuit affirmed in *Bone Shirt*. There, the court noted that the remedial districts had 65% and 74% NVAPs, respectively, and noted the importance of considering "other factors, including turnout." 461 F.3d at 1023. Defendant's suggestion that there is something improper about a 66% NVAP district is especially peculiar, considering he is simultaneously defending District 9A—which at 79.8% NVAP is the fifth highest in the nation—against Plaintiffs' allegation that it is excessively packed. Ex. 2 at 5 (Collingwood Rebuttal). These two positions are irreconcilable.

Moreover, Defendant's contention that Demonstrative District 9 is an improper remedy because it is a multi-member district is misplaced. ECF No. 59 at 21. As Plaintiffs discussed above, *see supra* at 17-19, whether an appropriate VRA remedy is single-member or multi-member districts depends upon an intensely local appraisal of the electoral conditions of each district—not a blunt one-size-fits-all rule. The Eighth Circuit's decision in *Bone Shirt* upholding a combination of single member and multi-member Native American majority VRA remedial districts in South Dakota underscores this fact.

The evidence forecloses Defendant's suggestion that Demonstrative District 9 would somehow violate the Equal Protection Clause. The district is required by the VRA, complies with traditional districting principles, joins Native American voters and tribes that share common interests and needs across a host of issues having nothing to do with race, and would remedy the enacted plan's dilutive effect which has reduced from three to one the number of legislators Native American voters in northeastern North Dakota can elect to the state legislature.

**CONCLUSION**

For the foregoing reasons, Defendant's motion for summary judgment should be denied.

March 1, 2023

/s/ Michael S. Carter
Michael S. Carter
OK Bar No. 31961
Matthew Campbell
NM Bar No. 138207, CO Bar No. 40808
mcampbell@narf.org
NATIVE AMERICAN RIGHTS FUND
1506 Broadway
Boulder, CO 80302
Telephone: (303) 447-8760
*Counsel for Plaintiffs*

Samantha B. Kelty
AZ Bar No. 024110, TX Bar No. 24085074
kelty@narf.org
NATIVE AMERICAN RIGHTS FUND
950 F Street NW, Ste. 1050 Washington, DC 20004
Telephone: (202) 785-4166
*Counsel for Plaintiffs*

/s/ Timothy Q. Purdon
Timothy Q. Purdon
N.D. Bar No. 05392
TPurdon@RobinsKaplan.com
ROBINS KAPLAN, LLP
1207 West Divide Avenue, Suite 200
Bismarck, ND 58501
Telephone: (701) 255-3000
Fax: (612) 339-4181
*Counsel for Plaintiff Spirit Lake Nation*

Respectfully submitted,

/s/ Mark P. Gaber
DC Bar No. 988077
mgaber@campaignlegal.org
Molly E. Danahy
DC Bar No. 1643411
mdanahy@campaignlegal.org
Nicole Hansen
NY Bar 5992326
nhansen@campaignlegal.org
CAMPAIGN LEGAL CENTER
1101 14th St. NW, Ste. 400
Washington, DC 20005
Telephone: (202) 736-2200
Fax: (202) 736-2222
*Counsel for Plaintiffs*

Bryan Sells (admitted *pro hac vice*)
GA Bar No. 635562
bryan@bryansellslaw.com
THE LAW OFFICE OF BRYAN L. SELLS, LLC
PO Box 5493
Atlanta, GA 31107-0493
Telephone: (404) 480-4212
*Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

I certify that the foregoing was served on all counsel of record via the Court's CM/ECF system.

/s/ Mark P. Gaber
Mark P. Gaber

*Counsel for Plaintiffs*