IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA
EASTERN DIVISION

| | |
|---|---|
| Turtle Mountain Band of Chippewa Indians, Spirit Lake Tribe, Wesley Davis, Zachery S. King, and Collette Brown,<br><br>        Plaintiffs,<br><br>vs.<br><br>Michael Howe, in his official capacity as Secretary of State of North Dakota,<br><br>        Defendant. | **ORDER DENYING MOTION FOR SUMMARY JUDGMENT**<br><br>Case No. 3:22-cv-22 |

Defendant Michael Howe, as Secretary of State of North Dakota (the "Secretary"), moves for summary judgment on the Plaintiffs' Section 2 claim under the Voting Rights Act ("VRA"), 52 U.S.C. § 10301.  Doc. No. 58.  Plaintiffs Turtle Mountain Band of Chippewa Indians ("Turtle Mountain"), Spirit Lake Tribe ("Spirit Lake"), Wesley Davis, Zachery S. King, and Collette Brown (together, the "Plaintiffs") oppose the motion.  Doc. No. 65.  For the reasons below, the motion is denied.

**I.      FACTS**

This case arises from the redrawing of certain North Dakota legislative districts pursuant to redistricting legislation and whether certain redistricting changes in that legislation violate Section 2 of the VRA.  Article IV, Section 2 of the North Dakota Constitution requires the state legislature to redraw the district boundaries of each legislative district after the Census.  After the federal government released its 2020 Census data to the states, North Dakota Governor Doug Burgum convened a special session of the North Dakota Legislative Assembly to redistrict.  Doc. No. 60-31.  On November 10, 2021, the Legislative Assembly passed House Bill 1504, the

redistricting legislation at issue here. H.B. 1504, 67th Leg., Spec. Sess. (N.D. 2021). Governor Burgum signed it into law the next day. Doc. No. 19-1.

Prior to the 2021 redistricting, the Turtle Mountain Indian Reservation was its own state legislative district (district 9), as was Spirit Lake (district 23). From 1990 until the 2021 redistricting, district 9 elected a Native American candidate to the North Dakota Senate and two Native American candidates to the North Dakota House of Representatives. Doc. No. 65-3 at 7. The 2021 redistricting legislation changed those districts by dividing district 9 into two single-representative subdistricts, 9A and 9B (9A contains most of the Turtle Mountain Indian Reservation, with the remainder in district 9B), and separating Spirit Lake from the counties it previously shared a district with and placing it in district 15 (neighboring district 9).

This case[1] challenges those changes and alleges the changes dilute the voting strength of Native American voters in Turtle Mountain, Spirit Lake, and surrounding areas, in violation of Section 2 of the VRA. Doc. No. 1. The Plaintiffs assert that a Native American supermajority was packed into district 9A, while the remaining Native American population was cracked across neighboring districts 9B and 15. And because of this cracking and packing, white voters in those districts (9B and 15) now generally defeat Native American voters' preferred candidates. The Secretary, for his part, disagrees, arguing that the Plaintiffs have failed to satisfy preconditions one and three under Thornburg v. Gingles, 478 U.S. 30, 46 (1986), meaning the Plaintiffs' voter dilution claim fails as a matter of law.

---

[1] A separate challenge to the redistricting legislation is ongoing in this District in Walen, et al. v. Burgum, et al., Case. No. 1:22-cv-31. That case raises a different claim (an Equal Protection claim) and challenges the redistricting of districts 4 and 9 into subdistricts of district 4A and 4B and subdistricts 9A and 9B, respectively.

Both parties rely heavily on expert reports and testimony in support of their respective positions. The Secretary's expert, Dr. M.V. Hood III, is a political science professor at the University of Georgia. Doc. No. 60-35 at 2. The Plaintiffs' expert is Dr. Loren Collingwood, a political science professor at the University of New Mexico. Doc. No. 65-2 at 48. Dr. Collingwood's report states the 2021 redistricting changes noted above result in Native American voters electing their preferred candidate in district 9A but never electing their preferred candidate in districts 9B and 15 because those candidates are blocked by a white voting bloc. Id. at 4-5. He also notes it is possible to redraw district 9 in a way that would eliminate the subdistricts, thus allowing Native American voters more opportunity to elect candidates of their choice.[2] Id. at 44.

On the other hand, Dr. Hood suggests that it is not possible to create a district in the vicinity of Spirit Lake where Native American preferred candidates are likely to consistently win elections. Doc. No. 60-35 at 4. He also opines that the Plaintiffs' two proposed remedial districts lack "traditional redistricting criteria" such as compactness, population deviation, core retention, and respect for communities of interest, id. at 10-11, and suggests that the Plaintiffs' proposed remedial districts may be impermissible racial gerrymanders. Id. at 11. In a rebuttal report though (Doc. No. 65-3), Dr. Collingwood questions Dr. Hood's findings because, among other things, Dr. Hood did not account for voter turnout statistics and weighed all elections equally. Id. Dr. Collingwood also critiques Dr. Hood's analysis of the proposed remedial districts. Id.

---

[2] The Plaintiffs' proposed districts would generally result in district 9 electing a Native American preferred Senator and two Native American preferred House Representatives.

## II.     ANALYSIS AND DISCUSSION

### A.     Summary Judgment Standard

Summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). "An issue is 'genuine' if the evidence is sufficient to persuade a reasonable jury to return a verdict for the nonmoving party." Schilf v. Eli Lilly & Co., 687 F.3d 947, 948 (8th Cir. 2012) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). "A fact is material if it 'might affect the outcome of the suit.'" Dick v. Dickinson State Univ., 826 F.3d 1054, 1061 (8th Cir. 2016) (quoting Anderson, 477 U.S. at 248).

At summary judgment, the non-movant bears an affirmative burden "to go beyond the pleadings and 'by affidavit or otherwise' designate 'specific facts showing that there is a genuine issue for trial.'" Commercial Union Ins. Co. v. Schmidt, 967 F.2d 270, 271 (8th Cir. 1992) (quoting Robinson v. Monaghan, 864 F.2d 622, 624 (8th Cir. 1989)). "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." Anderson, 477 U.S. at 255.

### B.     Section 2 Claim Under The Voting Rights Act

Section 2 of the VRA prohibits any "standard, practice, or procedure" that "results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color[.]." 52 U.S.C. § 10301(a). A violation of Section 2 is established if it is shown that "the political processes leading to [a] nomination or election" in the jurisdiction "are not equally open to participation by [minority voters] in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice."

Id. § 10301(b).  The United States Supreme Court has "construed § 2 to prohibit the distribution of minority voters into districts in a way that dilutes their voting power."  Wis. Legislature v. Wis. Elections Comm'n, 142 S. Ct. 1245, 1248 (2022) (citing Gingles, 478 U.S. at 46).  "The essence of a § 2 claim is that a certain electoral law, practice, or structure interacts with social and historical conditions to cause an inequality in the opportunities enjoyed by minority and white voters to elect their preferred candidates."  Bone Shirt v. Hazeltine, 461 F.3d 1011, 1017-18 (8th Cir. 2006) (cleaned up).

In Thornburg v. Gingles, the United States Supreme Court identified three preconditions (also known as the Gingles factors) that must be initially satisfied to proceed with a Section 2 voter dilution claim:

1. The minority group . . . is sufficiently large and geographically compact to constitute a majority in a single-member district;

2. The minority group . . . is politically cohesive; and,

3. The white majority votes sufficiently as a bloc to enable it—in the absence of special circumstances . . . usually to defeat the minority's preferred candidate.

Gingles, 478 U.S. at 50-51.  Failure to prove any precondition defeats a Section 2 claim.  Clay v. Bd. of Educ., 90 F.3d 1357, 1362 (8th Cir. 1996).  If all preconditions are met, then there is a viable voter dilution claim and the analysis shifts to determining whether, under the totality of the circumstances, members of the racial minority group have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice.  52 U.S.C. § 10301(b); see also Johnson v. De Grandy, 512 U.S. 997, 1011-12 (1994) (once the three preconditions are met, the totality of the circumstances is addressed).

Here the Secretary challenges the first and third Gingles preconditions. He does not challenge the second precondition or the totality of the circumstances analysis (at this point in the case and for the purposes of this summary judgment motion). Doc. No. 59 at 16-17. He also argues that the Plaintiffs' proposed remedial districts are impermissible under the VRA and the United States Constitution. Id. at 17.

### 1. Precondition 1: Sufficiently Large and Geographically Compact

The first Gingles precondition requires the Plaintiffs to demonstrate that the minority group (Native Americans) is sufficiently large and geographically compact to constitute a majority in a potential district.[3] Gingles, 478 U.S. at 50. This is also known as the "majority-minority standard." Jeffers v. Beebe, 895 F. Supp. 2d 920, 931 (E.D. Ark. 2012). As explained in Gingles, "unless minority voters possess the potential to elect representatives in the absence of the challenged structure or practice, they cannot claim to have been injured by that structure or practice." Gingles, 478 U.S. at 50. So, this precondition focuses on electoral potential—and specifically here, whether Native American voters have the potential to constitute the majority of voters "in some reasonably configured legislative district." See Cooper v. Harris, 581 U.S. 285, 301 (2017); see also Houston v. Lafayette Cnty., Miss., 56 F.3d 606, 611 (5th Cir. 1995). Hence the analysis for the first precondition considers the proposed district(s) and not the existing district. See, e.g., Bone Shirt, 461 F.3d at 1018.

The Secretary asserts that the Native American population at issue is not sufficiently large and geographically compact to form a majority-minority district, stating "there is no way to modify

---

[3] While the first precondition refers to a minority constituting a majority in a "single-member district," the analysis is done on a case-by-case basis, and the Gingles factors "cannot be applied mechanically and without regard to the nature of the claim." See Voinovich v. Quilter, 507 U.S. 146, 158 (1993).

the district lines to pull a relevant number of additional Native American voters into either District 9 or District 15 without racially gerrymandering a new multimember district that connects the two geographically distant reservations with a narrow land bridge." Doc. No. 59 at 18. But given the record, this argument is, at best, a question of fact to be resolved at trial.

Recall that the focus of the first Gingles precondition is on the proposed remedial districts. Here, the Plaintiffs offer two proposed remedial districts. Both proposed districts reconfigure district 9 by adjusting certain neighboring districts 14, 15, and 29[4] to gain more Native American voters (see Doc. No. 65-2 at 30-44), which suggests (at least for the purposes of summary judgment) that the Native American population is sufficiently large and geographically compact. That is also evidenced by both remedial districts having a Native American voting age population ("VAP") ranging between 66-69%. Id. at 47. Per Dr. Collingwood's report, the proposed districts create voter margins that ensure Native American preferred candidates have an opportunity to win at-large elections in district 9. Id. at 44. The proposed remedial districts also result in Native American voters generally electing three candidates of choice in legislative elections (as opposed to one). Id. Put simply, the Plaintiffs have proposed two remedial districts that appear to demonstrate the possibility of a majority-minority district.

Beyond that, although the Secretary takes issue with the proposed district lines of the remedial districts, there is evidence in the record to suggest that the remedial districts do adhere to traditional redistricting criteria. The proposed districts do not appear to be shaped differently or more oddly than any other North Dakota district, and it is mathematically undisputed that certain other districts in North Dakota are less compact than the proposed remedial districts. Doc. No.

---

[4] The second proposed remedial district does not change district 29. Doc. No. 65-2 at 38.

65-3 at 10.  Dr. Hood also agreed that the proposed remedial districts may adhere to traditional redistricting principles so that they satisfy the VRA.  Doc. No. 65-4 at 52-53.

Again, to satisfy the first Gingles precondition, the Plaintiffs must show that Native American voters have the potential to constitute the majority of voters in a reasonably configured legislative district.  Gingles, 478 U.S. at 50.  The Secretary's challenges to the proposed remedial districts amount to factual disputes that cannot be resolved on summary judgment.  On this record, there is a genuine issue of material fact as to the first Gingles precondition, so summary judgment cannot be granted.

### 2. Precondition 3: Racially Polarized Voting

The Secretary also moves for summary judgment on the third Gingles precondition.  The third precondition requires the Plaintiffs to demonstrate that "the white majority votes sufficiently as a bloc to enable it—in the absence of special circumstances . . . usually to defeat the minority's preferred candidate."  Gingles, 478 U.S. at 51.  Because there is no simple doctrinal test to determine legally significant racial bloc voting, the inquiry hinges on statistical evidence.  Id. at 58-59.

On this issue, the two experts offer differing conclusions and evidence.  Dr. Collingwood offers extensive statistical data to support his conclusion that, in the 2021 redistricted districts 9B and 15, white voters are voting as a bloc to prevent Native American voters from electing candidates of their choice.  Doc. No. 65-2 at 46.  Dr. Hood disagrees.  Doc. No. 60-35 at 4.  But Dr. Collingwood explains in a rebuttal report why he believed his methodology is correct and accurate.  Doc. No. 65-3.  Among other issues and differences, Dr. Hood weighed all elections equally (Doc. No. 65-4 at 12), while Dr. Collingwood gave more weight to certain elections.  Doc. No. 65-3 at 7.  But Dr. Hood also testified that it may be appropriate to weigh certain elections as

more probative than others.  Doc. No. 65-4 at 12-14.  Dr. Hood also stated that given the results of the November 2022 election, it was possible that Native American preferred candidates were being defeated by a white voting bloc in districts 9B and 15.  Id. at 30.

What the Court is left with is conflicting expert testimony as to whether districts 9B and 15 allow Native Americans an opportunity to elect preferred candidates and whether these candidates are usually defeated by a white voting bloc.  Weighing expert testimony and reports and making fact decisions are fact issues to be resolved at trial.  See Anderson, 477 U.S. at 251-52 (credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are left for trial.).  On this record, there is a genuine dispute of material fact as to whether the third Gingles precondition has been met, precluding summary judgment.

    **C.**    **Proposed Remedial Districts**

The Secretary next argues the proposed remedial districts are impermissible under the VRA and are racial gerrymanders in violation of the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution.  Doc. No. 59 at 19-25.  As an initial matter, this argument is flawed because it is premature—if there is a Section 2 violation, the Secretary will have the first opportunity to correct the violation.  See Bone Shirt, 461 F.3d at 1022; Williams v. Texarkana, Ark., 32 F.3d 1265, 1268 (8th Cir. 1994) ("If an appropriate legislative body offers a remedial plan, the court must defer to the proposed plan unless the plan does not completely remedy the violation or the proposed plan itself constitutes a section two violation.").  This alone precludes summary judgment on this ground because (1) there has been no determination yet of whether there is a Section 2 violation, and (2) the Secretary is not bound to the Plaintiffs' proposed remedial districts in devising a remedy if there is a Section 2 violation.

Setting that issue aside for the moment, the Secretary seems to take issue with the proposed remedial districts being multimember districts, as opposed to single member districts. Doc. No. 59 at 21. While it is true that multimember districts can be used to dilute minority votes, the United States Supreme Court has been clear that an examination of a Section 2 violation is flexible and fact intensive. Gingles, 478 U.S. at 46. Importantly, the VRA does not bar multimember districts. Id. at 47. The Court is quite skeptical that the VRA would bar multimember districts that tend to allow more minority preferred candidates to be elected, as is the case with the proposed remedial districts here.

The Secretary also argues the Plaintiffs seek a supermajority of Native American voters in district 9, instead of a simple majority as required by the VRA. While only a simple majority is required under the VRA, it is recommended that remedial districts contain 65% minority voters. Bone Shirt, 461 F.3d at 1023. The Native American VAP of 66-69% in the proposed remedial districts is well under the 74% Native American VAP that was affirmed by the Eighth Circuit Court of Appeals in Bone Shirt. Id. It is also worth repeating that the proposed remedial districts are just that—proposed remedial districts. The proposed districts are not set in stone, and if there is a Section 2 violation, the Secretary need not consider the proposed remedial districts. So, once again, summary judgment is inappropriate on these facts.

Turning to the Equal Protection argument, one cannot conclude that the proposed remedial districts are racial gerrymanders on this record. A party alleging a racial gerrymander must show that race was the "predominant factor" in the decision to "place a significant number of voters within or without a particular district." Cooper, 581 U.S. at 291. This requires a showing that other factors, like compactness, respect for political subdivisions, and others, were "subordinated . . . to racial considerations." Id. (internal quotation marks omitted). Even if race does predominate

in the drawing of a district, compliance with Section 2 of the VRA is a compelling interest that generally precludes an Equal Protection violation.  Id. at 292.

Here, there is evidence in the record that Turtle Mountain and Spirit Lake share more commonalities than simply race.  Shared socioeconomic status and need for investment, combined with Turtle Mountain's and Spirit Lake's participation in various joint ventures, is alone enough to create genuine issues of material fact as to whether race was the predominant factor in the creation of the proposed remedial districts.  Further, even if it is assumed that race predominated the creation of the proposed districts, there is a genuine issue of material fact as to whether compliance with Section 2 of the VRA is a sufficiently compelling interest to satisfy strict scrutiny.  All told, this argument is premature, and fact issues again preclude granting the Secretary's motion for summary judgment on his Equal Protection argument.

IV.   **CONCLUSION**

Based on the above, and on all the files, records, and proceedings in this case, the Secretary's motion for summary judgment (Doc. No. 58) is **DENIED**.

**IT IS SO ORDERED**.

Dated this 10th day of April, 2023.

*/s/ Peter D. Welte*
Peter D. Welte, Chief Judge
United States District Court