## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NORTH DAKOTA

| | |
|---|---|
| TURTLE MOUNTAIN BAND OF CHIPPEWA INDIANS, *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> MICHAEL HOWE, in his official capacity as Secretary of State of the State of North Dakota, <br><br> Defendant. | Civil No. 3:22-cv-00022-PDW-ARS |

## PLAINTIFFS' TRIAL MEMORANDUM

### I.    Statement of the Case

The 2020 Census revealed that North Dakota Legislative District 9, which had for decades been wholly contained within heavily Native American Rolette County and had for decades elected three Native American-preferred candidates to the state legislature, needed to geographically expand to satisfy population equality requirements. The configuration the legislature selected in its 2021 Redistricting Plan violates Section 2 of the Voting Rights Act ("VRA") in two ways.

First, the legislature added parts of two counties to the east, Towner and Cavalier Counties, that are nearly 100% white and whose voters cast ballots in the polar opposite direction of Rolette County's Native American voters. This choice reduced District 9's Native American voting age population ("NVAP") by twenty points and nearly doubled its white VAP, resulting in a district with a bare majority of Native American eligible voters. Among actual voters in usual electoral conditions, however, white voters constitute a sizeable majority of the newly enacted District 9. The legislature chose this configuration over one that would expand District 9 south to include

1

Benson County—home to the Spirit Lake Tribe and with a VAP closely split between Native American and white voters.

Second, having dramatically reconfigured District 9 and its racial demographics, the legislature then subdivided the district into two state house districts—something the Turtle Mountain Band of Chippewa Indians ("Turtle Mountain") never requested—with District 9A packed with Native American voters, having a nearly 80% NVAP, and leaving a sizeable population of Native American voters cracked apart in two neighboring districts (District 9B and District 15) in which their voting strength is overwhelmed by a white majority.

As Plaintiffs' demonstrative plans show, the Native American population on and around the Turtle Mountain and Spirit Lake Reservations is sufficiently large and geographically compact to form an effective majority in a single state-Senate district and a multi-member at-large House District. Moreover, as Defendant concedes, voting in North Dakota and in this particular region of the state is racially polarized, with white voters preferring one candidate and Native American voters preferring a different candidate. As a result of this polarization, and the cracking of Native voters into House and Senate Districts where white bloc voting usually defeats the Native American candidate of choice, Native Americans in the region saw their opportunity to elect preferred candidates decrease from two state house members and one state senator to just a single representative in the state house. The dilutive effects of the plan are evidenced most notably by the most recent election results from 2022, in which the majority white voting populations in Senate Districts 9 and 15 and House Subdistrict 9B overwhelmingly defeated Native American-preferred candidates.

The discriminatory effects of the 2021 Redistricting Plan interact with social and historical conditions in North Dakota to create an unequal opportunity for Native American voters to elect

their preferred candidates. This includes North Dakota's well-established history of official discrimination against Native Americans, including discrimination in the electoral process, as well as the wide-ranging socioeconomic disparities between Native American and white citizens in North Dakota. Moreover, the dilutive effect of the plan was the product of a lack of responsiveness to Native American voters. Indeed, the legislative record of the redistricting process shows that the legislature failed to honor Tribal Leaders' requests to hold redistricting committee hearings on Tribal Lands, and utilized a blunt, one-size fits all subdistrict policy to address concerns about litigation over Native vote dilution, despite the fact that doing so substantially degraded the Native voters' opportunity to elect candidates of their choice in northeast North Dakota. Whatever the legislature's intent, the enacted plan minimizes Native American voting strength such that for the first time since 1990, not a single member of the North Dakota state senate is Native American. This is so despite the fact that the Native Americans share of the population increased since the last decennial census to nearly six percent of the State's total population. Under these circumstances, the 2021 Redistricting Plan's configuration of districts 9, 9A, 9B, and 15 violates Section 2 of the VRA.

## II.      Procedural History

On February 7, 2022, Plaintiffs Turtle Mountain Band of Chippewa Indians, Spirit Lake Tribe, Wesley Davis, Zachary S. King, and Collette Brown filed this lawsuit against the Secretary of State of North Dakota, alleging that the 2021 Redistricting Plan violates Section 2 of the Voting Rights Act, 52 U.S.C. § 10301. *See* ECF No. 1, Compl. at 29-31. Defendant Jaeger moved to dismiss Plaintiffs' complaint, *see* ECF No. 17, Mot. to Dismiss, Apr. 15, 2022, and on July 7, 2022, the Court denied Defendant's motion. *See* ECF No. 30, Order Denying Mot. to Dismiss, Jul. 7, 2022. Plaintiffs supplemented their complaint on December 7, 2022, to add allegations relating to

the 2022 elections for the state legislature. *See* ECF No. 44, Supp. Compl., Dec. 7, 2022. Defendant subsequently moved for summary judgment, asking the Court to find that Plaintiffs had failed to establish two of the three necessary preconditions for a Section 2 claim. *See* ECF No. 59, Mot. for Summary Judgment, Feb. 1, 2023; ECF No. 60, Mem. in Support of Mot. for Summary Judgment, Feb. 1, 2023. The Court denied the motion on April 11, 2023. *See* ECF No. 89, Order Denying Mot. for Summary Judgment, Apr. 10, 2023.

## III.    Citation to Authority for Legal Issues

Aside from pending motions in limine, the only unresolved legal issue is the ultimate question of vote dilution. The following are the principal authorities on that issue: *Thornburg v. Gingles*, 478 U.S. 30 (1986); *League of United Latin Am. Citizens v. Perry*, 548 U.S. 399 (2006); and *Bone Shirt v. Hazeltine*, 461 F.3d 1011 (8th Cir. 2006). The Supreme Court's pending decision in *Allen v. Milligan*, expected to be released by the end of June, may bear on the case as well.

Section 2 of the VRA prohibits states from enacting a redistricting plan that results in an "inequality in the opportunities enjoyed by [minority] and white voters to elect their preferred candidates." *Bone Shirt v. Hazeltine*, 461 F.3d 1011, 1018 (8th Cir. 2006) (quoting *Cottier v. City of Martin*, 445 F.3d 1113, 1116 (8th Cir. 2006)). A Section 2 violation "occurs when: 'based on the totality of circumstances, it is shown that the political processes leading to nomination or election ... are not equally open to participation by members of a [a racial group] in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice.'" *Bone Shirt*, 461 F.3d at 1018 (quoting *League of United Latin Am. Citizens v. Perry*, 548 U.S. 399, 425 (2006)).

To establish a Section 2 violation, Plaintiffs must "prove by a preponderance of the evidence three elements, often referred to as the '*Gingles* preconditions': (1) [T]he racial group is

4

sufficiently large and geographically compact to constitute a majority in a single-member district; (2) the racial group is politically cohesive; and (3) the majority votes sufficiently as a bloc to enable it usually to defeat the minority's preferred candidate." *Id.* Once the three *Gingles* Preconditions are established, the court must consider whether "the totality of the circumstances indicates minority voters ha[ve] 'less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice[.]'" *Id*. at 1021 (quoting 52 U.S.C. § 10301(b)). To determine whether the totality of the circumstances are met, courts may consider "the extent to which members of the [racial minority group] have been elected to office in the State," 52 U.S.C. § 10301(b), as well as the following factors (referred to as the "Senate Factors"):

1. the extent of any history of official discrimination in the state or political subdivision that touched the right of the members of the minority group to register, to vote, or otherwise to participate in the democratic process;

2. the extent to which voting in the elections of the state or political subdivision is racially polarized;

3. the extent to which the state or political subdivision has used unusually large election districts, majority vote requirements, anti-single shot provisions, or other voting practices or procedures that may enhance the opportunity for discrimination against the minority group;

4. if there is a candidate slating process, whether the members of the minority group have been denied access to that process;

5. the extent to which members of the minority group in the state or political subdivision bear the effects of discrimination in such areas as education, employment and health, which hinder their ability to participate effectively in the political process;

6. whether political campaigns have been characterized by overt or subtle racial appeals;

7. the extent to which members of the minority group have been elected to public office in the jurisdiction.

. . .

5

[8.] whether there is a significant lack of responsiveness on the part of elected officials to the particularized needs of the members of the minority group.

[9.] whether the policy underlying the state or political subdivision's use of such voting qualification, prerequisite to voting, or standard, practice or procedure is tenuous.

*Thornburg v. Gingles*, 478 U.S. 30, 36–37 (1986) (quoting S. Rep. No. 97-417 at 28–29 (1982)); *see also Bone Shirt*, 461 F.3d at 1021-22. "There is no requirement that any particular number of factors be proved, or that a majority of them point one way or the other." *United States v. Marengo Cnty. Comm'n*, 731 F.2d 1546, 1566 n.33 (11th Cir. 1984) (quoting S. Rep. No. 97-417, at 29 (1982)). Finally, while "proportionality is not dispositive" in a Section 2 claim "it is a relevant fact in the totality of circumstances to be analyzed when determining whether members of a minority group have 'less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." *Johnson v. De Grandy*, 512 U.S. 997, 1000 (1994).

## IV.    General Statement of Evidence

Plaintiffs will offer expert and lay testimony as well as video and documentary evidence to establish that the 2021 Redistricting Plan violates Section 2 of the VRA, in that all three *Gingles* factors are satisfied and the totality of circumstances shows that the plan unlawfully dilutes Native American voting strength in northeastern North Dakota.

### A.    *Gingles* 1: Native American voters in the region are geographically compact so as to constitute a majority of eligible voters in an alternative district configuration.

Plaintiffs submitted two demonstrative maps showing that it is possible to draw a reasonably compact majority Native legislative district in northeast North Dakota. P105 (Plaintiffs'

Demonstrative Plan 1 Map); P106 (Plaintiffs' Demonstrative Plan 2 Map). Both plans satisfy *Gingles* prong 1, but Plaintiffs will focus their presentation on Plaintiffs' Demonstrative Plan 1.[1]

Plaintiffs' Demonstrative Plan 1 creates a new District 9 centered primarily in Rolette and Benson Counties. This district is shown in both a regional view and set into the enacted plan:

### **Plaintiffs' Demonstrative Plan 1 Regional View**



P045 (L. Collingwood Rebuttal Report Map 1 – Plaintiffs' Demonstrative Plan 1 District 9)

---

[1] The primary difference between the two plans is that Plaintiffs' Demonstrative Plan 2, by splitting two precincts, reduces the number of neighboring districts that would need to be adjusted.

**Plaintiffs' Demonstrative Plan 1 Statewide View**



P105 (Pls. Demonstrative Plan 1 Map).

Plaintiffs' Demonstrative Plan 1 contains a proposed District 9 with a NVAP of 66.1%. P042 at 5 (Rebuttal Report of Dr. Loren Collingwood). The NVAP of District 9 is almost precisely the median NVAP of the 31 Native American majority state legislative districts nationwide, and lower than the NVAP of District 9 in the 2012-2020 state legislative plan ("benchmark plan"). P042 at 5 (Rebuttal Report of Dr. Loren Collingwood).

As Dr. Collingwood will testify, Demonstrative Plan 1 performs substantially better for Native Americans in northeast North Dakota than enacted Districts 9 and 15, winning all but three contests. P001 at 32 (Expert Report of Dr. Loren Collingwood).

Under Plaintiffs' Demonstrative Plan 1, District 9 does not split any voting precincts or municipalities. P042 at 16 (Rebuttal Report of Dr. Loren Collingwood). As Dr. Collingwood will testify, although the water boundaries of Devil's Lake and the Sheyenne River have a distortionary lowering effect on Plaintiffs' Demonstrative District 9's mathematical compactness scores, *see* P042 at 10 (Rebuttal Report of Dr. Loren Collingwood), the district still scores as more compact

than several other state legislative districts in the 2021 enacted plan, P042 at 9-11 (Rebuttal Report of Dr. Loren Collingwood).

Dr. Collingwood's testimony will also establish that Plaintiffs' Demonstrative District 9 scores higher on mathematical compactness metrics than several congressional districts the Supreme Court has held to be "reasonably compact" for purposes of *Gingles* prong one. P042 at 12 (Rebuttal Report of Dr. Loren Collingwood). Even Defendant's expert, Dr. M.V. "Trey" Hood, testified at his deposition that under the methodology he had previously used to evaluate compactness in a Virginia redistricting case, all of the enacted North Dakota districts *and* Plaintiffs' Demonstrative District 9 are "reasonably compact." Ex. A at 143:25-144:8 (Hood Dep.); *see id.* at 189:2-6 ("Q: [U]nder your own metric from Virginia and applied here, . . . [Plaintiffs' demonstrative] district is sufficiently or reasonably compact, correct? A: Correct."); *see also* P124 (Virginia 2012-2020 State Senate Plan).

Plaintiffs' Demonstrative District 9 adheres to other traditional districting criteria as well. As Dr. Collingwood will explain, the district splits the same number of counties (three) as does enacted District 15 and the enacted state house version of District 9 (9A and 9B). P042 at 19-20 (Rebuttal Report of Dr. Loren Collingwood). Demonstrative District 9 has the same Eddy County split as the enacted map to follow the Spirit Lake Reservation boundary—a principle the legislature declared important. P042 at 20 (Rebuttal Report of Dr. Loren Collingwood). Demonstrative District 9 spans about the same distance north-to-south as the enacted District 9 does east-to-west. P042 at 18 (Rebuttal Report of Dr. Loren Collingwood). And a number of North Dakota's legislative districts are geographically large—including many that are larger than Plaintiffs' Demonstrative District 9—because of the sparse population in rural areas of the state. P042 at 18 (Rebuttal Report of Dr. Loren Collingwood).

A whole Pierce County voting precinct links Rolette to Benson County in Plaintiffs' Demonstrative District 1. P120 (Precinct Maps for Benson, Eddy, Pierce, and Rolette Counties). This precinct is larger than a number of connecting points in other enacted districts in the state. P042 at 14-16 (Rebuttal Report of Dr. Loren Collingwood). Indeed, as Dr. Collingwood explains, the Pierce County precinct included in Plaintiffs' Demonstrative District 9 "spans 180 square miles and is itself larger than a majority of the other districts in the plan." P042 at 13 (Rebuttal Report of Dr. Loren Collingwood). Moreover, Rolette and Benson Counties, which are linked in Plaintiffs' Demonstrative Plan 1, are geographically closer to one another than Rolette and Cavalier Counties, which were linked together in the enacted plan. Ex. A at 177:3-20 (Hood Dep.).

Unlike the enacted plan, which splits the Turtle Mountain Reservation and its trust lands between Districts 9A and 9B, Plaintiffs' Demonstrative District 9 keeps the Reservation and the trust lands together—a feature Dr. Hood agreed at his deposition was important and could be a community of interest consideration. Ex. A at 169:5-24 (Hood Dep.). Below is the map illustrating how the enacted plan splits the Reservation from the trust lands (shown in tan):



P042 at 21 (Rebuttal Report of Dr. Loren Collingwood).

Finally, Plaintiffs' demonstrative districts comply with the traditional redistricting criteria of preserving communities of interest by reuniting the Turtle Mountain Reservation with the Turtle Mountain Trust Lands, and uniting Native American voters living on and around the Turtle Mountain Reservation with Native American voters living on and around the Spirit Lake Reservation. Spirit Lake and Turtle Mountain—as well as their members and voting public—share many common characteristics and interests that relate to their common representational needs in the state legislature. The two reservations are just 55 miles apart. P042 at 17 (Rebuttal Report of Dr. Loren Collingwood). Chairman Azure of Turtle Mountain and former Chairman Yankton of Spirit Lake will testify at trial about the shared values and beliefs of their Tribes, the "similar socio-economic statuses" of their members, and the similar representational needs from the state legislature related to economic investment, state-sponsored services, and legislative appropriations that differ from other North Dakota rural communities, where agricultural and energy interests predominate, and from the state's urban areas. They will likewise testify to the joint ventures the Tribes have engaged in, including funding for tribal colleges, negotiating the tribal-state gaming compact, taxation on tribal lands, hunting and fishing regulation, tribal and state law enforcement, and funding for education, foster care, and health care.

Defendant will likely contend that a district that includes both Turtle Mountain and Spirit Lake is a "racial gerrymander." But this is a baseless claim. A party alleging a racial gerrymander must show that race was the "predominant factor" in the decision to "place a significant number of voters within or without a particular district. *Cooper v. Harris*, 581 U.S. 285, 291 (2017). This requires a showing that other factors, like compactness, respect for political subdivisions, and others, were "subordinated . . . to racial considerations." *Id.* (internal quotation marks omitted).

Defendant cannot meet this burden. Moreover, even if race does predominate in the drawing of a district, compliance with Section 2 of the VRA is a compelling interest sufficient to justify the use of race, which precludes such a district from being deemed an Equal Protection violation. *Id.* at 292.

As the above discussion regarding *Gingles* prong one shows, Plaintiffs' Demonstrative District 9 satisfies the traditional redistricting criteria as well or better than enacted Districts 9, 9A, 9B, and 15, and many other enacted districts. It also beats out districts that the Supreme Court has found to comply with traditional districting principles for VRA purposes. Dr. Hood testified at his deposition that Plaintiffs' Demonstrative District 9 is reasonably compact and satisfies a host of traditional districting criteria. He likewise testified he has no evidence to suggest the proposed district is a racial gerrymander, and that enacted District 9 might just as easily be a racial gerrymander given that the legislature added so many white voters to the district. Moreover, Spirit Lake and Turtle Mountain have a host of shared needs and interests having nothing to do with race, and thus are properly combined in a VRA district. *See LULAC*, 548 U.S. at 434-35. In addition, a *Gingles* 1 demonstration plan merely shows that a discriminatory result may be afoot. Such a plan shows that there is the potential to draw a district in which Native American voters will constitute a sufficient majority to elect their preferred candidates—unlike in the enacted plan. The legislature will have the first opportunity to draw a remedial plan, and need not even look at race to draw a district that combines Rolette and Benson Counties—which Dr. Hood acknowledged are closer in proximity than are Rolette and Cavalier Counties, which the enacted plan joins.

**B.      *Gingles* 2: Native American Voters in North Dakota and in Districts 9 and 15 are politically cohesive.**

As Dr. Collingwood will testify, voting in North Dakota and in Districts 9 and 15 is racially polarized, meaning that Native American voters vote cohesively for one set of candidates while

white voters vote cohesively against those candidates. P001 at 4-16 (Expert Report of Dr. Loren Collingwood). Defendant's expert, Dr. Hood, agrees. P080 at 4-6 (Expert Report of Dr. M.V. Hood III (Walen v. Burgum)); P081 at 2, 4 (Expert Report of Dr. M.V. Hood III (Turtle Mountain)).

   **C.**   ***Gingles* 3: White Bloc voting usually defeats the Native American candidate of choice in enacted Senate Districts 9 and 15 and House District 9B.**

   Under the benchmark plan, Native American voters in northeastern North Dakota elected their candidate of choice to all three seats in District 9. P042 at 7 (Rebuttal Report of Dr. Loren Collingwood). Under the enacted plan, Native American voters in the region were able to elect just *one* candidate of choice—Jayme Davis—to the state house in District 9A. P001 at 14-15 (Expert Report of Dr. Loren Collingwood). Notably, the total NVAP share of the statewide population grew from 5.1% to 5.9% from the 2010 to 2020 census. Dr. Collingwood will testify that if Native Americans elected candidates to the state legislature in proportion to their share of the overall statewide population, that would equate to three state senate seats and six state house seats. Because of the configuration of districts in the new redistricting plan, for the first time in over thirty years, no member of a North Dakota Native American Tribe serves in the state senate today, and just two Native American representatives are currently serving in the state house. P042 at 6 (Rebuttal Report of Dr. Loren Collingwood).

   This is because white bloc voting defeats Native American voters' candidates of choice in Districts 9, 9B, and 15. At the outset, it is important to note that there no longer is any dispute between Plaintiffs and Defendant on this score. Defendant has always acknowledged that *Gingles* 3 is satisfied in Districts 9B and 15. P081 (Expert Report of M.V. Hood III). When Defendant filed his motion for summary judgment in this case, he disputed whether *Gingles* 3 was satisfied as to Senate District 9. But after Defendant's expert Dr. Hood was deposed (during which he acknowledged that his *own* analysis would establish *Gingles* 3 is present in Senate District 9),

Defendant reversed course, and filed a summary judgment brief in the *Walen* case contending that the removal of the subdistrict lines would result in a VRA violation because, in the full District 9, white voters would usually defeat Native American voters' preferred candidates. P098 (Walen Summ. J. Brief). That is, Defendant *agrees Gingles* 3 is present in District 9, he just thinks the solution is a subdistrict that reduces Native American voters' opportunity to elect their preferred candidates to a single state house seat, rather than maintaining Native American voters' opportunity to elect in three legislative seats, as in the 2012-2020 plan.

In any event, even if there remained some factual dispute as to *Gingles* prong 3, Plaintiffs will establish the precondition is satisfied at trial. As Dr. Collingwood (and Dr. Hood) will testify, three categories of elections are most probative for determining whether the white majority block votes against Native American voters' candidates of choice: (1) "endogenous" elections, or elections for the office that is at issue (here state legislative elections as opposed to statewide, or "exogenous" elections), (2) more recent elections, and (3) elections featuring a Native American candidate. P042 at 5-7 (Rebuttal Report of Dr. Loren Collingwood); P001 at 21 (Expert Report of Dr. Loren Collingwood). Dr. Collingwood will testify that white bloc voting defeats the Native American preferred candidates in 100% of the endogenous elections in District 9, in 100% of the most recent (2022) elections in District 9, 71% of elections in the most recent two cycles 2022 and 2020, 57% of elections in the most recent three election cycles that lack special circumstances making them nonprobative (2022, 2020, and 2016), and in 60% of elections in District 9 featuring a Native American candidate. P042 at 7 (Rebuttal Report of Dr. Loren Collingwood). Dr. Collingwood will also testify that across 30 contests between 2014 and 2022, the block rate by which white voters prevent the Native American preferred candidate from prevailing in District 15 is 97%. P001 at 26 (Expert Report of Dr. Loren Collingwood). And in District 9B, Dr. Collingwood

will testify that the block rate by which white voters prevent the Native American preferred candidate from winning is 81%. P001 at 16-21.

Dr. Collingwood will further testify that the 2018 elections exhibited "special circumstances" and "it would be appropriate to entirely disregard the 2018 elections" or at least give them "very little weight" in assessing white bloc voting. P042 at 8 (Rebuttal Report of Dr. Loren Collingwood). The special circumstances of the 2018 Election are most evident when analyzing Native American voter turnout rates. Although the redrawn District 9 has a small majority NVAP (down twenty percentage points from the benchmark district), its voting electorate is, under usual circumstances, substantially majority white. P042 at 5 (Rebuttal Report of Dr. Loren Collingwood). The chart below shows the demographic composition of the voting electorate in District 9 for the past five election cycles:

**Enacted District 9 Electorate Demographic Composition**

| Election | White Electorate Share | Native American Electorate Share |
|---|---|---|
| 2014 | 67% | 33% |
| 2016 | 63% | 37% |
| 2018 | 50% | 50% |
| 2020 | 63% | 37% |
| 2022 | 60% | 40% |

P042 at 4-5 (Rebuttal Report of Dr. Loren Collingwood). As Dr. Collingwood will testify, Native American voter turnout nationwide, in North Dakota, and specifically in District 9, is typically substantially lower than white voter turnout. P042 at 3-4 (Rebuttal Report of Dr. Loren Collingwood). In District 9, Native American voter turnout is "usually in the neighborhood of 20-30 percentage points" lower than white turnout. P042 at 4 (Rebuttal Report of Dr. Loren Collingwood). For all categories of voters, turnout in presidential election cycles exceeds turnout in midterm election cycles as a general rule. P042 at 4 (Rebuttal Report of Dr. Loren Collingwood).

As the graph below shows, however, Native American turnout in 2018 skyrocketed to 57.6% in District 9, exceeding statewide overall turnout and approaching (but not reaching) white turnout in the district. P042 at 4 (Rebuttal Report of Dr. Loren Collingwood).



P042 at 4 (Rebuttal Report of Dr. Loren Collingwood).

As Dr. Collingwood explained in his rebuttal report and will explain at trial, "[i]n all the many elections in different jurisdictions that I have studied, I have never seen a Native American turnout number begin to approach 60% in a federal, state, or local contest. Rather, the figures often hover around 30% - which is in line with my estimates in every other election year in LD-9." P042 at 4 (Rebuttal Report of Dr. Loren Collingwood). Furthermore, the general pattern of lower turnout for midterm versus presidential cycles is "strikingly inverted" with respect to Native American turnout in the 2018 election. *Id*.

Chairman Azure of Turtle Mountain and Chairman Yankton of Spirit Lake will testify that the 2018 election featured unique circumstances. The state's voter ID law, which required proof of residential street addresses—something many Native American voters lacked—had previously been enjoined by this Court but was permitted to go in effect by the U.S. Supreme Court just before

the 2018 election. The Chairmen will testify to the resulting substantial amounts of money spent by national, local, and regional organizations focused on educating and turning out Native voters. In addition, national celebrities like Dave Matthews Band and Mark Ruffalo toured North Dakota Reservations and held get-out-the-vote events. As the Chairmen will testify, this type of sustained spending and electoral education focused on Native American voters had never occurred prior to the 2018 election and has not happened since.

Defendant may contend that *Gingles* prong 3 in the full District 9 is not satisfied, as he did in his summary judgment motion (while conceding it is satisfied in District 9B and 15). But this would be contrary to the litigation position Defendant has taken in the *Walen* case and would be contrary to Dr. Hood's own testimony. At his deposition, Dr. Hood conceded that his own analysis in his *Walen* expert report with respect to District 9, if updated to include the 2022 elections he viewed most probative, would show the presence of *Gingles* prong 3 with respect to District 9, with a 60% block rate for Native American preferred candidates.

4.      **An analysis of the Senate Factors indicates that Native American voters have less opportunity than other members of the electorate to participate in the political process.**

Plaintiffs will present the following evidence demonstrating that an analysis of the Senate Factors shows that Native Americans are denied an equal opportunity to participate in the electoral process in North Dakota.

i.      **There is a history of official voting-related discrimination against Native Americans in North Dakota.**

Dr. Daniel McCool will testify about the extensive history of official voting-related discrimination against Native Americans in North Dakota, which continues to this day. P064 at 7-27, 33-35 (Expert Report of Dr. Daniel McCool). As Dr. McCool will explain, this history is rooted in a broader history of discrimination against Native Americans in North Dakota that dates back

17

to its days as a territory, and stems in large part from the conflict over land between white settlers and Native peoples. P064 at 7-10 (Expert Report of Dr. Daniel McCool). After statehood, Native Americans were openly and explicitly denied the right to vote unless they qualified as "civilized persons" who had "severed their tribal relations two years next preceding" the election in which they sought to vote. P064 at 10 (Expert Report of Dr. Daniel McCool). Dr. McCool will testify that the demand that Native people give up their culture as a condition of voting was unique in American history. P064 at 10 (Expert Report of Dr. Daniel McCool). Dr. McCool will also testify about how the long history of generalized discrimination against Native Americans in North Dakota affects their ability to participate in the electoral process. P064 at 21 (Expert Report of Dr. Daniel McCool). Finally, Dr. McCool will testify about the well documented contemporary history of voting-related discrimination against Native Americans in North Dakota, which has forced Native voters and Tribes to regularly appeal to the courts to vindicate their fundamental right to vote.  P064 at 21-27 (Expert Report of Dr. Daniel McCool).

> ii. **The legislature's exercise of its discretionary authority to create House subdistricts enhanced the opportunity for discrimination against Native Americans in northeast North Dakota.**

Plaintiffs will present substantial evidence showing that the legislature's discretionary authority to create House subdistricts enhanced the opportunity for discrimination against Native Americans in northeast North Dakota.

The 2021 Redistricting plan enacted by the legislature substantially changed the districts in northeastern North Dakota and in particular the districts in which the Turtle Mountain and Spirit Lake reservations are located. Parts of Towner and Cavalier Counties—the VAP of which are 96.0% and 95.6% white respectively—were added to District 9. P100 (2021 Enacted N.D. State Senate Map); P103 (2012-2020 N.D. Legislative Plan Map); P001 at 16 (Expert Report of Dr.

Loren Collingwood). By extending District 9 east into overwhelmingly white counties, the enacted plan dramatically changed the demographic makeup of the district, reducing its NVAP by twenty percentage points, from 74.4% to 54.5%. P001 at 31 (Expert Report of Dr. Loren Collingwood). Among the 31 Native American-majority state legislative districts in the country, the enacted version of District 9 has the second lowest NVAP share nationwide. P042 at 5 (Rebuttal Report of Dr. Loren Collingwood). The average NVAP of a majority-Native American legislative district nationwide is 68.1% and the median is 66.7%. P042 at 5 (Rebuttal Report of Dr. Loren Collingwood). The Spirit Lake Reservation was separated from all of the counties with which it previously shared a district and placed in District 15, which neighbors District 9. P100 (2021 Enacted N.D. State Senate Map); P103 (2012-2020 N.D. Legislative Plan Map).

Citing the VRA the legislature divided District 9 into two subdistricts that each elect one state representative seat, Districts 9A and 9B, D431 at 17:16-18:23 (Nov. 9, 2021, Redistricting Comm. Hr'g Tr.). Presumably this was because, as Defendant asserted in the *Walen* matter, the full District 9 violated the VRA. *Walen* MSJ at 40. District 9A has a Native American VAP of 79.8%. P042 at 5 (Rebuttal Report of Dr. Loren Collingwood). This is the fifth highest NVAP among the 31 Native American-majority state legislative districts nationwide. P042 at 5 (Rebuttal Report of Dr. Loren Collingwood); D491 (Native American Majority State Legislative Districts). The remaining Native American population in northeastern North Dakota is split across Districts 9B and 15. District 9B has a NVAP of 29.4%. P143 (Maptitude Report for District 9B). District 15 has a NVAP of 20.39%. P145 (Maptitude Report for District 15).

A map illustrating the fragmenting of northeastern North Dakota's Native American voters among Districts 9A, 9B, and 15 is shown below, with concentrations of Native Americans shown in blue and the district lines shown in red.

**Enacted Plan Fragmenting of Native American Population**



P059 (L. Collingwood Rebuttal Report Appendix A – 2021 Enacted Plan Native American VAP Shading).

The first election under the new legislative redistricting plan was held on November 8, 2022. Native American preferred candidates lost every state legislative contest in Districts 9 and 15 except for District 9A's state house seat. The Native American incumbent state senator Richard Marcellais lost his contest for the state senate seat in District 9. Native American candidates Collette Brown and Heather Lawrence-Skadsem lost their contests for state senate and state house in District 15. And incumbent Native American preferred candidate Marvin Nelson lost his contest for state house in District 9B. P001 at 17 (Expert Report of Dr. Loren Collingwood).

In addition to quantitative evidence of the discriminatory impact of the legislature's linedrawing, Plaintiffs will present testimony from Dr. Daniel McCool about the differences between how the legislature effectively utilized its discretionary authority to create subdistricts to ensure the 2021 Plan did not discriminate against Native voters on the MHA Reservation but failed

to do the same for Native voters living on and near the Turtle Mountain and Spirit Lake Reservations. P064 at 33-35 (Expert Report of Dr. Daniel McCool).

        iii.        **Native Americans in North Dakota generally and in Rolette, Ramsey, and Benson Counties specifically bear the effects of discrimination in the areas of income, poverty, education, health insurance coverage, computer ownership and access, housing, employment, and mortality, which hinders their ability to effectively participate in the political process.**

Dr. Weston McCool will testify that he reviewed data from the Census Bureau's 2015-2019 five-year American Community Survey on seven socioeconomic variables—income, poverty, education, computer ownership and access, homeownership, and employment. P073 at 1-3 (Expert Report of Dr. Weston McCool). He will further testify that he looked at how Native Americans and white North Dakotans in Rolette, Ramsey, and Benson Counties compare on each of these variables, and found that the Native American population is at a statistically significant disadvantage when compared to the white population on each of these factors, across all three counties. P073 at 5-13 (Expert Report of Dr. Weston McCool). Dr. Weston McCool will further testify that he reviewed data from the Kaiser Family Foundation on the rates at which white residents and Native American residents in North Dakota avoid health care due to costs. P073 at 3 (Expert Report of Dr. Weston McCool). He will testify that Native Americans in North Dakota are more than three times as likely as white residents to report avoiding seeking medical care because of cost. P073 at 8, 10, 13 (Expert Report of Dr. Weston McCool). Based on these findings, Dr. Weston McCool will testify that there is a systemic and statistically significant race-based bias that disadvantages the Native American population when compared with the white population in northeast North Dakota. P073 at 13 (Expert Report of Dr. Weston McCool). Dr. Weston McCool will further testify that, when combined with evidence of depressed participation by Native Americans in the political process, a reasonable expert would conclude that the socioeconomic

disadvantage suffered by Native Americans in North Dakota hinder their ability to participate in the political process. P073 at 13 (Expert Report of Dr. Weston McCool).

> **iv.     It is rare to find Native Americans holding any kind of elected office in North Dakota outside of tribal government.**

Plaintiffs will offer testimony from Dr. Daniel McCool that "it is very rare to find American Indians holding any kind of public office in the state other than in tribal government." P064 at 50-57 (Expert Report of Dr. Daniel McCool). Dr. McCool reviewed data from the North Dakota Indian Affairs Committee and found that prior to the 2022 election, Senator Richard Marcellais was the only Native American state legislator representing a "Tribal District" in North Dakota. P064 at 50 (Expert Report of Dr. Daniel McCool). He further found that all seven members of the Tribal State Relations Committee are white. P067 at 51 (Expert Report of Dr. Daniel McCool). Of the twenty members of the Governor's cabinet, Dr. McCool identified just two individuals who are Native American. P064 at 51 (Expert Report of Dr. Daniel McCool). Dr. McCool will testify that it is similarly rare to find Native Americans serving in elected office at the county and local levels, particularly in urban areas and even where there is a substantial Native population. P064 at 52-53, 54-57 (Expert Report of Dr. Daniel McCool).

> **v.     The North Dakota legislature is not responsive to the needs of Native Americans.**

Plaintiffs will offer expert testimony from Dr. Daniel McCool demonstrating that there is a consistent pattern of state and local officials failing to respond to the needs of Native Americans and Tribal Members in North Dakota. P064 at 50-57 (Expert Report of Dr. Daniel McCool). Dr. McCool will testify about the Redistricting Committee's refusal to hold hearings in Indian Country, and the impact this had on Native participation in the process. P064 at 58-59 (Expert Report of Dr. Daniel McCool). He will also offer testimony about the legislature's imposition of a subdistrict

Turtle Mountain did not request and its rejection of the joint request by Turtle Mountain and Spirit Lake to be placed in a unified district, as well as the impact of these decision on Tribal members. P064 at 60-61 (Expert Report of Dr. Daniel McCool). And he will testify that the legislature took these actions despite warnings that they would be detrimental to Native voters in the region. P064 at 61 (Expert Report of Dr. Daniel McCool).

In addition to testifying about the legislature's lack of responsiveness during the redistricting process, Dr. McCool will offer testimony about the legislature's reaction to the conflict over the DAPL pipeline, and its impact on tribal-state relations in North Dakota. P064 at 50-57 (Expert Report of Dr. Daniel McCool). Plaintiffs will also offer testimony by Chairman Azure, Chairman Yankton, and Collette Brown about the legislature's failure to respond to the needs of the Turtle Mountain and Spirit Lake, and the respective Tribes' members during the redistricting process.

Finally, Plaintiffs intend to present evidence from the Legislative record that demonstrates the legislature's lack of responsiveness during the redistricting process, including with respect to the Plaintiffs, and their members.

Defendant may contend that the legislature *was* responsive to Native Americans during the 2021 redistricting process because some Native Americans and Native American Tribes (*i.e.*, MHA, Standing Rock, and Spirit Lake) requested (prior the release of Census data) that subdistricts be considered, and the legislature then drew two subdistricts—one for MHA (which had requested one) and one for Turtle Mountain (which had not). But this does not evince a responsive legislature, particularly considering the legislature's rejection of Turtle Mountain and Spirit Lake's request for a unified legislative district in which they could retain the opportunity to elect three Native American preferred candidates. Moreover, Defendant may contend that

Governor Burgum has sought to improve upon prior administrations' relations with North Dakota's Tribes. But any such efforts are recent and do not overcome the totality of circumstances, historical and contemporaneous discrimination and disparate statuses, that together with the districting configuration here provide less opportunity for Native American voters to participate equally in the political process. Moreover, evidence of increased responsiveness by the executive branch has little to no bearing on whether the state legislature is adequately responsive to Native Americans.

### vi.    The policy underlying Districts 9 and 15 is tenuous.

In addition to the evidence summarized above, which demonstrates that the enactment of Districts 9, 9A, 9B, and 15 bears no functional relationship to the Legislature's stated policy of creating subdistricts around Native populations to avoid VRA litigation, Plaintiffs will offer testimony from Dr. Daniel McCool that the enacted plan is tenuous policy that makes it more difficult for Native Americans to elect candidates of their choice. P064 at 67-69 (Expert Report of Dr. Daniel McCool).

## V.    Evidentiary and Procedural Issues

### A.    Plaintiffs' Motion in Limine

Plaintiffs have moved to exclude the testimony of attorney Matt Campbell, who serves as counsel of record for the Plaintiffs in this case. ECF 96. The motion is fully briefed and ripe for resolution. The Court should grant the motion for the reasons stated in Plaintiffs' Memorandum and Reply in support of the same. ECF 97; ECF 101. *See also Shelton v. Am. Motors Corp.*, 805 F.2d 1323 (8th Cir. 1986).

### B.    Defendant's Motion in Limine

Defendant has moved to exclude the expert reports submitted by the parties' retained experts in this case, to exclude certain data relied on by Plaintiffs' experts Dr. Loren Collingwood

and Dr. Weston McCool, to exclude the conclusion made by Dr. McCool that socioeconomic disparities hinder North Dakota Native Americans' ability to participate effectively in the political process, and to limit the scope of testimony that may be offered by Chairwoman Lonna Jackson Street. ECF 93, ECF 94. The motion is fully briefed and ripe for resolution. The Court should deny the motion for the reasons stated in Plaintiffs' Response in Opposition to the motion and the authority cited therein. ECF 98.

### C.    Erika White, Bryan Nybakken, and Bryan Newby

Defendant listed current and former Secretary of State employees Erika White, Bryan Nybakken, and Bryan Newby as expert witnesses on the witness list he submitted to the Court and disclosed to Plaintiffs on May 24, 2023. Ex. B (Def. Exhibit List). While Defendant identified these individuals as potential non-retained expert witnesses on his initial and supplemental disclosures, to date he has not complied with his obligation under Rule 26 to provide a "summary of the facts and opinions to which" any of these witnesses are "expected to testify." Fed. R. Civ. P. 26(a)(2)(C); *see also* ECF 97-2 (Defs' Initial Rule 26(a)(1) Disclosures); ECF 97-1 (Defs' Supp. Rule 26(a)(1) Disclosures). Plaintiffs noted this omission in their motion in limine, *see* ECF 97 at 10 n.6, and subsequently brought the omission to Defendant's attention again during a meet and confer on May 24, prior to Defendant's submission of his witness list to the Court. Defendant has not supplemented his disclosures or otherwise provided the required information. As such, Plaintiffs object to Defendant's tender of these witnesses as experts and ask that the Court preclude them from offering opinion testimony. *See* Fed. R. Civ. P. 37(c)(1); *see, also e.g.*, *Vanderberg v. Petco Animal Supplies Store, Inc.*, 906 F.3d 698, 703 (8th Cir. 2018).

### D.      Representative William "Bill" Devlin

Plaintiffs served Representative Devlin with both document and deposition subpoenas during the discovery period in this case. Representative Devlin moved to quash the subpoenas, and after this Court denied the motion in a well-reasoned decision, Representative Devlin filed a petition for mandamus with the Eighth Circuit and sought a stay of this Court's order setting a deadline for him to comply with the subpoenas. On the same day that Plaintiffs filed their response to the petition, and without waiting for Plaintiffs' response to the request for a stay, the Circuit Court issued an administrative stay of the deadline to comply. The matter remains pending before the Eighth Circuit, and as such Plaintiffs have not obtained any of the responsive documents, nor have they had the opportunity to depose Representative Devlin.

At this late hour, even if the Eighth Circuit denies the petition for mandamus and affirms this Court's orders, Plaintiffs do not expect to be able to obtain and review the relevant documents and to subsequently depose Representative Devlin before trial begins, especially without disrupting trial preparation. As such, Plaintiffs request that the Court make time at the end of trial to discuss the status of Representative Devlin's petition and its relation to the trial record.

### D.      *Allen v. Milligan*

The Supreme Court will soon release its decision in *Allen v. Milligan*, an appeal from an Alabama district court's decision concluding that the Alabama legislature violated Section 2 of the VRA by failing to draw a second majority Black congressional district. The state in that case has made a number of arguments challenging various aspects of Section 2 precedent regarding *Gingles* prong 1. The *Milligan* decision, which is expected to be announced by the end of June, may bear on this case and require supplemental post-trial briefing or further proceedings.

## VI.   Plaintiffs' Objections to Defendant's Exhibits

While the parties are still conferring on exhibits, Plaintiffs intend to stipulate to the admission of the vast majority of Defendant's exhibits, a large portion of which consists of the legislative record of the 2021 redistricting process, upon which Plaintiffs also intend to rely. Plaintiffs intend to stipulate as to foundation with respect to Defendants' remaining exhibits. Consistent with the Court's pretrial order, *see* ECF 34 at 3, Plaintiffs reserve the right to object under Fed. R. Evid. 402 and 403 with respect to these exhibits based on the purpose for which they are offered. Plaintiffs do not intend to object to any of Defendant's exhibits on other grounds.

June 5, 2023

/s/ Michael S. Carter
Michael S. Carter
OK Bar No. 31961
Matthew Campbell
NM Bar No. 138207, CO Bar No. 40808
mcampbell@narf.org
NATIVE AMERICAN RIGHTS FUND
250 Arapahoe Ave.
Boulder, CO 80302
Telephone: (303) 447-8760
*Counsel for Plaintiffs*

Samantha B. Kelty
AZ Bar No. 024110, TX Bar No. 24085074
kelty@narf.org
NATIVE AMERICAN RIGHTS FUND
950 F Street NW, Ste. 1050
Washington, DC 20004
Telephone: (202) 785-4166
*Counsel for Plaintiffs*

/s/ Timothy Q. Purdon
Timothy Q. Purdon
N.D. Bar No. 05392
TPurdon@RobinsKaplan.com
ROBINS KAPLAN, LLP
1207 West Divide Avenue, Suite 200
Bismarck, ND 58501
Telephone: (701) 255-3000
Fax: (612) 339-4181
*Counsel for Plaintiffs Spirit Lake Nation
and Turtle Mountain Band of Chippewa
Indians*

Respectfully submitted,

/s/ Mark P. Gaber
DC Bar No. 988077
mgaber@campaignlegal.org
Molly E. Danahy
DC Bar No. 1643411
mdanahy@campaignlegal.org
Nicole Hansen
NY Bar 5992326
nhansen@campaignlegal.org
CAMPAIGN LEGAL CENTER
1101 14th St. NW, Ste. 400
Washington, DC 20005
Telephone: (202) 736-2200
Fax: (202) 736-2222
*Counsel for Plaintiffs*

Bryan Sells (admitted *pro hac vice*)
GA Bar No. 635562
bryan@bryansellslsaw.com
THE LAW OFFICE OF BRYAN L. SELLS,
LLC
PO Box 5493
Atlanta, GA 31107-0493
Telephone: (404) 480-4212
*Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

I certify that the foregoing was served on all counsel of record via the Court's CM/ECF system.

/s/ Mark P. Gaber
Mark P. Gaber

*Counsel for Plaintiffs*