**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA
EASTERN DIVISION**

| | |
|---|---|
| Turtle Mountain Band of Chippewa Indians, Spirit Lake Tribe, Wesley Davis, Zachery S. King, and Collette Brown | Case No. 3:22-cv-00022 |
| Plaintiffs, | |
| vs. | **BRIEF IN SUPPORT OF MOTION FOR STAY OF JUDGMENT PENDING APPEAL** |
| Michael Howe in his official capacity as Secretary of State of North Dakota, | |
| Defendant. | |

## I.      INTRODUCTION

In this action, Plaintiffs Turtle Mountain Band of Chippewa Indians, Spirit Lake Tribe, Wesley Davis, Zachery S. King, and Collette Brown (collectively "Plaintiffs") allege that North Dakota's 2021 state legislative redistricting plan dilutes Native American voting strength in violation of Section 2 of the Voting Rights Act ("VRA") (codified at 52 U.S.C. § 10301). The basis for Plaintiffs' "dilution" allegation is a preference for racially gerrymandering the election map to join together two different and distinct Native American tribal reservations within a single elongated legislative district—despite the fact those two different tribal reservations have never before been joined together into the same legislative district in State history.

On Friday, November 17, 2023—less than two months before the date candidates are scheduled to begin petitioning to be on the 2024 ballot—the Court entered judgment for Plaintiffs. The Court enjoined the Secretary of State from "administering, enforcing, preparing for, or in any way permitting the nomination or election" of legislative elections for several districts, and the Court set a schedule by which the Secretary and Legislative Assembly shall have until December

22, 2023, to adopt a remedial plan, the Plaintiffs shall have until January 5, 2024, to object to that remedial plan, and the Secretary shall have until January 19, 2024, to file a reply in support of that remedial plan. Doc. 126 (Judgment) at 2.

But on the following Monday, November 20, 2023, the Eighth Circuit rendered a decision highly relevant to the instant case in *Arkansas State Conf. NAACP v. Arkansas Bd. of Apportionment*, —F.4th—, 2023 WL 8011300 (8th Cir. Nov. 20, 2023). In that decision, the Eighth Circuit unequivocally held that Section 2 of the VRA does not create a private right of action, because the statute's plain text clearly "intended to place enforcement in the hands of the [Attorney General], rather than private parties." *Id*. at *5 (citation omitted). The Eighth Circuit declined to address whether 42 U.S.C. § 1983 could nonetheless be used by private parties to bring Section 2 claims under the VRA. *See id*. at *12 (noting the question was not properly before it). However, the Eighth Circuit's holding and rationale cast significant doubt over this Court's finding that private Plaintiffs in this action can use Section 1983 for a private right of action to bring Section 2 VRA claims when, as the Eighth Circuit has now held, Section 2 of the VRA does not permit lawsuits by private plaintiffs.

In light of *Arkansas State Conf. NAACP*, the Secretary has a legally sound basis to seek appellate review of this Court's judgment in the instant matter. However, the timing of this Court's judgment and injunction make it impossible for the Secretary to receive meaningful appellate review before the 2024 election map needs to be established with finality. As will be discussed further *infra*, the realities of administering a statewide election in North Dakota mean that the 2024 election map needs to be finalized no later than December 31, 2023. After that date, candidates are scheduled begin petitioning to be on the ballots in their respective districts, and adjusting the district boundaries thereafter will risk substantial confusion, cost, and unfairness for candidates,

voters, and election administrators alike. Moreover, that potential for confusion and unfairness, without the opportunity for meaningful appellate review, risks undermining the election process and voter confidence in a presidential election year.

The Secretary has filed a Notice of Appeal to challenge this Court's finding that the Plaintiffs have a private right of action. However, because this Court's injunction was entered with insufficient time to seek meaningful appellate review without disrupting the State's 2024 election, a stay of the Court's injunction pending appeal (and through the 2024 election cycle) is appropriate under the Supreme Court's *Purcell* analysis for staying injunctions that interfere with upcoming elections.

Alternatively, even if the Court finds a *Purcell* analysis is inapplicable, a stay of the Court's injunction pending appeal should be granted under a traditional stay analysis.

Rules 8(a)(1)(A) and (C) of the Federal Rules of Appellate Procedure direct the Secretary to bring this motion in the District Court as a condition to seeking a stay pending appeal in the Court of Appeals. The Secretary respectfully requests that the Court enter an order on this motion as soon as possible, but no later than **December 12, 2023**, so that, if the motion to stay is denied by this Court, a stay pending appeal may be sought from the Eighth Circuit ahead of the January 1, 2024 ballot petitioning deadline.

## II.     LAW & ARGUMENT

### A.     Injunctions Likely to Disrupt Scheduled Elections Are Subject to the Supreme Court's *Purcell* Analysis

The Supreme Court "has repeatedly emphasized that lower federal courts should ordinarily not alter the election rules on the eve of an election." *Republican Nat'l Comm. v. Democratic Nat'l Comm.*, 140 S. Ct. 1205, 1207 (2020). That is because "[l]ate judicial tinkering with election laws can lead to disruption and to unanticipated and unfair consequences for candidates, political

parties, and voters, among others." *Merrill v. Milligan*, 142 S. Ct. 879, 881 (2022) (Kavanaugh, J., concurring). This principle comes from *Purcell v. Gonzalez*, where the Supreme Court explained that courts should not change election rules proximate to an election when doing so could confuse voters and create problems for administering the election. *See* 549 U.S. 1, 4 (2006) ("Court orders affecting elections … can themselves result in voter confusion and consequent incentive to remain away from the polls.").

Therefore, when a plaintiff seeks to enjoin the operation of election procedures before an election, the framework for assessing the injunction is adjusted, and federal courts must "weigh, in addition to the harms attendant upon issuance or nonissuance of an injunction, considerations specific to election cases and its own institutional procedures." *Id*. at 4; *see also Riley v. Kennedy*, 553 U.S. 406, 426 (2008) ("practical considerations sometimes require courts to allow elections to proceed despite pending legal challenges"). And "when a lower court intervenes and alters the election rules so close to the election date, our precedents indicate that this [c]ourt, as appropriate, should correct that error." *Republican Nat'l Comm*., 140 S. Ct. at 1207. Importantly, this analysis is not limited to only the date of the election itself, but also considers the necessary requirements that must be completed before then for the election to proceed in an organized and transparent manner. *E.g.*, *Merrill v. Milligan,* 142 S. Ct. 879, 880 (2022) (Kavanaugh, J., concurring) ("Filing deadlines need to be met, but candidates cannot be sure what district they need to file for. … Nor do incumbents know if they now might be running against other incumbents … On top of that, state and local election officials need substantial time to plan for elections. Running elections state-wide is extraordinarily complicated and difficult. Those elections require enormous advance preparations by state and local officials …").

The Supreme Court has not fully delineated when a *Purcell* stay analysis is required; however, Justice Kavanaugh's concurrence in *Merrill v. Milligan,* 142 S. Ct. 879 (2022), is instructive for this case. The *Merrill* case involved several challenges to Alabama's congressional electoral maps, wherein the plaintiffs alleged vote dilution in violation of the VRA. *See Singleton v. Merrill*, No. 2:21-cv-1291 (N.D. Ala.), *Milligan v. Merrill*, No. 2:21-cv-1530 (N.D. Ala.), and *Caster v. Merrill*, No. 2:21-cv-1536 (N.D. Ala.). The Alabama Secretary of State was enjoined by the district court from conducting elections based on the existing redistricting plan, and the Alabama legislature was given 14 days to enact a new redistricting plan. No. 2:21-cv-1530, Doc. 107, pp. 5-6; *see also* No. 2:21-cv-01536, Doc. 101, pp. 6-7. However, the Supreme Court stayed the district court's injunction pending appellate review. *See Merrill*, 142 S. Ct. at 879.

Justice Kavanaugh, joined by Justice Alito, wrote separately to concur with the stay of the injunction. *See Merrill,* 142 S. Ct. at 879–82 (Kavanaugh, J., concurring). Citing the *Purcell* principle, the concurrence explained, "[t]he stay order follows this Court's election-law precedents, which establish (i) that federal district courts ordinarily should not enjoin state election laws in the period close to an election, and (ii) that federal appellate courts should stay injunctions when, as here, lower federal courts contravene that principle." *Id.* at 879. Justices Kavanaugh and Alito then further explained "the *Purcell* principle is probably best understood as a sensible refinement of ordinary stay principles for the election context—a principle that is not absolute but instead simply heightens the showing necessary for a plaintiff to overcome the State's extraordinarily strong interest in avoiding late, judicially imposed changes to its election laws and procedures." *Id.* at 881. The heightened standard that plaintiffs must establish when an injunction is likely to disrupt a scheduled election has four elements:

(i) the underlying merits are entirely clearcut in favor of the plaintiff;

(ii) the plaintiff would suffer irreparable harm absent the injunction;

(iii) the plaintiff has not unduly delayed bringing the complaint to court; and

(iv) the changes in question are at least feasible before the election without significant cost, confusion, or hardship.

*Id.* This modified test for stays in election cases has been applied by various district courts in the Eighth Circuit, including by this Court. *See Walen v. Burgum*, No. 1:22-CV-31, 2022 WL 1688746, at *5 (D.N.D. May 26, 2022) ("Justice Kavanaugh's framework provides helpful guidance for addressing the *Purcell* issue"); *see also, e.g.*, *Berry v. Ashcroft*, No. 4:22-CV-00465, 2022 WL 2643504, at *2–3 (E.D. Mo. July 8, 2022); *Lower Brule Sioux Tribe v. Lyman Cnty.*, 625 F. Supp. 3d 891, 933–35 (D.S.D. 2022). And this modified stay standard has been expressly applied by the Eleventh Circuit Court of Appeals. *League of Women Voters of Fla., Inc. v. Fla. Sec'y of State*, 32 F.4th 1363, 1372 (11th Cir. 2022) ("we agree with Justice Kavanaugh that *Purcell* only (but significantly) 'heightens' the standard that a plaintiff must meet to obtain injunctive relief that will upset a state's interest in running its elections without judicial interference"); *see also Grace, Inc. v. City of Miami*, No. 23-12472, 2023 WL 5286232, at *2–3 (11th Cir. Aug. 4, 2023).

**B.     A Stay Pending Appeal Should be Granted Under the Modified *Purcell* Analysis**

Under the modified *Purcell* analysis, the Court should grant a stay of its injunction pending the Secretary's appeal and permitting preparation for the November 2024 elections to continue under the legislatively-enacted map while this litigation continues.

**(i)  The Underlying Merits Are Not Entirely Clearcut in Favor of The Plaintiffs**

The first element of the modified test for staying an injunction that threatens to disrupt the administration of a scheduled election is that the underlying merits are "entirely clearcut" in favor of the plaintiffs. *Merrill*, 142 S. Ct. at 881 (Kavanaugh, J., concurring). The burden to establish

that the underlying merits for an injunction are "entirely clearcut" lies with the plaintiff. *Id*.; *see also League of Women Voters*, 32 F.4th 1363 at 1372 (11th Cir. 2022) ("Whatever the precise standard, we think it clear that, for cases controlled by *Purcell*'s analysis, the party seeking injunctive relief has a 'heightened' burden.").

In July of 2022, this Court denied Defendant's motion to dismiss for lack of a private right of action under either Section 2 of the VRA or 42 U.S.C. § 1983 by finding that "§ 1983 provides a private remedy for violations of Section 2 of the VRA, and therefore, it is not necessary for the Court to decide whether Section 2, standing alone, contains a private right of action." Doc. 30 at 6. However, after the Court made that finding, the Eighth Circuit's recent decision in *Arkansas State Conf. NAACP* called into doubt this Court's finding of a private right of action under Section 1983 for alleged violations of Section 2 of the VRA.

In that opinion, the Eighth Circuit squarely held, that under the plain text of the VRA, the United States Attorney General is the only party who can sue to enforce Section 2 of the VRA. *Arkansas State Conf. NAACP*, 2023 WL 8011300, at *4-11 (Section 2 of the VRA "intended to place enforcement in the hands of the [Attorney General], rather than private parties"). The Eighth Circuit declined to address the question of whether a private right of action missing from Section 2 of the VRA could still be found by private plaintiffs under 42 U.S.C. § 1983 for bringing Section 2 claims. *See Arkansas State Conf. NAACP*, 2023 WL 8011300, at *12 (noting the issue was not properly presented in that case). However, the Eighth Circuit's holding that Section 2 of the VRA lacks a private right of action because it affirmatively assigns a right of action to the U.S. Attorney General would also support holding that a private right of action for Section 2 claims cannot be smuggled in through Section 1983.

As the Secretary intends to establish on appeal, Section 1983 cannot be used to bring a Section 2 VRA claim for at least two reasons: (1) Section 2 confers aggregate—not individual—rights; and (2) the fact that the VRA expressly assigns enforcement authority to the U.S. Attorney General precludes private enforcement under Section 1983.

(a) <u>Section 2 of the VRA confers aggregate—not individual— rights</u>

The first question in deciding whether a statute can be enforced by private litigants under Section 1983 is whether the "statute confers an individual right." *Gonzaga Univ. v. Doe*, 536 U.S. 273, 284-85 (2002) (noting "§ 1983 merely provides a mechanism for enforcing individual rights 'secured' elsewhere"). Importantly, that right must be individual, not aggregate. *Id.* at 275 (where statutes "have an 'aggregate' focus, they are not concerned with whether the needs of any particular person have been satisfied, and they cannot give rise to individual rights"); *see also, e.g., Does v. Gillespie*, 867 F.3d 1034, 1041-42 (8th Cir. 2017) ("a statute that speaks to the government official" empowered by a statute "'does not confer the sort of *individual* entitlement that is enforceable under § 1983'") (quoting *Gonzaga*, 536 U.S. at 287). And Section 2 of the VRA falls well short of unambiguously conferring any ***individual*** right on any particular person. To the contrary, it only confers rights on minority groups in the ***aggregate***.

Section 2 of the VRA contains two subsections—subsections (a) and (b). *See* 52 U.S.C. 10301. It may be true the first subsection appears, on a glance, to describe an individual right; it forbids voting practices that "result[] in a denial or abridgement of the right of ***any citizen*** … to vote on account of race or color … as provided in subsection (b)." 52 U.S.C. 10301(a) (emphasis added); *Cf. Arkansas State Conf. NAACP*, 2023 WL 8011300, at *4 (noting subsection (a) appears to contain elements of both individual and aggregate rights, but declining to resolve the question because Section 2 lacks a private remedy). However, subsection (b), added in 1982, explains and

clarifies subsection (a) is a <u>group</u> right. Subsection (b) provides "[a] violation of subsection (a) is established if … the political processes leading to nomination or election ...  are not equally open to participation by **members of a class of citizens** protected by subsection (a) in that **its members** have less opportunity than other members of the electorate to participate in the political process … ." 52 U.S.C. 10301(b) (emphasis added).

Congress's addition of the language in subsection (b) thus starkly de-individualized the Section 2 right. Indeed, whether a state has violated Section 2 has nothing to do with the electoral opportunity enjoyed by any individual voter—the analysis does not require consideration of whether any particular voter can elect his or her candidate of choice. Rather, what Section 2 protects is the electoral opportunity of aggregated minority groups as a whole.

Unlike ordinary antidiscrimination statutes, proving that any specific individual voter suffered discrimination or a dilution of his or her voting power does not suffice to prove a Section 2 violation. Instead, Section 2 plaintiffs must prove that a "minority group" as a whole has "distinctive minority group interests" in the form of candidates they collectively prefer, and that white bloc voting usually defeats the group's collectively-preferred candidates. *Thornburg v. Gingles*, 478 U.S. 30, 51 (1986). The ultimate question is therefore whether, in the aggregate, "the ability of minority voters to elect their chosen representatives is inferior to that of white voters." *Id.* at 48 n.15. And if an individual minority voter's preferred candidates are usually defeated by white bloc voting, but the candidates preferred by his or her "minority group" are not defeated (or if his or her group has no cohesive preferences either way), there is no Section 2 violation. *See id.* at 51.

Because Section 2 protects group rights, not any individual's rights, it follows that it does not create private rights that individual plaintiffs can enforce under Section 1983. "Statutes with

an 'aggregate,' rather than an individual, focus 'cannot give rise to individual rights.'" *Midwest Foster Care & Adoption Ass'n v. Kincade*, 712 F.3d 1190, 1200 (8th Cir. 2013) (some internal quotation marks omitted) (quoting *Gonzaga*, 536 U.S. at 288).

In rejecting Defendants' motion to dismiss for lack of a private right of action under Section 1983, this Court misstated and mis-applied the test.  he test is not simply whether Section 2 of the VRA "confers a right" in a generalized sense. *Cf.* Doc. 30 (July 2022 Order) at 10. Instead, the test is whether Section 2 of the VRA creates an individual, non-aggregated right that could be enforced through Section 1983. *See Gonzaga*, 536 U.S. at 284-85; *Does v. Gillespie*, 867 F.3d at 1041-42. And as described above, it does not.

In short, because Section 2 of the VRA confers an aggregate right and not an individual right, it does not create any individual right that would be enforceable through a private right of action under 42 U.S.C. § 1983. That consideration provides the first reason why Plaintiffs' likelihood of success for asserting a private right of action under Section 1983 for an alleged violation of Section 2 of the VRA is not "entirely clearcut." *Merrill,* 142 S. Ct. at 881 (Kavanaugh, J., concurring).

> (b)  *The fact that the VRA expressly assigns enforcement authority to the United States Attorney General precludes private claims under Section 1983*

Additionally, even when a federal statute creates individual rights, Section 1983 claims are precluded when the remedial devices provided in the underlying statute are sufficiently comprehensive to demonstrate congressional intent to preclude the remedy of a private lawsuit under Section 1983. *Middlesex Cnty. Sewerage Auth. v. Nat'l Sea Clammers Ass'n*, 453 U.S. 1 (1981). The State may show Congress "shut the door to private enforcement … impliedly, by creating a comprehensive enforcement scheme that is incompatible with individual enforcement under § 1983." *Gonzaga*, 536 U.S. at 285.

Section 12 of the Voting Rights Act provides a comprehensive scheme to enforce Section 2 by the Attorney General of the United States. 52 U.S.C. § 10308. This includes a right of the Attorney General to seek an injunction, and potential penalties of a fine up to $5,000 and/or be imprisoned for up to five years. *Id.* With respect to Section 2, the plain language of the Voting Rights Act provides for enforcement by the Attorney General only, not by private parties. *Arkansas State Conf. NAACP*, 2023 WL 8011300, at *5 ("If the text and structure of § 2 and § 12 show anything, it is that 'Congress intended to place enforcement in the hands of the [Attorney General], rather than private parties.'") (citation omitted).

In its *Order Denying Motion to Dismiss*, this Court found, "Critically, … there is also nothing in Section 12 that is incompatible with private enforcement, as there can be collective and private remedies available for the same federal statute." Doc. 30 at 11 (citing *Cannon v. Univ. of Chicago*, 441 U.S. 677, 717 (1979)). However, the cited case, *Cannon*, stated:

> When Congress intends private litigants to have a cause of action to support their statutory rights, the far better course is for it to specify as much when it creates those rights … . ***Title IX presents the atypical situation*** in which all of the circumstances that the Court has previously identified as supportive of an implied remedy are present. We therefore conclude that petitioner may maintain her lawsuit, despite the absence of any express authorization for it in the statute.

*Cannon*, 441 U.S. at 717 (emphasis added). This Court did not cite any authority or provide analysis as to why Section 2 of the VRA includes an implied remedy, or why the VRA was an "atypical situation" for finding one. And in any event, the Eighth Circuit Court of Appeals has now held there is no private remedy in the VRA, express or implied. *Arkansas State Conf. NAACP*, 2023 WL 8011300, at *4-5. This Court's holding on this point was thus in error.

In its Order Denying Motion to Dismiss, this Court also stated: "Tellingly, the VRA itself seems to anticipate private litigation, as it contains a provision allowing for court-ordered attorneys' fees for 'the prevailing party, other than the United States.'" Doc. 30 (July 2022 Order)

at 11 (quoting 52 U.S.C. § 10310(e)). But the Court's statement does not support the Court's holding. Section 10310(e), by its text, refers only to attorney's fees for actions to "directly enforce the Fourteenth and Fifteenth Amendments"; dilution claims under Section 2 are **_not_** actions to directly enforce the Fourteenth and Fifteenth Amendments, as the Eighth Circuit recently re-affirmed. *See Arkansas State Conf. NAACP*, 2023 WL 8011300, at *7 n.3 ("By focusing solely on the discriminatory impact [under Section 2], not intentional discrimination, the advocacy groups are not attempting to 'enforce the voting guarantees of the fourteenth or fifteenth amendment.'"). Here again, the Court's' reasoning was in error.

Finally, in its Order Denying Motion to Dismiss, this Court also pointed to the fact that Section 2 VRA claims have previously been successfully brought by private litigants. Doc. 30 (July 2022 Order) at 11-12. But, as the Eighth Circuit recently noted, none of those cases actually analyzed the question of whether a private right of action exists to enforce Section 2 violations, and such cases do not control the analysis in a case where the question is actually presented. *See Arkansas State Conf. NAACP*, 2023 WL 8011300, at *9-11 (noting statements to that effect in prior cases "were *just* background assumptions—mere dicta at most"). The Court's reasoning on this point was thus again in error.

In short, Plaintiffs should not be permitted to circumvent the comprehensive enforcement scheme provided in the VRA by using Section 1983 to bring private litigation. Finding that Section 1983 enables private litigants to bring Section 2 claims would undermine Congress's clear decision to assign enforcement authority for Section 2 claims to the U.S. Attorney General. And that is another reason why Plaintiffs' likelihood of success for asserting a private right of action under Section 1983 for alleging a VRA Section 2 claim is not "entirely clearcut." *Merrill,* 142 S. Ct. at 881 (Kavanaugh, J., concurring).

**(ii) Plaintiffs Would Not Suffer Irreparable Harm Absent the Injunction**

The second element of the modified test for stays in election cases is that the plaintiffs would suffer irreparable harm absent the injunction. *Merrill*, 142 S. Ct. at 881 (Kavanaugh, J., concurring). "Lack of irreparable harm 'is an independently sufficient ground upon which to deny a preliminary injunction.'" *Grasso Enters., LLC v. Express Scripts, Inc.*, 809 F.3d 1033, 1040 (8th Cir. 2016) (quoting *Watkins Inc. v. Lewis*, 346 F.3d 841, 844 (8th Cir. 2003)).

As discussed above, Plaintiffs did not have a private right of action available to them to commence this lawsuit in the first place. The aggregate rights afforded by Section 2 of the VRA can only be enforced by the Attorney General of the United States, who is not a party to this case. The Attorney General of the United States may bring an action to address the alleged harm to Plaintiffs and others, but it has chosen not to do so in this action. Moreover, while this litigation has been underway, the November 2022 elections were already held using the challenged map, and Plaintiffs have made no showing they will be irreparably harmed by continuing to vote in accordance with the challenged map while this litigation is resolved on appeal.

**(iii) While Plaintiffs Did Not Unduly Delay Bringing the Complaint, the Issuance of Judgment was Unfortunately Timed**

The third element of the modified test for stays in election cases is whether the plaintiffs unduly delayed bringing the complaint to court. *Merrill*, 142 S. Ct. at 881 (Kavanaugh, J., concurring). While the Secretary does not assert that Plaintiffs unduly delayed in bringing their original Complaint, there was nevertheless a critical delay in this case that brings it within the scope of a *Purcell* analysis.

The bench trial in this case was held from June 12-15, 2023. This trial date was set significantly earlier than the originally scheduled trial in North Dakota's other recent redistricting case, *Walen, et. al. v. Burgum, et. al.*, No. 1:22-CV-00031 (D.N.D.), which was initially set for

trial from October 2-6, 2023. The earlier trial date for this case was specifically requested by the Secretary to account for the possibility that if Plaintiffs were successful at trial the State may be ordered to perform a redistricting that could potentially interfere with the November 2024 elections if delayed too long. Doc. 33 at p. 2. However, the trial concluded on June 15, 2023, and the District Court did not issue its Findings of Fact and Conclusions of Law (Doc. 125) and Judgment (Doc. 126) until November 17, 2023, more than **five months later**.

The Secretary respectfully acknowledges that carefully weighing the evidence and adjudicating the dispute requires a significant amount of time, and makes no suggestion that the Court's Judgment was improperly delayed. However, the fact remains that the Judgment was not issued until the latter half of November, shortly before the Thanksgiving holiday and with insufficient time to seek appellate review before the election map needs to be finalized. This timing of the Judgment's issuance—as well as the Court's schedule for creating and reviewing a remedial plan extending to at least January 19, 2024 (and potentially longer)—makes it impossible to seek meaningful appellate review, meet statutory deadlines, and carry out the 2024 elections without significant cost, confusion, and hardship, as discussed further *infra*.

### (iv)   The Changes in Question Are Not Feasible Before the Election Without Significant Cost, Confusion, or Hardship.

The fourth element of the modified test for stays in election cases is whether the changes in question are feasible before the election without significant cost, confusion, or hardship. *Merrill*, 142 S. Ct. at 881 (Kavanaugh, J., concurring). The Court's schedule for proposing and objecting to remedial maps goes until January 19, 2024, which is only 144 days (about 4.7 months) before the June 11, 2024 statewide primary election. N.D.C.C. § 16.1-11-01. But even more pressingly, the Court's deadline extends past the December 31, 2023, deadline by which candidates petitioning

to be on the ballot need to know what election map applies for delineating the district boundaries. *See* N.D.C.C. § 16.1-11-15; *see also* Tr. Transcript, Vol. III, at pp. 190-91.

What qualifies as "too close" to scheduled election deadlines under *Purcell* varies depending on "the nature of the election law at issue, and how easily the State could make the change without undue collateral effects." *Merrill* 142 S. Ct. at 881 n.1 (2022) (Kavanaugh, J., concurring). The ability of the State to seek meaningful appellate review of the election-impacting injunction also factors into a *Purcell* timing analysis. *See, e.g., Walen v. Burgum*, No. 1:22-CV-31, 2022 WL 1688746, at *6 (D.N.D. May 26, 2022) (noting that *Purcell* "direct[s] courts to weigh the opportunity for appellate review").

Courts have applied the *Purcell* principle to prevent injunctions prior to elections on similar timeframes as the present case. For example, in *League of Women Voters of Fla., Inc. v. Lee*, 595 F. Supp. 3d 1042 (N.D. Fla. 2022), the District Court for the Northern District of Florida initially denied a stay of its order enjoining amendments to Florida's Election Code, stating that the closest election was still roughly five months away. *Id.* at 1172–73. However, the Eleventh Circuit granted a stay pending appeal, finding that while "the Supreme Court has never specified precisely what it means to be 'on the eve of an election' for *Purcell* purposes … [w]hatever *Purcell*'s outer bounds, we think that this case fits within them." *League of Women Voters of Fla., Inc. v. Fla. Sec'y of State*, 32 F.4th 1363, 1371 (11th Cir. 2022).[1] Additionally, in *Merrill*, the Supreme Court granted a stay even though the primary election was still "about four months" away from the Supreme

---

[1] In its opinion granting a stay, the Eleventh Circuit stated that the election was less than 4 months from the District Court's injunction. *See League of Women Voters,* 32 F.4th at 1371. However, as noted by the district court, it was in fact almost 5 months, or 145 days, away. *See League of Women Voters*, 595 F. Supp. 3d at 1172 ("Florida's primary election is set for August 23, 2022, and the general is set for November 8, 2022. … So the closest election is roughly five months away.").

Court stay, and even longer from the District Court's injunctions that were issued two weeks prior. *See Merrill*, 142 S. Ct. at 879, 888 (Kagan, J., dissenting).

Here, it is not feasible for the Legislative Assembly to adopt a remedial plan by the Court-ordered deadline of December 22, 2023. And even if a remedial plan could be adopted in time, the Court's scheduling plan following adoption goes until January 19, 2024, well after important scheduled election activities have already commenced, inevitably causing confusion and hardship among voters, election officials, and candidates.

> *(a)* <u>*Cost, confusion, and hardship to the Legislative Assembly*</u>

The Court's Judgment gave the Secretary and the North Dakota Legislative Assembly until December 22, 2023, to adopt a remedial plan, and the Court directed that any such a plan would be subject to Plaintiffs' objections, a reply in support by the Secretary no later than January 19, 2024, and presumably the Court's review and approval (or rejection) of the proffered remedial plan sometime thereafter. Doc. 126 at 2.

The District Court is correct that the State should be given the opportunity to adopt a remedial map before one is imposed by the federal courts. "The Supreme Court has repeatedly held that 'redistricting and reapportioning legislative bodies is a legislative task which the federal courts should make every effort not to preempt.'" *Diaz v. Silver*, 932 F. Supp. 462, 465 (E.D.N.Y. 1996) (quoting *Wise v. Lipscomb*, 437 U.S. 535, 539 (1978)). "Federal-court review of districting legislation represents a serious intrusion on the most vital of local functions. It is well settled that 'reapportionment is primarily the duty and responsibility of the State.'" *Miller v. Johnson*, 515 U.S. 900 (1995) (internal citations omitted).

However, the Court's direction for the Legislative Assembly and Secretary to "adopt a plan" for the Court's (and Plaintiffs') review (Doc. 126 at 2) is unclear. Under the North Dakota

Constitution, the Legislative Assembly (not the Secretary of State) is charged with the task of redistricting, and new redistricting plans must be enacted through duly enacted laws, which require bicameral approval and presentation to the Governor. *See* N.D. Const., art. IV, §§ 2, 13; art. V, § 9. It is not apparent that the State Constitution permits the State Legislative Assembly to conditionally "adopt a plan" for the Court's review through any process other than duly enacting a new law. *Cf.* N.D. Const., art. IV, §§ 2, 13.

Additionally, the Court's direction to the Legislative Assembly to adopt a remedial plan also has significant problems of logistics and timing. The Court gave the Legislative Assembly just 35 days from the date of its Judgment (November 17, 2023 to December 22, 2023) to adopt a remedial plan. Doc. 126 at 2. However, North Dakota does not have a full-time legislature, and the Legislative Assembly's 2023 biennial regular session was already adjourned by the date of the Court's Judgment. Furthermore, the window provided by the Court falls over the winter holiday period, compounding logistical difficulties. Consequently, the Legislative Assembly—which is not a party to this dispute—has indicated to the Secretary that it will not be able to reconvene to adopt a remedial map by this Court's deadlines.[2]

### (b) *Cost, confusion, and hardship with respect to the 2024 elections*

Even if the Legislative Assembly was able to comply with the Court's Judgment and adopt a remedial plan by December 22, 2023, the schedule set by the Court to review and approve the remedial plan—extending until at least January 19, 2024, and potentially later—will delay the finalization of the State's legislative district map until it is too late to carry out the 2024 election cycle without significant cost, confusion, and hardship for candidates, voters and election

---

[2] Through this brief, the Secretary does not purport to speak for or on behalf of the Legislative Assembly.

administrators. While the Judgment directs that the first elections in the remedial district(s) shall occur in the November 2024 general election (Doc. 126 at p. 2), the final map must be in place for the June 11, 2024 primary election, where the candidates who will run in the general election are selected by the voters. N.D.C.C. § 16.1-11-01. But even before that, the final map must be in place by January 1, 2024, when candidates begin petitioning for inclusion on the ballot in their districts. N.D.C.C. § 16.1-11-15; *see also* Tr. Transcript, Vol. III, at pp. 190-91. Consequently, for a variety of reasons to be discussed *infra*, compliance with the Court's injunction is likely to cause significant confusion, cost, and hardship.

First of all, it must be noted that while the injunction only expressly applies to Districts 9 and 15 and Subdistricts 9A and 9B, the complexity of district line crafting ensures that those are not the only districts that will be impacted by the Court's Judgment. Changing those district boundaries cannot happen in a vacuum. Due to the constitutional and statutory requirement that legislative districts have substantial population equality (N.D. Const., art. IV, § 2; N.D.C.C. § 54-03-01.5(5)), changes to the boundaries of Districts 9 and 15 will necessarily require changes in at least the immediately adjacent districts, and potentially cascading further throughout the State.  For example, Plaintiffs' Demonstrative Plan 1 requires changes to Districts 9, 14, 15, and 29. *See* Tr. Exhibit P001 at pp. 31-32. Plaintiffs' Demonstrative Plan 2 requires changes to Districts 9, 14, and 15. *See* Tr. Exhibit P001 at pp. 38-39. And if the North Dakota Legislative Assembly adopts its own remedial plan in accordance with the Court's Judgment, its map may impact different or additional districts. Therefore, under the Court's Judgment, it potentially will not be known which districts are subject to being altered until sometime after January 19, 2024.

But beyond uncertainty over which districts will be impacted, a significant problem of timing relates to the collection of signatures by candidates. Candidates running by petition are

required to get "the signatures of at least one percent of the total resident population of the legislative district as determined by the most recent federal decennial census." N.D.C.C. § 16.1-11-06(1)(b)(3)(d). Candidates can begin circulating petitions for signatures on January 1 preceding a primary election (January 1, 2024, with respect to the 2024 primary election). Candidates only have from January 1, 2024, until April 8, 2024, to gather the required number of signatures on petitions. These are dates set by statute. *See* N.D.C.C. §§ 16.1-11-06, 16.1-11-15. All districts impacted by the yet-to-be adopted remedial plan could then have candidates gathering signatures beginning January 1, 2024, only to later find out later that some or all of the signatures they gathered no longer qualify. Consequently, any delay in establishing a final redistricting map directly impacts candidates' ability to meet the requirements to be placed on the ballot in all districts impacted by the yet-to-be adopted remedial plan.

In addition to the signature gathering issues for candidates, the candidates themselves may find out after a remedial plan is adopted and accepted by the Court that they no longer reside within the district in which they are running. The North Dakota Constitution provides, "An individual may not serve in the legislative assembly unless the individual lives in the district from which selected." N.D. Const., art. IV, § 5. Candidates cannot make an informed decision about whether they should run for a seat in the Legislative Assembly, or which district they should gather signatures in, until the boundaries of the districts are established. A candidate may start campaigning and gathering signatures January 1, 2024, only to find out after January 19, 2024, that he or she actually resides in a different district and will not be constitutionally eligible to serve in the Legislative Assembly for that district.

For example, District 14 is not subject to the Court's injunction, but will potentially be altered by the remedial plan (as it is under both of Plaintiffs' demonstrative plans). As an even-

numbered district, District 14 will have a senator and two representatives up for election in 2024 as part of North Dakota's staggering of terms for the Legislative Assembly. *See* N.D.C.C. § 54-02-01.15(3)(a) ("A senator must be elected from each even-numbered district in 2024 for a term of four years."); *see also* N.D.C.C. § 54-02-01.15(3)(b) ("Two representatives must be elected from each even-numbered district not comprised of subdistricts in 2024 for a term of four years."). In other words, despite being ostensibly unaffected by the Court's injunction, candidates who reside in District 14 and gather signatures in January 2024, as permitted by statute, may later discover that, due to the yet-to-be established remedial map's geographical changes, they no longer reside in District 14 or the signatures that they gathered were from citizens who no longer reside in District 14.

The timing of the Court's Judgment also causes issues for candidates running by the endorsement of a political party. According to N.D.C.C. § 16.1-03-17, if redistricting of the Legislative Assembly becomes effective after the organization of political parties and before the primary or the general election, some of the political parties in newly established districts are required to reorganize as closely as possible in conformance with Chapter 16.1-03 to assure compliance with primary election filing deadlines. This would include districts in which the population residing within any new geographic area added to the district is at least 25 percent of the district's total population. N.D.C.C. § 16.1-03-17(2). The reorganization of the parties has already occurred based on the enjoined maps. *See* Tr. Transcript, Vol. III, at pp. 195-96; *see also* N.D.C.C. §§ 16.1-03-01, 16.1-03-17. The Court's Judgment will require the political parties to reorganize and caucus well past the statutory deadline of May 15 if they are to endorse candidates to be placed on the ballot. *See* Tr. Transcript, Vol. III, at pp. 195.

These types of hardships and uncertainties for candidates are recognized as the basis for staying an election-disrupting injunction. As Justice Kavanaugh noted in *Merrill*: "Filing deadlines need to be met, but candidates cannot be sure what district they need to file for. Indeed, at this point, some potential candidates do not even know which district they live in. Nor do incumbents know if they now might be running against other incumbents in the upcoming primaries." 142 S. Ct. at 880. (Kavanaugh, J., concurring). Moreover, "state and local election officials need substantial time to plan for elections. Running elections state-wide is extraordinarily complicated and difficult. Those elections require enormous advance preparations by state and local officials, and pose significant logistical challenges." *Id.*

Additionally, the Court's schedule for reviewing an adopted remedial plan makes it impossible for county commissions to timely comply with their election duties. The board of county commissioners for each of North Dakota's 53 counties is required to divide the county into precincts and establish the county precinct boundaries no later than December 31 of the year immediately preceding an election cycle (by December 31, 2023, for the 2024 election cycle). N.D.C.C. §§ 16.1-04-01(1)(a), 16.1-04-01(3). North Dakota law prohibits a single precinct from encompassing more than one legislative district. N.D.C.C. § 16.1-04-01(1)(a). County commissions must establish the precincts in a properly noticed public meeting in accordance with N.D.C.C. ch. 11-11. Once the Court approves a remedial plan sometime after January 19, 2023, the commissions of the impacted counties would have to meet to establish precincts, already passed their statutory deadline of December 31, 2023.

This statutory deadline to set precincts is very important to the administration of the election because establishment of the precincts is necessary for the county auditors to be able to begin the extremely detailed and time-consuming process of updating the data for the Street

Master, discussed at length at trial by State Elections Director Erika White (Tr. Transcript, Vol. III, at p. 202) and the Elections Systems Administration Manager Brian Nybakken (Tr. Transcript, Vol. IV, at pp. 11-24). The Street Master is tied to the Central Voter File and identifies highways, roads, lanes, and boulevards within a precinct, allowing election officials to determine whether a particular house number resides within a particular precinct.  Tr. Transcript, Vol. IV, at p. 11. The Street Master ties an address to a precinct, to a ballot style, and ultimately to the voter to ensure that the voter is receiving the correct ballot at the polling location with the correct candidates, contests, and ballot measures. Tr. Transcript, Vol. III, at p. 202. It is crucial that the Street Master is properly updated so that voters are given the correct ballot, and are not voting on candidates from the wrong district, or for example voting on bond measures they will not be paying for. *Id.*

For the reasons noted above, the Court's Judgment and injunction should be stayed pending appeal to prevent undue cost, confusion, and hardship, and the 2024 election cycle should be allowed to proceed under the current legislatively enacted maps while this litigation is pending appellate review and final resolution.

## C.    A Stay Should be Granted Even if a Traditional Stay Analysis is Applied

Even if the Court does not apply the modified test discussed above, a stay should nevertheless be granted based upon the traditional criteria. Courts within the Eighth Circuit traditionally consider the following four factors when determining whether to stay an order of a district court pending appeal or to suspend an order granting an injunction while an appeal is pending: "(1) the likelihood that a party seeking the stay will prevail on the merits of the appeal; (2) the likelihood that the moving party will be irreparably harmed absent a stay; (3) the prospect that others will be harmed if the court grants the stay; and (4) the public interest in granting the stay." *Iowa Utilities Bd. v. F.C.C.*, 109 F.3d 418, 423 (8th Cir. 1996).

### (i)  Secretary Howe is Likely to Prevail on the Merits of the Appeal

The bases of the Secretary's appeal are discussed in more detail above. The Secretary's appeal is based on recent Eighth Circuit precedent which unequivocally established there is no private right of action to enforce Section 2 of the Voting Rights Act in this Circuit. As discussed *supra*, that holding considerably erodes the basis of this Court's finding that Section 1983 can be used to bring a private cause of action under Section 2 of the VRA. The Secretary is therefore likely to prevail on the merits, and North Dakota should not be forced to adopt a court-ordered remedial plan until it has at least had the opportunity to have its arguments meaningfully considered in the appellate courts.

### (ii)  The State Will be Irreparably Harmed Absent a Stay

"Federal-court review of districting legislation represents a serious intrusion on the most vital of local functions." *Miller v. Johnson*, 515 U.S. 900, 915 (1995) (quoting *Chapman v. Meier*, 420 U.S. 1, 27 (1975)). "[A]ny time a State is enjoined by a Court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." *New Motor Vehicle Bd. of Cal. v. Orrin W. Fox Co.*, 434 U.S. 1345, 1351 (1977) (Rehnquist, J., in chambers); *see also Coal. for Econ. Equity v. Wilson*, 122 F.3d 718, 719 (9th Cir. 1997) ("[I]t is clear that a state suffers irreparable injury whenever an enactment of its people … is enjoined."). Further, "[a] State indisputably has a compelling interest in preserving the integrity of its election process." *Eu v. San Francisco County Democratic Central Comm.*, 489 U.S. 214, 231 (1989). Sovereign harms are magnified when the challenged law reflects "the State's policy judgments" about election-related matters. *Perry v. Perez*, 565 U.S. 388, 393 (2012).

As discussed in more detail above, the State's ability to conduct statewide elections in 2024 will be irreparably harmed absent a stay of this Court's injunction and Judgment. The Judgment

provides that the Secretary Howe and the Legislative Assembly may adopt a plan to remedy the violation of Section 2 by December 22, 2023—a deadline which is currently less than one month away and was only 35 days away when the Judgment was entered. This deadline is not feasible, as discussed above. Additionally, as also discussed above, the requirements and timeline laid out by the Court in its Judgment cannot be feasibly incorporated into the election timelines established in North Dakota law for the 2024 election cycle without causing confusion and hardship among candidates, voters, and election officials alike.

### (iii)  Plaintiffs and The Public Will Not be Harmed if the Court Grants the Stay and the Public Interest is Best Served by Granting the Stay

As discussed above, Plaintiffs will not be harmed by a stay of this Court's injunction pending appeal because they did not have a private right of action available to them to commence this lawsuit in the first place. Moreover, while this litigation has been underway, the November 2022 elections were already held using the challenged map, and Plaintiffs have made no showing they will be irreparably harmed by continuing to vote in accordance with the challenged map while this litigation is resolved on appeal.

Likewise, the public interest would be served by a stay of the Court's Judgment pending appeal. Like the candidates and election officials, voters and the general public have an obvious interest in the 2024 elections being properly administered without unnecessary confusion and hardship. The public interest is also served by ensuring that the redistricting maps enacted by the peoples' elected representatives receive meaningful appellate review before they are struck down and replaced by the decree of a federal court. *See Chapman v. Meier*, 420 U.S. 1, 27 (1975) ("reapportionment is primarily the duty and responsibility of the State through its legislature or other body, rather than of a federal court"); *see also*, *e.g., Toomey v. Arizona*, 2021 WL 4915370, *3 (D. Ariz. Oct. 21, 2021) ("The public interest is served in preserving the integrity of the right

to appellate review.") (citation omitted). And for the reasons discussed *supra*, significant confusion and hardship is likely to develop if a stay of this Court's injunction is not granted pending appeal and the legislative maps are not fixed in place by the January 1, 2024, starting date for candidates to begin petitioning to be on the ballots in their respective districts. The public interest therefore weighs in favor of staying this Court's injunction pending appeal and through the 2024 election. *See, e.g., Reynolds v. Sims*, 377 U.S. 533, 585 (1964) (even if a State's redistricting is ultimately held unlawful, "where an impending election is imminent and a State's election machinery is already in progress, equitable considerations might justify a court in withholding the granting of immediately effective relief in a legislative apportionment case").

## III.   CONCLUSION

For the reasons set forth above, the Secretary respectfully requests that the Court grant this motion for a stay of judgment pending appeal. The Secretary respectfully requests that the Court enter an order on this motion as soon as possible, but no later than **December 12, 2023**, so that, if the motion to stay is denied by this Court, a stay pending appeal may be sought from the Eighth Circuit ahead of the January 1, 2024, deadline for candidates to begin petitioning for signatures in their districts.

Dated this 4th day of December, 2023.

<div style="margin-left:40%;">

State of North Dakota
Drew H. Wrigley
Attorney General

By:___*/s/ David R. Phillips*_____
    David R. Phillips (ND Bar No. 06116)
    Special Assistant Attorney General
    dphillips@bgwattorneys.com
    300 West Century Avenue
    P.O. Box 4247
    Bismarck, ND 58502-4247
    Telephone: (701) 751-8188

</div>

Philip Axt (ND Bar No. 09585)
Solicitor General
Email: pjaxt@nd.gov
600 E. Boulevard Ave., Dept. 125
Bismarck, ND 58505
Telephone: (701) 328-2210

Counsel for Defendant Michael Howe, in his official capacity as Secretary of State of North Dakota

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing **BRIEF IN SUPPORT OF MOTION FOR STAY OF JUDGMENT PENDING APPEAL** was on the 4th day of December, 2023, filed electronically with the Clerk of Court through ECF:

Michael S. Carter
OK No. 31961
Matthew Campbell
NM No. 138207, CO No. 40808
Native American Rights Fund
1506 Broadway
Boulder, CO 80301
carter@narf.org
mcampbell@narf.org

Molly E. Danahy
DC Bar No. 1643411
Campaign Legal Center
1101 14th St. NW, Ste. 400
Washington, DC 20005
mdanahy@campaignlegal.org

Mark P. Gaber
DC Bar No. 98807
Campaign Legal Center
1101 14th St. NW, Ste. 400
Washington, DC 20005
mgaber@campaignlegal.org

Bryan L. Sells
GA No. 635562
The Law Office of Bryan L. Sells, LLC
PO BOX 5493

Atlanta, GA 31107-0493
bryan@bryansellslaw.com

Samantha Blencke Kelty
AZ No. 024110
TX No. 24085074
Native American Rights Fund
1514 P Street NW, Suite D
Washington, DC 20005
kelty@narf.org

Timothy Q. Purdon
ND No. 05392
ROBINS KAPLAN LLP
1207 West Divide Avenue, Suite 200
Bismarck, ND 58501
TPurdon@RobinsKaplan.com

Allison Neswood
Native American Rights Fund
250 Arapahoe Ave
Boulder, CO 80302
202-734-6449
neswood@narf.org

Phil Axt
Office of Attorney General
600 E. Boulevard Avenue, Dept. 125
Bismarck, ND 58502
pjaxt@nd.gov

Scott K. Porsborg
Austin T. Lafferty
Brian D. Schmidt
Smith Porsborg Schweigert Armstrong Moldenhauer & Smith
122 E. Broadway Avenue
P.O. Box 460
Bismarck, ND 58502-0460
701-258-0630
sporsborg@smithporsborg.com
alafferty@smithporsborg.com
bschmidt@smithporsborg.com

Victor J. Williamson
U.S. Department of Justice

950 Pennsylvania Avenue, NW
Room 7263 NWB
Washington, DC 20530
202-305-0036
victor.williamson@usdoj.gov

By: _____/s/ David R. Phillips_____
     DAVID R. PHILLIPS