**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NORTH DAKOTA**
**EASTERN DIVISION**

| | |
|---|---|
| TURTLE MOUNTAIN BAND OF CHIPPEWA INDIANS, et. al.,<br><br>Plaintiffs,<br><br>v.<br><br>MICHAEL HOWE, in his official capacity as Secretary of the State of North Dakota,<br><br>Defendant. | Civil No. 3:22-cv-00022 |

# MEMORANDUM OF LAW IN SUPPORT OF SECRETARY HOWE'S MOTION FOR JUDGMENT ON THE PLEADINGS PURSUANT TO FED. R. CIV. P. 12(c)

DREW H. WRIGLEY
Attorney General
State of North Dakota

DAVID H. THOMPSON
PETER A. PATTERSON
ATHANASIA O. LIVAS
Special Assistant Attorneys General
dthompson@cooperkirk.com
ppatterson@cooperkirk.com
alivas@cooperkirk.com
1523 New Hampshire Ave., N.W.
Washington, D.C. 20036

PHILIP AXT
Solicitor General
Office of Attorney General
600 E. Boulevard Ave., Dept. 125
Bismarck, ND 58505
(701) 328-3625
pjaxt@nd.gov

DAVID R. PHILLIPS
Special Assistant Attorney General
300 West Century Avenue
P.O. Box 4247
Bismarck, ND 58502
(701) 751-8188
dphillips@bgwattorneys.com

*Counsel for Michael Howe, in his official capacity as Secretary of State of North Dakota*

# **TABLE OF CONTENTS**

**PAGE**

TABLE OF AUTHORITIES .......... iii

INTRODUCTION AND SUMMARY OF ARGUMENT .......... 1

BACKGROUND .......... 2

I. North Dakota's Redistricting, Plaintiffs' Lawsuit, and Appeal to the Eighth Circuit .......... 2

II. The Supreme Court's *Callais* Decision and Remand .......... 4

STANDARD OF REVIEW .......... 7

ARGUMENT .......... 8

I. Plaintiffs Still Lack a Private Right of Action .......... 8

II. Plaintiffs Cannot Prevail on their Claims Under *Callais*. .......... 10

III. The Court's Remedial Order Must Now Be Dissolved .......... 13

CONCLUSION .......... 15

## TABLE OF AUTHORITIES

**Cases** **Page(s)**

*Abbott v. Perez*, 585 U.S. 579 (2018) .......... 14

*Ark. State Conf. NAACP v. Ark. Bd. of Apportionment*, 86 F.4th 1204 (8th Cir. 2023) .......... 9

*Ark. United v. Thurston*, 146 F.4th 673 (8th Cir. 2025) .......... 9

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) .......... 7

*Ashley Cnty. v. Pfizer, Inc.*, 552 F.3d 659 (8th Cir. 2009) .......... 7

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) .......... 7

*Cravens v. Smith*, 610 F.3d 1019 (8th Cir. 2010) .......... 8

*Dep't of Homeland Security v. D.V.D.*, 145 S.Ct. 2627 (2025) .......... 15

*Does v. Gillespie*, 867 F.3d 1034 (8th Cir. 2017) .......... 10

*Faibisch v. Univ. of Minn.*, 304 F.3d 797 (8th Cir. 2002) .......... 7

*Gonzaga Univ. v. Doe*, 536 U.S. 273 (2002) .......... 9

*Greenman v. Jessen*, 787 F.3d 882 (8th Cir. 2015) .......... 8

*Health & Hosp. Corp. of Marion Cnty. v. Talevski*, 599 U.S. 166 (2023) .......... 9

*Klett v. Pim*, 965 F.2d 587 (8th Cir. 1990) .......... 15

*Louisiana v. Callais*, 146 S.Ct. 1131 (2026) .......... *passim*

*Miller v. Johnson*, 515 U.S. 900 (1995) .......... 14

*Miller v. Redwood Toxicology Lab, Inc.*, 688 F.3d 928 (8th Cir. 2012) .......... 8

*Paulson v. Meier*, 232 F.Supp.183 (D.N.D. 1964) .......... 15

*Porous Media Corp. v. Pall Corp.*, 186 F.3d 1077 (8th Cir. 1999) .......... 8

*Rucho v. Common Cause*, 588 U.S. 684 (2019) .......... 6, 13

*Turtle Mountain Band of Chippewa Indians v. Howe*, 137 F.4th 710 (8th Cir. 2025) .......... 4, 9, 10

*Turtle Mountain Band of Chippewa Indians v. Howe*, 145 S.Ct. 2876 (2025) .......... 5

*Turtle Mountain Band of Chippewa Indians v. Howe*,
2025 WL 1833993 (8th Cir. July 3, 2025) ....................................................................4

*Turtle Mountain Band of Chippewa Indians v. Howe*,
2026 WL 1972750 (8th Cir. July 7, 2026) ................................................................1, 7

*Turtle Mountain Band v. Howe*, 224 L.Ed.2d 827 (2026) .......................................................4, 7, 9

*United States v. United Mine Workers of Am.*, 330 U.S. 258 (1947) ..........................................15

*Upham v. Seamon*, 456 U.S. 37 (1982)...........................................................................15

*Zean v. Fairview Health Servs.*, 858 F.3d 520 (8th Cir. 2017)...................................................8

**<u>Constitutions</u>**

U.S. CONST. amend. XIV ..........................................................................................5

U.S. CONST. amend. XV ..........................................................................................5, 10

N.D. CONST. art. IV, § 2..........................................................................................2

**<u>Statues and Rules</u>**

42 U.S.C. § 1983 ..........................................................................................*passim*

Fed. R. Civ. P. 12(c) ..........................................................................................7

Fed. R. Civ. P. 12(b)(6) ..........................................................................................7

HB 1504, 67th Leg., Reg. Sess. (N.D. 2021)..........................................................................2

**<u>Other Authorities</u>**

5B Wright & Miller, Federal Practice & Procedure § 1357 (3d ed. 2004).......................................8

## INTRODUCTION AND SUMMARY OF ARGUMENT

While this case was on appeal, the Supreme Court decided *Louisiana v. Callais*, 146 S.Ct. 1131 (2026). In that decision, the Supreme Court explained that Section 2 of the Voting Rights Act "imposes liability only when the evidence supports a *strong inference* that the State *intentionally* drew its districts to afford minority voters less opportunity because of their race." *Id.* at 1157 (emphasis added). The Supreme Court also explained that a plaintiff's illustrative maps "cannot use race as a districting criterion," and "must meet all the State's legitimate districting objectives" "just as well" as the State's enacted map. *Id.* at 1159. Plaintiffs must also "provide an analysis that controls for party affiliation," which is "critical for 'disentangl[ing] race and politics'" *id.* (citation omitted), and the totality of circumstances analysis must focus on "present-day intentional racial discrimination regarding voting," *id.* at 1160.

On July 07, 2026, the Eighth Circuit remanded to this Court, stating "[t]he district court ruled before *Callais* was decided, and … thus applied what is now an incorrect legal framework. Accordingly, we vacate the … judgment of November 17, 2023, and remand … for further proceedings in light of *Callais*." *Turtle Mountain Band of Chippewa Indians v. Howe*, 2026 WL 1972750, at *1 (8th Cir. July 7, 2026). Plaintiffs' claims are the basis for a remedial order that remains in effect (Dkt. 164), despite the finding of a Section 2 violation having been vacated.

The Secretary now respectfully asks that the Court dissolve the remedial order and dismiss Plaintiffs' lawsuit with prejudice for two independent reasons.

First, the Secretary renews the argument that neither the VRA itself nor 42 U.S.C. § 1983 provides a private right of action for claims of vote dilution under Section 2 of the VRA. The Eighth Circuit has already held as much, and *Callais* does not change the private right of action analysis. While the Eighth Circuit's opinion on the lack of a private right was vacated in light of

*Callais*, it remains persuasive authority on that point, and there is no reason to believe the Eighth Circuit would reach a different conclusion were the question to come before it again.

And second, even if the Court were to assume a private right of action under Section 1983, it is now manifestly obvious that Plaintiffs cannot state a viable claim under Section 2 of the VRA. First and foremost, Plaintiffs have not made any allegation capable of establishing a strong inference of intentional race discrimination; to the contrary, this Court has already found it to be "evident" that the Legislative Assembly "sought input from the Tribes" and believed that the as-enacted map "would comply with the VRA." Dkt. 125 at 38. Second, Plaintiffs allege the State violated the VRA because it purportedly "diluted" Native American voting strength by not joining the Turtle Mountain and Spirit Lake reservations into a single district, but there's no way to plausibly allege those reservations could be joined into a single district that controls for population parameters and still meets the State's legitimate districting criteria, such as compactness and partisan outcomes, "just as well" as the State's as-enacted map. And third, Plaintiffs offered no allegation or analysis that purports to control for party affiliation or otherwise makes any attempt whatsoever to disentangle race from politics. For any or all of those reasons, it is exceedingly apparent that Plaintiffs' claims—which they've now been litigating for years, and on which this Court already held a trial—are not viable under Section 2 of the VRA.

## BACKGROUND

### I. North Dakota's Redistricting, Plaintiffs' Lawsuit, and Appeal to the Eighth Circuit

Like many states, North Dakota's Legislative Assembly undertakes redistricting for its state legislative districts following each census. N.D. CONST. art. IV, § 2. And in 2021, the state legislative districts challenged in this litigation were enacted by the Legislative Assembly, with broad bipartisan support. *See* HB 1504, 67th Leg., Reg. Sess. (N.D. 2021).

After the 2020 census, the Turtle Mountain reservation no longer had the population to effectively constitute its own district. Canada lies to the north, so the Legislative Assembly's options during redistricting were to expand the district east, south, or west. The Legislative Assembly expanded that district eastwards, while also creating a sub-district that would effectively enable members of the Turtle Mountain Reservation to elect a delegate to the State House of Representatives. Plaintiffs then filed their lawsuit, alleging the 2021 redistricting map "diluted" Native American voting strength in violation of Section 2 because the Legislative Assembly did not create an elongated, dumbbell-shaped district that stretches diagonally across the state to join voters from the Turtle Mountain and Spirit Lake reservations into the same legislative district (and despite those different reservations never having been previously placed in the same legislative district in the entirety of North Dakota's history). *See* Dkt. 1 at ¶¶9, 49.

Plaintiffs asserted a private right of action through two methods: first, through an implied right of action under Section 2 itself, and second, through 42 U.S.C. § 1983. The Secretary moved to dismiss for lack of a private right of action. This court remarked that "[a]t first blush, the Secretary's argument" was "compelling," Dkt. 30 at 8, but nonetheless concluded that it believed Section 1983 provides a private right of action for vote dilution claims, *id.* at 9.

After denying the motion to dismiss, the Court held a bench trial in June of 2023, and, on November 17, 2023, entered an order enjoining the Secretary from "administering, enforcing, preparing for, or in any way permitting the nomination or election" of candidates in several districts. Dkt. 125 at 39. The Court found it was "evident" the Legislative Assembly "carefully examine[d] the VRA and believed" the enacted map would comply with the VRA, but believed the State did not "go far enough." *Id.* at 38. The Court declined to make a finding whether Plaintiffs' illustrative maps were based on race, stating: "even assuming race was the predominate

motivating factor in drawing the districts, establishing (and then remedying) a Section 2 violation provides a compelling justification for adopting one of the proposed plans." *Id.* at 20 n.3; *contra Callais*, 146 S.Ct. at 1159. And the Court treated as immaterial that the State's map "better reflects traditional redistricting criteria than the Tribes' proposed districts," based on a belief that Section 2 claims are "not defeated simply because the challenged plan performs better on certain traditional redistricting criteria." Dkt. 125 at 17-18; *contra Callais*, 146 S.Ct. at 1159.

The Court's November 17, 2023, order gave the Secretary and Legislative Assembly until December 22 to adopt a remedial plan. Dkt. 125 at 39. And on January 8, the Court denied the Secretary's motion for a stay pending appeal (wherein he explained the Secretary lacks constitutional authority to propose modifications of the legislative map, *see* Dkt. 132 at 16-17), denied the Legislative Assembly's request for an extension of time to adopt a remedial plan, and imposed one of Plaintiffs' illustrative districts as a remedial map. Dkt. 164 at 3. The Secretary complied with the Court's remedial order for the 2024 elections, while appealing both the merits of this Court's Section 2 decision and the private right of action decision.

In May of 2025, the Eighth Circuit reversed and vacated this court's judgment on the private right of action question, holding that Section 2 of the VRA does not clearly reflect the kind of unambiguous intent to create individual rights that would be necessary for such claims to be privately enforceable under Section 1983. *Turtle Mountain Band of Chippewa Indians v. Howe*, 137 F.4th 710, 721 (8th Cir. 2025), *cert. granted, judgment vacated*, 224 L.Ed. 2d 827 (2026). And by a vote of 7-3, the Eighth Circuit denied rehearing en banc. *Turtle Mountain Band of Chippewa Indians v. Howe*, 2025 WL 1833993, at *1 (8th Cir. July 3, 2025).

## II. The Supreme Court's *Callais* Decision and Remand

Plaintiffs petitioned the Supreme Court for review and requested a stay of the Eighth

Circuit's mandate, and six justices of that Court entered an unexplained order staying the Eighth Circuit's mandate pending certiorari review. *Turtle Mountain Band of Chippewa Indians v. Howe*, 145 S.Ct. 2876, 2877 (2025). Justices Thomas, Alito, and Gorsuch would have denied Plaintiffs' request for a stay. *Id*. Plaintiffs' certiorari petition was then held by the Supreme Court (along with VRA challenges from several other States) while it considered *Callais*.

On April 29, 2026, the Supreme Court issued its opinion in *Callais*, addressing whether Louisiana's racially motivated creation of a majority-minority congressional district to cure a previous finding of a Section 2 violation itself violated the Fourteenth or Fifteenth Amendments to the U.S. Constitution. Various "problems in the existing body of § 2 case law" "convinced [the Court] that the time had come to resolve whether compliance with the Voting Rights Act can indeed provide a compelling reason for race-based districting." *Callais*, 146 S.Ct. at 1143. The Court concluded that "[c]ompliance with § 2, *as properly construed*, can provide such a reason," *id.* (emphasis in original), but "correctly understood, § 2 does not impose liability at odds with the Constitution, and it should not have imposed liability on Louisiana for its 2022 map," *id.*

As the Supreme Court explained, Section 2 "imposes liability only when the evidence supports a strong inference that the State intentionally drew its districts to afford minority voters less opportunity because of their race. Not only does this interpretation follow from the plain text of § 2, but it is consistent with the limited authority that the Fifteenth Amendment confers." *Id.* at 1157. By contrast, "a law that seeks to enforce the Fifteenth Amendment by prohibiting mere disparate impact would fail to enforce a right that the Amendment secures." *Id.* at 1155. "For this reason, the focus of § 2 must be enforcement of the Fifteenth Amendment's prohibition on *intentional* racial discrimination." *Id.* (emphasis in original). Only "[w]hen § 2 is properly interpreted in the way we have outlined," the Supreme Court explained, is it "sufficiently

congruent with and proportional to the Amendment's prohibition." *Id.*

Related to that, the Supreme Court explained that a Section 2 plaintiff must be able to proffer illustrative maps that satisfy *all* of a state's legitimate districting goals—including compactness and partisan outcomes—"just as well" as the State's enacted map. *Id.* at 1159. If those proffered illustrative maps do not perform "just as well" as the State's enacted map, they necessarily "fail to demonstrate that the State's chosen map was driven by racial considerations rather than permissible aims." *Id*. Additionally, the Supreme Court explained that "in drawing illustrative maps, plaintiffs cannot use race as a districting criterion." *Id*. After all, "[i]f a plaintiff can produce an additional majority-minority district only by using race—a process that would be unconstitutional if a State engaged in such mapmaking …—that illustrative map sheds no light on whether the State acted unconstitutionally by *not* adopting such a map." *Id.* "Thus, an illustrative map in which race was used has no value in proving a § 2 plaintiff's case." *Id.*

Finally, the Supreme Court explained that Section 2 plaintiffs must disentangle allegations of racially discriminatory voting practices from partisan voting patterns. "[L]itigants cannot ... dress[] their political-gerrymandering claims in racial garb." *Id.* at 1158. The Court explained that "[i]mposing liability 'based on the racial effects of a political gerrymander in a jurisdiction in which race and partisan preference are very closely correlated ... would, if accepted, provide a convenient way … to sidestep our holding in *Rucho* that partisan-gerrymandering claims are not justiciable in federal court.'" *Id.* (citation omitted). And courts cannot allow litigants to "exploit § 2 for partisan purposes by 'repackag[ing] a partisan-gerrymandering claim as a racial-gerrymandering claim.'" *Id.* (citation omitted). Consequently, in order to state a viable Section 2 claims, plaintiffs "must provide an analysis that controls for party affiliation." *Id.* at 1159.

After it issued the *Callais* decision, the Supreme Court granted, vacated, and remanded this

case for further proceedings in light of that opinion. *See Turtle Mountain Band v. Howe*, 224 L.Ed.2d 827 (2026) ("The judgment is vacated, and the case is remanded to … the Eighth Circuit for further consideration in light of *Louisiana v. Callais*, 608 U. S. ___ (2026).").

The Eighth Circuit, in turn, remanded the case back to this Court. *Turtle Mountain Band of Chippewa Indians v. Howe*, 2026 WL 1972750, at *1 (8th Cir. July 7, 2026) ("The district court ruled before *Callais* was decided, and the court thus applied what is now an incorrect legal framework. Accordingly, we vacate the district court's judgment of November 17, 2023, and remand the case for further proceedings in light of *Callais*.").

On July 22, 2026, the Secretary submitted a proposed briefing schedule to address the viability of Plaintiffs' claims post-*Callais*, as well as Plaintiffs' contention that they should be permitted to file an amended complaint at this extremely late stage. *See* Dkt. 181. As of the time of this filing, the Court has not entered an order governing post-remand proceedings.

## **STANDARD OF REVIEW**

"Judgment on the pleadings is appropriate where no material issue of fact remains to be resolved and the movant is entitled to judgment as a matter of law." *Faibisch v. Univ. of Minn.*, 304 F.3d 797, 803 (8th Cir. 2002) (citation omitted). "After the pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings." Fed. R. Civ. P. 12(c). The standard for judgment on the pleadings is the same as a motion to dismiss under Rule 12(b)(6). *Ashley Cnty. v. Pfizer, Inc.*, 552 F.3d 659, 665 (8th Cir. 2009).

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is plausible where its factual content creates a "reasonable inference that the defendant is liable for

the misconduct alleged." *Id.* "[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions"; courts "are not bound to accept as true a legal conclusion couched as a factual allegation." *Id.* (citation omitted).

In resolving a motion to dismiss or motion for judgment on the pleadings, courts may consider, in addition to the pleadings, "materials that are part of the public record or do not contradict the complaint," as well as materials "necessarily embraced by the pleadings." *Greenman v. Jessen*, 787 F.3d 882, 887 (8th Cir. 2015) (quoting *Porous Media Corp. v. Pall Corp.*, 186 F.3d 1077, 1079 (8th Cir. 1999)). "Stated more comprehensively," courts may consider "matters incorporated by reference or integral to the claim, items subject to judicial notice, matters of public record, orders, [and] items appearing in the record of the case." *Zean v. Fairview Health Servs.*, 858 F.3d 520, 526 (8th Cir. 2017) (quoting *Miller v. Redwood Toxicology Lab, Inc.*, 688 F.3d 928, 931 n.3 (8th Cir. 2012), quoting in turn 5B Wright & Miller, Federal Practice & Procedure § 1357 (3d ed. 2004)). A court may "take judicial notice of prior orders entered in the case." *Cravens v. Smith*, 610 F.3d 1019, 1029 (8th Cir. 2010) (citation omitted)

## **ARGUMENT**

### **I. Plaintiffs Still Lack a Private Right of Action**

As a threshold matter, this lawsuit should be dismissed because the Eighth Circuit has held that Plaintiffs lack a private right of action under 42 U.S.C. § 1983 to allege claims of "vote dilution" under Section 2 of the VRA. Although the Eighth Circuit's opinion was vacated for reconsideration in light of *Callais*, that opinion remains a strongly persuasive authority in this Circuit. *Callais* did not address the private right of action question, and there is no reason to believe that the Eighth Circuit would reach a contrary conclusion were the question to come before it again, especially given that en banc rehearing was denied by a vote of 7-3.

Moreover, it remains binding law in this Circuit that Section 2 itself is not enforceable through an implied right of action. *See Ark. State Conf. NAACP v. Ark. Bd. of Apportionment*, 86 F.4th 1204 (8th Cir. 2023). And that decision on the lack of an implied right of action, which remains in effect, was foundational to the holding that Section 2 cannot be privately enforced through Section 1983 either. Indeed, the Eighth Circuit stated on appeal in this case: "It is … unnecessary to undertake an independent analysis of *Gonzaga*'s first step given that *Arkansas State Conference* has already decided the issue. We need only recite and elaborate upon our decision there." *Turtle Mountain Band of Chippewa Indians v. Howe*, 137 F.4th 710, 718 (8th Cir. 2025), *cert. granted, judgment vacated*, 224 L.Ed. 2d 827 (2026).[1]

Section 1983 does not make all federal laws privately enforceable in court. Instead, the Supreme Court has "crafted a test for determining whether a particular federal law actually secures rights for § 1983 purposes." *Health & Hosp. Corp. of Marion Cnty. v. Talevski*, 599 U.S. 166, 175 (2023). And applying that test to this case, the Eighth Circuit held that Plaintiffs failed to overcome the "significant hurdle" of demonstrating Section 2's prohibition on vote dilution "unambiguously" creates an individual right that is enforceable under Section 1983. *Turtle Mountain*, 137 F.4th at 717 (quoting *Talevski*, 599 U.S. at 186); *see also Gonzaga Univ. v. Doe*, 536 U.S. 273, 280 (2002) (Congress must speak with a "clear voice" that indicates an "unambiguous" intent to confer individual rights). And where, as here, "structural elements of the statute and language in a discrete subsection give mixed signals about legislative intent, Congress has not spoken—as required by *Gonzaga*—with a clear voice that manifests an

[1] Since issuing its decision on the appeal in this case, the Eighth Circuit has continued to re-affirm its position that private enforceability for provisions of the VRA is not to be inferred absent clear congressional intent to that effect. *See Ark. United v. Thurston*, 146 F.4th 673, 676 (8th Cir. 2025) (holding that Section 208 of the VRA is not privately enforceable).

unambiguous intent to confer individual rights." *Turtle Mountain*, 137 F.4th at 720 (quoting *Does v. Gillespie*, 867 F.3d 1034, 1043 (8th Cir. 2017)).

For the same reasons as before, and because nothing in *Callais* changes the private enforceability analysis, Plaintiffs' lawsuit should be dismissed for lack of a cause of action.

## II. Plaintiffs Cannot Prevail on their Claims Under *Callais*.

Even if this Court were to assume that Section 1983 provides a private right of action, it is now manifestly clear that Plaintiffs cannot prevail on the merits of their Section 2 claim.

As noted *supra*, the Supreme Court explained in *Callais* that Section 2 of the VRA "imposes liability only when the evidence supports a strong inference that the State *intentionally* drew its districts to afford minority voters less opportunity because of their race." 146 S.Ct. at 1157 (emphasis added). To succeed on a Section 2 claim, a plaintiff's illustrative maps "cannot use race as a districting criterion," and they "must meet all the State's legitimate districting objectives" "just as well" as the State's enacted map. *Id.* at 1159. Plaintiffs must also "provide an analysis that controls for party affiliation," which is "critical for 'disentangl[ing] race and politics.'" *Id.* (citation omitted). And the totality of circumstances analysis must focus on "present-day intentional racial discrimination regarding voting." *Id.* at 1160.

More broadly, "a law that seeks to enforce the Fifteenth Amendment by prohibiting mere disparate impact would fail to enforce a right that the Amendment secures. That is never 'appropriate,' … because Congress cannot 'enforce a constitutional right by changing what the right is.'" *Id.* at 1155 (citations omitted). "For this reason, the focus of § 2 must be enforcement of the Fifteenth Amendment's prohibition on *intentional* racial discrimination." *Id.* (emphasis original). "Only when understood this way does § 2 of the Voting Rights Act properly fit within Congress's Fifteenth Amendment enforcement power." *Id.* "In short, § 2 imposes liability only

when the evidence supports a strong inference that the State *intentionally* drew its districts to afford minority voters less opportunity because of their race." *Id.* at 1157 (emphasis added).

In light of *Callais*'s clarifications regarding the applicable legal standard, Plaintiffs' claims under Section 2 of the VRA are not viable for at least three different reasons.

**1. No Inference of Intentional Discrimination**. Foremost, Plaintiffs' Complaint is devoid of *any* allegation that the North Dakota Legislative Assembly intended to discriminate on the basis of race when enacting the challenged map. *See generally* Dkt. 1 (Complaint); Dkt. 44 (Supplemental Complaint). Nor *could* Plaintiffs now plausibly make any such allegation in this case—even with further factfinding or if granted leave to amend their complaint.

As this Court already determined after overseeing extensive proceedings and holding a bench trial, it is "*evident*" that the Legislative Assembly "carefully examine[d] the VRA and believed" the duly enacted map "would comply with the VRA." Dkt. 125 at 38 (emphasis added); *see also id.* at 36 (finding "no evidence that the Secretary used the 2021 redistricting plan to enhance the opportunity of discrimination against Native Americans"); *id.* at 37 ("the record establishes that the Secretary and the Legislative Assembly were intensely concerned with complying with the VRA … The justification … for the 2021 redistricting plan is not tenuous."). That is the polar opposite of what *Callais* requires for establishing a Section 2 claim, that Section 2 claims may only be viable where "the evidence supports a *strong inference* that the State *intentionally* drew its districts to afford minority voters less opportunity because of their race." *Callais*, 146 S.Ct. at 1157 (emphasis added). The Court's previous findings concerning the lack of discriminatory intent on the part of the State squarely foreclose any viable Section 2 claim and require the dismissal of Plaintiffs' Section 2 claims by themselves.

**2. No Sacrificing Traditional Districting Criteria**. Plaintiffs' Section 2 claims are also

non-viable for the separate and independent reason their entire theory of the case is that the State "diluted" Native American voting strength because it declined to create an elongated district that stretches diagonally across the state to join voters from the Turtle Mountain and Spirit Lake reservations into an entirely new legislative district. *See* Dkt. 1 at ¶¶9, 49.

However, the Supreme Court has now explained that to state a viable Section 2 claim plaintiffs must be able to proffer alternative districts that "meet all the State's legitimate districting objectives" "just as well" as the State's enacted map. *Callais*, 146 S.Ct at 1159. But as already established in these proceedings, an alternative map that joins both tribal reservations into a single district while still controlling for population parameters would necessarily require sacrificing on traditional districting criteria, including compactness and partisan outcomes. Indeed, this Court previously noted the State's as-enacted map "better reflects traditional redistricting criteria than the Tribes' proposed districts," but concluded that point was non-determinative based on a belief that Section 2 claims are "not defeated simply because the challenged plan performs better on certain traditional redistricting criteria." Dkt. 125 at 17-18. The Supreme Court has now clarified that was an incorrect conclusion. *Callais*, 146 S.Ct. at 1159. That is a second and independent reason that Plaintiffs' Section 2 claims necessarily fail on the merits.

**3. No Attempt to Disaggregate Partisanship from Race**. Plaintiffs' Section 2 claims are also non-viable for a third independent reason: their Complaint offers no allegation or analysis that purports to control for party affiliation or otherwise make any attempt to disentangle race from partisanship. *See generally* Dkt. 1 (Complaint); Dkt. 44 (Supplemental Complaint).

As the Supreme Court explained in *Callais*, Section 2 plaintiffs must "provide an analysis that controls for party affiliation," which is "critical for 'disentangl[ing] race and politics.'" *Callais*, 146 S.Ct. at 1159 (citation omitted). Not requiring Section 2 plaintiffs to make such a

showing would allow them to "exploit § 2 for partisan purposes by 'repackag[ing] a partisan-gerrymandering claim as a racial-gerrymandering claim," and "sidestep [the Supreme Court's] holding in *Rucho* that partisan-gerrymandering claims are not justiciable in federal court." *Id.* at 1158 (citations omitted). This Court's prior order on Section 2 liability did not attempt to disaggregate race from partisan preference, yet its analysis of racially polarized voting reveals that the "Native American preferred candidates" considered were universally the candidates of the Democratic party (or independents running against the candidate of the Republican party). *See* Dkt. 125 at 23-29. As such, Plaintiffs' inability to disentangle race from partisan voting patterns is a third independent reason that their claims necessarily fail on the merits.

## III. The Court's Remedial Order Must Now Be Dissolved

Plaintiffs have indicated that they intend to oppose dismissal not by defending the viability of the claims that they've now been litigating against the State for years, and on which this Court already held a trial, but by instead requesting leave to file an amended complaint that will assert new or reconstituted claims. *See* Dkt. 184. The Secretary opposes any request by Plaintiffs to file an amended complaint at this extremely late hour, and will respond to any such motion in due course if Plaintiffs do indeed move for leave to amend their claims. However, even if the Court were to grant Plaintiffs leave to file such an amended complaint, the Court must vacate the remedial order that was imposed based on Plaintiffs' current claims.

That remedial order is based on a finding of Section 2 liability that has now been vacated, Dkt. 179, and upon arguments and conclusions that the Supreme Court has clarified are not sufficient to establish a Section 2 violation. *Compare, e.g.*, *Callais*, 146 S.Ct. at 1157 (requiring evidence that establishes a strong inference of intentional discrimination) *with* Dkt. 125 at 38-39 (finding a Section 2 violation despite finding the State did not intentionally discriminate); *compare*

*Callais*, 146 S.Ct. at 1159 (requiring Plaintiffs' illustrative maps to achieve the State's legitimate districting criteria "just as well" as the enacted map) *with* Dkt. 125 at 17-18 (finding a Section 2 violation despite noting Plaintiffs' illustrative districts did not perform as well on certain legitimate districting criteria); *compare Callais*, 146 S.Ct. at 1159 (requiring that Plaintiffs' illustrative maps not be drawn considering race) *with* Dkt. 125 at 38-39 (finding a Section 2 violation while assuming it irrelevant whether Plaintiffs' illustrative maps were drawn based on race); and *compare Callais*, 146 S.Ct. at 1158-59 (requiring an analysis that disentangles race from partisan preferences) *with* Dkt. 125 at 38-39 (finding a Section 2 violation without any attempt to disentangle race from partisan preferences). That should now be corrected.

"Redistricting 'is primarily the duty and responsibility of the State,' and '[f]ederal-court review of districting legislation represents a serious intrusion on the most vital of local functions.'" *Abbott v. Perez*, 585 U.S. 579, 603 (2018) (quoting *Miller v. Johnson*, 515 U.S. 900, 915 (1995)). In *Callais*, the Supreme Court concluded that: "[c]orrectly understood, § 2 does not impose liability at odds with the Constitution, and it should not have imposed liability on Louisiana for its 2022 map." 146 S. Ct. at 1143. The same is true here. These proceedings have been ongoing for years, including a bench trial and an appeal up to the Supreme Court. All the while, the State has lacked finality over its election map and it has been forced to hold elections under a map that is contrary to what was enacted by the people's representatives.

The time has come for this case to come to an end. Supreme Court precedent now conclusively establishes that North Dakota's 2021 election map should not have been found in violation of Section 2 based on Plaintiffs' claims, and this case should be promptly dismissed. But even if the Court were to allow this litigation to live on through an amended complaint that asserts new or reconstituted claims, the remedial order based on Plaintiffs' current claims must be

dissolved. *See, e.g.*, *Klett v. Pim*, 965 F.2d 587, 590 (8th Cir. 1990) ("The right to remedial relief falls with an injunction which events prove was erroneously issued ….") (quoting *United States v. United Mine Workers of Am.*, 330 U.S. 258, 295 (1947)); *Dep't of Homeland Security v. D.V.D.*, 145 S.Ct. 2627, 2629 (2025) (a "remedial order cannot [] be used to enforce an injunction that [a Supreme Court] [decision] rendered unenforceable").[2]

## **CONCLUSION**

Plaintiffs' lawsuit should be dismissed with prejudice because they do not and cannot state a viable claim under Section 2 of the Voting Rights Act, and because they also lack a private right of action to bring their claims in the first place. But even if Plaintiffs were to be granted leave to file an amended complaint that asserts new or reconstituted claims, the remedial order imposed on the State based on their current claims must now be dissolved.

Dated August 7, 2026.

DREW H. WRIGLEY
Attorney General
State of North Dakota

*/s/ Philip Axt*
PHILIP AXT
Solicitor General

DAVID H. THOMPSON
PETER A. PATTERSON

---

[2] As the Secretary has consistently maintained throughout the life of this litigation, administering statewide elections fairly and transparently means that the underlying election map must be fixed with finality by the January 1 preceding an election year. *See* Dkt. 132 at 3; *see also, e.g.*, Br. in Opp'n, *Turtle Mountain Band v. Howe*, U.S. No. 25-253 (Sep. 19, 2025), at 2, 34. For the 2026 elections, that deadline has long passed, and primary elections have already been held under the court-imposed remedial map. Consequently, even if the remedial order is now dissolved, the Secretary intends to proceed with the 2026 general elections using the court-imposed remedial map unless directed to act otherwise by a duly enacted law or a judicial order. *Cf., e.g.*, *Upham v. Seamon*, 456 U.S. 37, 44 (1982) (even where a federal court improperly imposes an election map, administering a fast-approaching election may require "allow[ing] the election to go forward in accordance with the [improper, court-imposed] schedule"); *Paulson v. Meier*, 232 F.Supp.183, 187-88 (D.N.D. 1964) (directing that an upcoming election be conducted under an unconstitutional and unlawful map because "reasonable and adequate time is not now available … [to] formulate a redistricting and reapportioning plan" for the upcoming general elections).

ATHANASIA O. LIVAS
Special Assistant Attorneys General
dthompson@cooperkirk.com
ppatterson@cooperkirk.com
alivas@cooperkirk.com
1523 New Hampshire Ave., N.W.
Washington, D.C. 20036

Office of Attorney General
600 E. Boulevard Ave., Dept. 125
Bismarck, ND 58505
(701) 328-3625
pjaxt@nd.gov

DAVID R. PHILLIPS
Special Assistant Attorney General
300 West Century Avenue
P.O. Box 4247
Bismarck, ND 58502
(701) 751-8188
dphillips@bgwattorneys.com

*Counsel for Michael Howe, in his official capacity as Secretary of State of North Dakota*

**CERTIFICATE OF SERVICE**

I certify that the foregoing was served on all counsel of record via the Court's CM/ECF system.

/s/ *David R. Phillips*
David R. Phillips

*Counsel for Michael Howe, in his official capacity as Secretary of State of North Dakota*